Nos. 25-1049, 25-1272

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

OCCIDENTAL CHEMICAL CORPORATION,

*Intervenor-Appellant.*

NOKIA OF AMERICA CORPORATION,

*Intervenor-Appellant,*

v.

ALDEN LEEDS INC., et al.,

*Defendants-Appellees.*

On Appeal from the U.S. District Court for the District of New Jersey

## BRIEF FOR INTERVENOR-APPELLANT
## OCCIDENTAL CHEMICAL CORPORATION

KATHY D. PATRICK
ANN T. LEBECK
NICK J. BEACHY
GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 751-5253
kpatrick@gibbsbruns.com

*(additional counsel
on inside cover)*

PAUL D. CLEMENT
ERIN E. MURPHY
C. HARKER RHODES IV
JOSEPH J. DEMOTT
PHILIP HAMMERSLEY*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Occidental Chemical Corp.*

July 28, 2025

JOHN J. MCDERMOTT
LAUREN KROHN WILD
MCDERMOTT WILD LLC
900 Haddon Avenue, Suite 233
Collingswood, NJ 08018
(856) 746-7962
jmcdermott@mcdermottwild.com

LARRY SILVER
LANGSAM STEVENS SILVER &
    HOLLAENDER LLP
1818 Market St., Suite 2430
Philadelphia, Pennsylvania 19103
 (215) 732-3255
lsilver@lssh-law.com

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Occidental Chemical Corporation hereby certifies that its ultimate parent corporation is Occidental Petroleum Corporation, a Delaware corporation. Berkshire Hathaway Inc. indirectly owns 10% or more of the issued and outstanding shares of common stock of Occidental Petroleum Corporation. No other publicly traded company owns more than 10% of the common stock of Occidental Petroleum Corporation.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES........................................................................... v

INTRODUCTION ....................................................................................... 1

JURISDICTION.......................................................................................... 4

STATEMENT OF THE ISSUES ................................................................. 5

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................. 5

STATEMENT OF THE CASE..................................................................... 5

    A.    Legal Background ...................................................................... 5

    B.    Factual Background.................................................................. 10

        1.    The Passaic River has suffered from major pollution for more than a century ............................................ 10

        2.    EPA initiates a massive remediation effort .............................. 14

        3.    EPA commissions David Batson to conduct a nonbinding allocation of responsibility ................................... 15

        4.    Batson assigns virtually all liability to OxyChem .................. 19

    C.    Procedural History.................................................................. 23

        1.    EPA uses the Batson Allocation as the foundation for a proposed settlement ................................................ 23

        2.    EPA files suit and lodges a proposed consent decree ............. 24

        3.    The district court enters the consent decree............................ 26

SUMMARY OF ARGUMENT..................................................................... 26

STANDARDS OF REVIEW ....................................................................... 30

ARGUMENT ............................................................................................ 31

I.    The Consent Decree Must Be Vacated Because EPA Failed To Comply With The Procedural Requirements Of CERCLA §122 ................. 31

    A.    EPA Violated §122 Several Times Over ............................................ 31

        1.    EPA flouted §122(e)(3)'s restrictions on the preparation and use of non-binding preliminary allocations of responsibility ....................................... 31

        2.    EPA flouted §122(f)'s limitations on covenants not to sue ............................................................................. 36

    B.    EPA Cannot Evade §122 by Invoking the Attorney General's Inherent Settlement Authority ............................................. 38

II.    The Consent Decree Is Not Substantively Fair, Reasonable, And Consistent With CERCLA's Goals ................................................. 43

    A.    The District Court Failed to Meaningfully Review the Substantive Flaws in the Consent Decree .......................................... 44

    B.    The Consent Decree Grossly Underestimated the Settling Defendants' Share of Responsibility for Polluting OU2 .................... 47

        1.    Batson's bedrock conclusion that OxyChem should bear more than 99.9% of the responsibility for cleaning up the Passaic is unsustainable ................................................. 48

        2.    EPA's modest "adjustments" to Batson's work come nowhere close to remedying its fundamental flaws ................. 55

    C.    The Consent Decree Arbitrarily Releases the Settling Parties From Liability for OU4 Based on a Study That Considered Only OU2 ....................................................... 57

    D.    The Consent Decree Contravenes CERCLA's Goals and the Public Interest .......................................................... 59

CONCLUSION ..................................................... 61

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE WITH WORD COUNT

IDENTICAL PDF AND HARD COPY CERTIFICATE

VIRUS SCAN CERTIFICATE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021).........................................................38

*Atl. Richfield Co. v. Christian*,
  590 U.S. 1 (2020)............................................................6

*Beazer E., Inc. v. Mead Corp.*,
  412 F.3d 429 (3d Cir. 2005).............................................9

*BP P.L.C. v. Mayor & City Council of Balt.*,
  141 S. Ct. 1532 (2021)...................................................38

*Conservation Nw. v. Sherman*,
  715 F.3d 1181 (9th Cir. 2013).........................................37

*Cornelius v. CVS Pharmacy Inc.*,
  133 F.4th 240 (3d Cir. 2025)...........................................47

*Encino Motorcars, LLC v. Navarro*,
  584 U.S. 79 (2018)........................................................38

*Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*,
  3 F.3d 759 (4th Cir. 1993)..............................................39

*Fed. Election Comm'n v. Cruz*,
  596 U.S. 289 (2022)......................................................35

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*,
  535 U.S. 743 (2002)......................................................35

*Girsh v. Jepson*,
  521 F.2d 153 (3d Cir. 1975)............................................46

*Gov't Emps. Ret. Sys. of Virgin Islands v. Gov't of Virgin Islands*,
  995 F.3d 66 (3d Cir. 2021)..............................................30

*In re Tutu Water Wells CERCLA Litig.*,
  326 F.3d 201 (3d Cir. 2003)...................................... *passim*

*Key Tronic Corp. v. United States*,
   511 U. S. 809 (1994) ................................................................5

*Loc. No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
   478 U.S. 501 (1986) ...............................................................37

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ...............................................................35

*Ohio v. EPA*,
   603 U.S. 279 (2024) ...............................................................46

*Pub. Serv. Elec. & Gas Co. v. Cooper Indus., LLC*,
   678 F.Supp.3d 611 (D.N.J. 2023) .........................................55

*Sekhar v. United States*,
   570 U.S. 729 (2013) ...............................................................43

*Shoshone Bannock Tribes v. Reno*,
   56 F.3d 1476 (D.C. Cir. 1995) ..............................................40

*Trinity Indus., Inc. v. Greenlease Holding Co.*,
   903 F.3d 333 (3d Cir. 2018) ..................................................48

*United States v. Akzo Coatings of Am., Inc.*,
   949 F.2d 1409 (6th Cir. 1991) ...............................................44

*United States v. Alcan Aluminum Corp.*,
   964 F.2d 252 (3d Cir. 1992) ..................................................38

*United States v. Atl. Rsch. Corp.*,
   551 U.S. 128 (2007) ........................................................... 6, 43

*United States v. BP Amoco Oil PLC*,
   277 F.3d 1012 (8th Cir. 2002) ........................................ 42, 45

*United States v. Carpenter*,
   526 F.3d 1237 (9th Cir. 2008) ...............................................40

*United States v. E.I. Dupont De Nemours & Co.*,
   432 F.3d 161 (3d Cir. 2005) ....................................................6

*United States v. Hercules*,
   961 F.2d 796 (8th Cir. 1992) .................................................. 40, 41, 42

*United States v. Johnson*,
   388 F.3d 96 (3d Cir. 2004) ...............................................................47

*United States v. Montrose Chem. Corp. of Cal.*,
   50 F.3d 741 (9th Cir. 1995) ..............................................................45

*United States v. Rose*,
   538 F.3d 175 (3d Cir. 2008) ..............................................................35

*United States v. S. Jersey Clothing Store*,
   976 F.Supp.2d 577 (D.N.J. 2013) ......................................................39

*United States v. Se. Penn. Transp. Auth.*,
   235 F.3d 817 (3d Cir. 2000) ......................................................... 8, 58

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001).........................................................................36

**Statutes**

5 U.S.C. §553 ....................................................................................27

26 U.S.C. §9507 ..................................................................................6

42 U.S.C. §9604(a) ..............................................................................6

42 U.S.C. §9606 ..................................................................................6

42 U.S.C. §9606(a) ..............................................................................6

42 U.S.C. §9607(a)(4) ..........................................................................6

42 U.S.C. §9611(a)(1) ..........................................................................6

42 U.S.C. §9613(f) ..............................................................................17

42 U.S.C. §9613(f)(1) ...........................................................................9

42 U.S.C. §9613(f)(2) ...........................................................................7

42 U.S.C. §9622(b)(1)...........................................................................7

42 U.S.C. §9622(c)(1) ................................................................ 41, 42, 46

42 U.S.C. §9622(d) ........................................................................ 7, 40

42 U.S.C. §9622(d)(1) ...................................................................... 8, 46

42 U.S.C. §9622(d)(2) .........................................................................8

42 U.S.C. §9622(e)(1) ..........................................................................9

42 U.S.C. §9622(e)(2) ..........................................................................9

42 U.S.C. §9622(e)(3) ................................................................... *passim*

42 U.S.C. §9622(f) ............................................................................40

42 U.S.C. §9622(f)(1) .................................................................... 36, 41

42 U.S.C. §9622(f)(3) ........................................................................36

42 U.S.C. §9622(f)(4) ........................................................................41

42 U.S.C. §9622(g) .............................................................................7

42 U.S.C. §9622(g)(1) ..........................................................................8

42 U.S.C. §9622(g)(4) ..................................................................... 8, 46

42 U.S.C. §9622(h) .............................................................................7

42 U.S.C. §9622(*i*) ......................................................................... 8, 40

42 U.S.C. §9622(*i*)(1) .........................................................................8

42 U.S.C. §9622(m) ...........................................................................46

**Regulations**

52 Fed. Reg. 19,919 (May 28, 1987) .......................................................32

87 Fed. Reg. 78,710 (Dec. 22, 2022) ..................................................... 39

**Other Authorities**

H.R. Rep. No. 99-962 (1986) (Conf. Rep.) .................................... 9, 31, 32

H.R. 1300, 106th Cong. (1999)......................................................................9

Barry S. Neuman, *No Way Out: The Plight of the Superfund
   Nonsettlor*, 20 Envtl. L. Rep. 10,295 (1990) .......................................7

S. 1834, 103d Cong. (1994) .......................................................................9

**INTRODUCTION**

For well over a century, thousands of companies and local governments discharged vast quantities of toxic chemicals into the Passaic River, so much so that the United States declared its aquatic life destroyed by 1926. Today, the river contains staggering amounts of contamination: more than 3 million kilograms of lead, 2 million kilograms of copper, 400,000 kilograms of polycyclic aromatic hydrocarbons ("PAHs"), 42,000 kilograms of mercury, 26,000 kilograms of polychlorinated biphenyls ("PCBs"), 38 kilograms of dioxins, and more. The Environmental Protection Agency ("EPA") estimates that the latest efforts to clean up the Passaic—which are not the first and will not be last—will cost $1.84 billion dollars, making this one of the most expensive cleanups in the history of the Comprehensive Environmental Cleanup, Response, Compensation, and Liability Act ("CERCLA").

Appellant Occidental Chemical Corporation ("OxyChem") is a corporate successor to the now-defunct Diamond Alkali Company, which manufactured pesticides and herbicides at a facility on the lower half of the Passaic from the 1940s through the 1960s. Diamond Alkali did not begin operating there until more than a decade *after* the river's aquatic life was declared destroyed, and it contributed little, if any, of most of the contaminants that decimated the Passaic. But Diamond Alkali was a significant dioxin contributor, so OxyChem has long accepted responsibility

to help remedy the pollution to which its predecessor contributed. OxyChem has already spent $260 million cleaning up its predecessor's property and funding and performing years of studies to help EPA select appropriate remedies for the Passaic. OxyChem is on pace to spend what EPA estimates will be another $257 million designing those remedies, and it has offered to implement them, too. All OxyChem has asked in return is to be allowed to pursue its statutory contribution rights to recover some of the costs of that massive undertaking from the dozens of other polluters of the Passaic River.

Apparently, that extraordinary offer was not good enough for EPA. Instead of letting OxyChem spend its own money to clean up the river and try to recover some of its costs via private-party litigation, EPA decided to let virtually *everyone but OxyChem* off the hook for a pittance. EPA deemed 82 parties, including several major polluters, collectively responsible for just 3.88% of the cleanup—about *0.04%* per party—while assigning *more than 90%* of responsibility to OxyChem. EPA then not only released its own claims against those parties for a mere $150 million, but also purported to extinguish OxyChem's contribution claims against them. Companies that indisputably spewed vast quantities of contaminants into the Passaic for decades—many before OxyChem's predecessor even came onto the scene—thus have been relieved of all risk of liability for pennies on the dollar (if that).

Remarkably, the district court blessed that patently inequitable state of affairs—but only by disregarding CERCLA's text and abdicating its responsibility to subject CERCLA consent decrees to meaningful judicial review. CERCLA §122(e)(3) authorizes EPA to facilitate settlement using a "non-binding preliminary allocation of responsibility" ("NBAR"), but requires EPA to prepare an NBAR itself and place the costs on settling parties, and forbids EPA from introducing an NBAR as evidence "in any proceeding." 42 U.S.C. §9622(e)(3). EPA defied each of these commands: It outsourced a "non-binding allocation of responsibility" to a private contractor, placed the costs on *non*-settlors, then introduced (and heavily relied on) that NBAR below. Though that NBAR "was the foundation for the settlement," D.Ct.Dkt.288-1.at.3, the district court waved away those statutory violations, embracing the head-scratching (il)logic that if what the government conceded was a "nonbinding allocation of responsibility" did not comply with CERCLA's statutory requirements for an NBAR, then it must not really have been an NBAR. The court also admitted that the consent decree "technically" violated another CERCLA procedural constraint but excused that violation by elevating what it perceived to be "congressional intent" and the "public interest" above the statutory text.

The consent decree's substantive flaws are as bad as its procedural flaws. The NBAR concluded that OxyChem should bear *99.94%* of the cost of cleaning up centuries of pollution in the Passaic, even though there is no dispute that its

3

predecessor did not contribute most of the toxins that the cleanup will address. While EPA tweaked those numbers at the margins, it never confronted the egregious mistakes that produced them.  Neither did the district court.  Instead of conducting the independent analysis that settled precedent requires, the court simply announced that it would "defer" to EPA's "expertise," thereby effectively granting EPA the very power to make binding allocations that Congress has repeatedly denied it.

The end result is a decision that effectively nullifies Congress' decisions to impose meaningful constraints on how the government may settle CERCLA claims and subject CERCLA settlements to meaningful judicial review—checks that are critical given the powerful incentives CERCLA's joint-and-several liability regime creates to understate the liability of settling parties at the expense of non-settling parties.  Worse still, the decision does all of that in service of letting egregious polluters walk away for nothing even approaching their fair share of liability.  That result cannot be reconciled with CERCLA, this Court's decisions, or any semblance of the public interest.

## JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §1331.  It granted the United States' motion to enter a consent decree on December 18, 2024, D.Ct.Dkt.394, and entered the decree on January 16, 2025, D.Ct.Dkt.398.  OxyChem

timely appealed both orders on February 13, 2025. D.Ct.Dkt.402. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether the consent decree violates CERCLA §122. This issue was raised, *inter alia*, at D.Ct.Dkt.309.at.13-21; objected to, *inter alia*, at D.Ct.Dkt.337.at.7-25; and ruled upon at D.Ct.Dkt.393.at.28-34.

2. Whether the consent decree is substantively fair, reasonable, and consistent with CERCLA's text and goals. This issue was raised, *inter alia*, at D.Ct.Dkt.288-1.at.30-36; objected to, *inter alia*, at D.Ct.Dkt.309.at.27-50; and ruled upon at D.Ct.Dkt.393.at.34-40.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

OxyChem is aware of the following related cases: *Occidental Chemical Corporation v. 21st Century Fox America, Inc.*, No. 2:18-cv-11273 (D.N.J), and *Occidental Chemical Corporation v. Givaudan Fragrances Corp.*, No. 2:23-cv-1699 (D.N.J.).

## STATEMENT OF THE CASE

### A.    Legal Background

1. "CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U. S. 809, 814 (1994). The President, in turn, has delegated administration of CERCLA to EPA. *Atl. Richfield Co. v.*

*Christian*, 590 U.S. 1, 6 n.1 (2020). One of EPA's central duties under CERCLA is "to compile and annually revise a prioritized list of contaminated sites." *Id.* at 6. A broad category of "[r]esponsible parties are jointly and severally liable for the full cost of the cleanup." *Id.*

EPA can conduct a cleanup itself, using money from the "Hazardous Substance Superfund," 26 U.S.C. §9507; 42 U.S.C. §§9604(a), 9611(a)(1), then file a lawsuit under CERCLA §107(a) seeking reimbursement from potentially responsible parties ("PRPs"), 42 U.S.C. §9607(a)(4)(A). Alternatively, under CERCLA §106, EPA may file an abatement action to compel PRPs to conduct the cleanup. 42 U.S.C. §9606. EPA may also issue a unilateral administrative order ("UAO") instructing PRPs to do so. *United States v. E.I. Dupont De Nemours & Co.*, 432 F.3d 161, 165 (3d Cir. 2005) (citing 42 U.S.C. §9606(a)). To incentivize private performance of cleanup work, CERCLA gives PRPs two ways to "recoup CERCLA-related costs from other PRPs." *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 131 (2007). Section 107(a) permits "a private party that has itself incurred cleanup costs" to bring a "cost-recovery action[]" against other PRPs. *Id.* at 139. By contrast, §113(f) "authorizes a PRP to seek contribution" from other PRPs "'during or following' a suit" ordering it to conduct or fund a cleanup if the party "paid more than [its] proportionate share." *Id.* at 138.

CERCLA §122 also authorizes various government actors to reach specific types of settlements.  For example, the President may enter into consent decrees under which PRPs will perform remedial action pursuant to §106, 42 U.S.C. §9622(d); reimburse parties for specified cleanup costs, *id.* §9622(b)(1); and execute "[d]e minimis settlements" with parties that contributed only "minimal" contaminants at a site, *id.* §9622(g).  And agency heads may settle §107(a) claims seeking reimbursement for cleanup costs they have incurred.  42 U.S.C. §9622(h).

2. Where (as here) EPA negotiates a settlement with only some PRPs, the negotiating parties have skewed incentives.  EPA has diminished incentives to drive a hard bargain because CERCLA's joint-and-several liability regime allows it to "hold nonsettlors fully liable … for the balance of cleanup costs even if the settlors paid less than their fair share."  Barry S. Neuman, *No Way Out: The Plight of the Superfund Nonsettlor*, 20 Envtl. L. Rep. 10,295, 10,300 (1990).  Conversely, settling parties have a strong incentive to minimize their own role and overstate non-settlors' liability, to reduce their own settlement costs.  Taken together, those incentives create significant risk that a partial settlement will substantially overestimate non-settlors' liability.  The consequences for non-settlors can be severe:  A partial settlement reduces the total "potential liability" only "by the amount of the settlement," leaving EPA free to seek the balance from non-settlors. 42 U.S.C. §9613(f)(2).  And because parties that settle with the United States "shall not be liable for claims for

contribution regarding matters addressed in the settlement," *id.*, non-settlors risk being left on the hook for a disproportionate share of the cleanup costs. *See United States v. Se. Penn. Transp. Auth.* ("*SEPTA*"), 235 F.3d 817, 825 (3d Cir. 2000).

To ameliorate those skewed incentives, CERCLA §122—entitled "Settlements"—mandates that EPA follow specific procedures in settling CERCLA claims. Before settling abatement (§106) and/or cost-recovery (§107) claims, EPA must publish the proposed settlement in the Federal Register and solicit and consider public comments. 42 U.S.C. §9622(d)(2), (*i*). Settlements of abatement claims must be approved by the Attorney General and embodied in a consent decree that is subject to judicial review for procedural and substantive fairness. *Id.* §9622(d)(1); *see In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003). Even de minimis settlements must undergo either notice-and-comment or the consent-decree process. 42 U.S.C. §9622(d)(1), (g)(1), (g)(4), (*i*)(1).

Congress has placed careful limitations on the procedures EPA may use to facilitate CERCLA settlements involving multiple PRPs. "Whenever [EPA] determines that a period of negotiation under this subsection would facilitate" a settlement "and would expedite remedial action," it may send each PRP a notice to that effect providing the "the names and addresses" of all PRPs; "the volume and nature of substances contributed by each [PRP]," and "[a] ranking by volume of the substances at the facility, to the extent such information is available." *Id.*

§9622(e)(1). This triggers a 60-day period during which PRPs may make settlement proposals to EPA, and a 120-day moratorium on EPA initiating a response action, filing an abatement action, or issuing a UAO. *Id.* §9622(e)(2).

Section 122(e) also empowers EPA to attempt to "expedite settlements" by preparing a "nonbinding preliminary allocation of responsibility." *Id.* §9622(e)(3). But Congress placed express limitations on EPA's authority to conduct and use such allocations. NBARs must be prepared by federal employees, who are given subpoena power "[t]o collect information necessary or appropriate for performing the allocation." *Id.* §9622(e)(3)(A)-(B); *see* H.R. Rep. No. 99-962, at 254 (1986) (Conf. Rep.). NBARs can be used only to facilitate negotiations; an NBAR "shall not be admissible as evidence in any proceeding" and "shall not constitute an apportionment or other statement on the divisibility of harm or causation." 42 U.S.C. §9622(e)(3)(C). Courts alone have the power to conduct a binding equitable allocation of cleanup costs. *See* 42 U.S.C. §9613(f)(1); *accord Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 431-32, 445 (3d Cir. 2005). Indeed, Congress has twice rejected proposals to give EPA that authority. *See* Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. (1999); Superfund Reform Act of 1994, S. 1834, 103d Cong. (1994). Finally, when an NBAR succeeds in facilitating a settlement, "[t]he costs incurred by [EPA] in producing the [NBAR] shall be reimbursed by the [settling] parties." 42 U.S.C. §9622(e)(3)(D). These safeguards help ensure that any

partial CERCLA settlement reflects a fair measure of the settling parties' liability and does not saddle non-settlors with far more than their share of cleanup costs.

### B.    Factual Background

#### 1.    The Passaic River has suffered from major pollution for more than a century.

Pollution of the Passaic River dates back to the Industrial Revolution. D.Ct.Dkt.309-2.at.3. By 1887, "many factories" lined its banks, "every day pouring forth millions of gallons of brilliantly colored and poisonous dyestuffs into the river." D.Ct.Dkt.288-14.B.11.at.¶37. At the turn of the century, "a multitude of industrial operations, such as manufactured gas plants, paper manufacturing and recycling facilities, petroleum refineries, shipping, tanneries, creosote wood preservers, metal recyclers and manufacturers of materials such as rubber, rope, textiles, paints and dyes, pharmaceuticals and chemicals" were situated "along the river's banks" in the growing cities of Newark and Paterson. D.Ct.Dkt.309-2.Ex.3.at.3. Municipalities also used the river for wastewater disposal. D.Ct.Dkt.309-2.Ex.3.at.3. By 1926, the United States declared the river's "[a]quatic life destroyed" by "[d]omestic sewage" and "industrial wastes of many kinds." D.Ct.Dkt.309-2.Ex.7.at.12. Yet pollution continued unabated for several more decades. D.Ct.Dkt.309-2.Ex.6.at.12; D.Ct.Dkt.288-14.B.11.at.¶¶47-60.

In the 1980s, state and federal authorities finally began to act. In 1982, the New Jersey Department of Environmental Protection ("NJDEP") closed the river to

fishing due to PCBs in fish tissue. D.Ct.Dkt.309-2.Ex.8. In 1983, New Jersey issued executive orders addressing dioxins found in the soils at two industrial facilities in Newark—the Givaudan Fragrances Corporation ("Givaudan") property at 125 Delawanna Avenue, and the former Diamond Alkali facility at 80-120 Lister Avenue, which was used for manufacturing the pesticide DDT and herbicides (including Agent Orange) from the 1940s through the 1960s. D.Ct.Dkt.309-2.Ex.9; D.Ct.Dkt.309-2.Ex.10; D.Ct.Dkt.309-2.Ex.3.at.3. In 1984, EPA put the Diamond Alkali site on the Superfund list. D.Ct.Dkt.309-2.Ex.3.at.4.

In 1994, EPA began investigating a six-mile stretch of the Lower Passaic and found some contaminants that originated from the Diamond Alkali facility, particularly pesticides and dioxin, as well as many contaminants *not* associated with Diamond Alkali. D.Ct.Dkt.309-2.Ex.3.at.4. In 2002, EPA expanded the investigation to include the entire Lower Passaic. D.Ct.Dkt.309-2.Ex.3.at.4. Based on this investigation, EPA divided the river into two "Operable Units": the lower 8.3 miles, known as OU2, and the whole river (both the lower 8.3 miles and the upper 9 miles), known as OU4. D.Ct.Dkt.309-2.Ex.3.at.10-11.

OU2 is substantially different from the rest of the river. D.Ct.Dkt.309-2.Ex.3.at.2; D.Ct.Dkt.288-13.B.7.at.¶¶19-21; D.Ct.Dkt.288-14.B.9.at.¶62. The lower 8.3 miles are wider and much deeper, and function as an upper estuary, mixing freshwater and saltwater. D.Ct.Dkt.288-13.B.7.at.¶¶19-21. At mile 8.3, however,

there is "a pronounced constriction," D.Ct.Dkt.309-2.Ex.3.at.2, after which the upper 9 miles are narrower, shallower, and function as a freshwater stream influenced by tides. D.Ct.Dkt.288-13.B.7.at.¶20. Sediment accumulation rates and patterns between OU2 and the upper 9 miles of OU4 are therefore meaningfully different; the lower 8.3 miles are "dominated by fine-grained sediments (primarily silts)," while the upper 9 are "dominated by coarser sediments." 309-2.Ex.3.at.2; D.Ct.Dkt.288-14.B.9.at.¶21. EPA determined that about 90 percent of the most heavily contaminated sediment is in OU2 and so prioritized that segment. D.Ct.Dkt.309-2.Ex.3.at.10-11.

EPA's study of OU2 identified eight contaminants of concern that "pose the greatest potential risks to human health and the environment," D.Ct.Dkt.309-2.Ex.3.at.14:

(1) dioxins and furans, which are "by-products of chemical manufacturing, combustion, … metal processing[,] and paper manufacturing";

(2) PCBs, which were once "used widely as coolants and oils, and in the manufacture of paints, caulking and building material";

(3) mercury, which is released through "metals processing, burning of coal, improper disposal of medical and other wastes, [and] industrial effluent discharge";

(4) DDT, a once-common pesticide that was banned in the United States in 1972;

(5) copper, which enters the environment "through releases from factories that make or use copper metal or compounds, leachate from landfills, combustion of fossil fuels, wood processing, [and] fertilizer production";

(6) dieldrin, another once-common pesticide "no longer produced or used";

(7) PAHs, which "are a major component of petroleum products, and are formed during incomplete burning of coal, oil, gas, wood or other substances"; and

(8) lead, which "come[s] from mining or factories that use lead compounds" and is "also released into the air during the burning of coal, oil[,] or waste."

D.Ct.Dkt.309-2.Ex.3.at.14-16.

Unsurprisingly, given the Passaic's status as "one of the major centers of the American industrial revolution," the EPA found OU2 "highly contaminated." D.Ct.Dkt.309-2.Ex.3.at.1-3.    It concluded that "elevated concentrations of [contaminants of concern] are ubiquitous in surface sediments of the lower 8.3 miles, bank to bank."  D.Ct.Dkt.309-2.Ex.3.at.17.  The estimated volume is staggering: more than 3 million kilograms of lead, 2 million kilograms of copper, 400,000 kilograms of PAHs, 42,000 kilograms of mercury, 26,000 kilograms of PCBs, and 38 kilograms of dioxins.    D.Ct.Dkt.289-19.at.ARR3245; *see* D.Ct.Dkt.309-

2.Ex.3.at.14-16, 21-41.   EPA has identified well over 100 industrial facilities as potentially responsible for discharging these contaminants into the Passaic over many decades.  D.Ct.Dkt.309-2.Ex.3.at.3; D.Ct.Dkt.309-2.Ex.5.at.38.

## 2.    EPA initiates a massive remediation effort.

EPA's efforts to clean up the Passaic date back to the 1980s.  As a corporate successor to the Diamond Alkali company, OxyChem has long participated in—and devoted hundreds of millions of dollars to—those efforts.

In 1987, EPA selected an interim containment remedy to address the Lister Avenue property (known as OU1).    D.Ct.Dkt.288-5.at.¶8;  D.Ct.Dkt.309-2.Ex.3.at.10.  OxyChem agreed to perform this interim remedy; completed it in 2004; and, "under EPA's oversight, has performed operation and maintenance" ever since.    D.Ct.Dkt.288-5.at.¶8;  *see*  D.Ct.Dkt.309-2.Ex.3.at.10;  Dkt.309-13.at.4; Dkt.110-4.at.21.  As a result of OxyChem's efforts, OU1 "is no longer an ongoing source of contamination to the Passaic River."  D.Ct.Dkt.309-2.Ex.3.at.10.  In June 2008, EPA and OxyChem (and OxyChem's indemnitor, Tierra Solutions Inc.) signed an agreement to address contamination in the river adjacent to the Lister Avenue facility.  D.Ct.Dkt.309-2.Ex.3.at.5.  Under that agreement, 40,000 cubic yards of sediment were removed (the "Tierra Removal").  D.Ct.Dkt.309-2.Ex.3.at.5.  All told, OxyChem and its indemnitors spent about $260 million cleaning up OU1 and the adjacent river.  D.Ct.Dkt.309-13.at.4; D.Ct.Dkt.110-4.at.21.

In March 2016, EPA selected a final remedy for OU2.   D.Ct.Dkt.309-2.Ex.3.at.79-81; D.Ct.Dkt.288-5.at.¶¶9, 16.   OxyChem performed the remedial design, which EPA approved in May 2024, at an EPA-estimated cost of $165 million. D.Ct.Dkt.335-4; D.Ct.Dkt.288-5.at.¶23; D.Ct.Dkt.309-02.at.Ex.13.   EPA estimates that the final remedy for OU2 will cost $1.38 billion, making that alone one of the most expensive CERCLA cleanups in history.  D.Ct.Dkt.309-2.Ex.3.at.88.  EPA has not yet selected a final remedy for OU4.  D.Ct.Dkt.288-6.at.¶19.  But in September 2021, it selected an interim remedy for the upper 9 miles, which is estimated to cost $441 million.  D.Ct.Dkt.288-6.at.¶¶13, 19.  OxyChem is currently performing the remedial design for this project, too, at an EPA-estimated cost of $92 million. D.Ct.Dkt.288-6.at.¶18; D.Ct.Dkt.309-10.at.Ex.100.

### 3. EPA commissions David Batson to conduct a nonbinding allocation of responsibility.

In March 2016, EPA notified over 100 parties of their potential liability under CERCLA "for the lower 8.3 miles" of the Passaic.  D.Ct.Dkt.288-5.Ex.A.at.3. Consistent with CERCLA §122(e)(1), this notice gave each PRP the names and addresses of other PRPs.  D.Ct.Dkt.288-5.Ex.A.Att.1.  EPA announced, however, that it had "decided not to use" the "procedures of Section 122(e)."  D.Ct.Dkt.288-5.Ex.A.at.4.  Instead of performing an NBAR itself, as §122(e)(3) requires, EPA decided to "use the services of a third party allocator."  Dkt.288-5.Ex.C.at.2; *see* Dkt.288-5.Ex.D.at.3.

Before launching this unorthodox third-party allocation, EPA had already decided to offer "an early cash out settlement" to 20 PRPs that (it said) "are not associated with the release or disposal of any of the [contaminants of concern] for OU2." Dkt.288-5.Ex.D.at.2; *see* Dkt.288-5.Ex.C.at.2. EPA further asserted that "a cash out settlement might be appropriate" for other PRPs "not associated with the release of dioxins, furans, or PCBs." Dkt.288-5.Ex.C.at.2. EPA initially planned to use the "third party allocator" to identify these parties. Dkt.288-5.Ex.D.at.3. After an August 2017 meeting with PRPs, however, EPA "concluded that the allocation process should include all of the [PRPs] for OU2"—except the Passaic Valley Sewerage Commission and four other municipal entities. Dkt.288-5.Ex.E.at.1. But EPA reiterated that "PRPs responsible for the release of dioxins, furans and/or PCBs" would not be permitted to cash out, and would instead "perform the OU2 remedial action." D.Ct.Dkt.309-3.Ex.23.at.1.

EPA hired one of its former attorneys, David Batson, as the third-party allocator and invited the parties to an October 2017 meeting where Batson would explain his proposal. Dkt.288-5.Ex.E.at.2. After that meeting, multiple PRPs expressed serious concerns. As paint manufacturer Benjamin Moore (ultimately a settling party) observed, there is "no statutory basis for the Batson allocation." D.Ct.Dkt.309-3.Ex.24.at.1. Benjamin Moore instead (correctly) described it as an "EPA-improvised process" that impermissibly deviated from "the process for an

16

allocation in aid of settlement" established in CERCLA §122(e)(3).  D.Ct.Dkt.309-3.Ex.24.at.1.    Benjamin Moore warned:    "[R]ather than accepting the Batson allocation as a basis for a settlement order, a court will likely reject the Batson allocation as inconsistent with CERCLA's requirements."    D.Ct.Dkt.309-3.Ex.24.at.2.

Many PRPs expressed serious concern about the evidentiary record on which Batson's allocation would be based.  When a court allocates CERCLA liability among PRPs under §113(f), the record is developed through judicially supervised discovery.  *See* 42 U.S.C. §9613(f).  And when EPA performs an NBAR, it has power "by subpoena [to] require the attendance and testimony of witnesses and the production of reports, papers, documents, answers to questions, and other information."  *Id.* §9622(e)(3)(B).  In stark contrast, Batson proposed to rely on a hodgepodge of existing documents supplemented by voluntary submissions from PRPs.  Multiple PRPs, including OxyChem, criticized this ad hoc approach, observing that there was no way to ensure that each party would undertake a diligent inquiry and (against its own interests) voluntarily produce all evidence of its own liability.    *See, e.g.*,  D.Ct.Dkt.309-3.Ex.24.at.3;  D.Ct.Dkt.309-3.Ex.26.at.3-4; D.Ct.Dkt.309-3.Ex.27.at.2-3, 5.

Even before Batson's unconventional allocation process began, PRPs had already begun seeking to minimize their own responsibility by pointing the finger at

Diamond Alkali (and thus OxyChem).  *See, e.g.*, D.Ct.Dkt.309-3.Ex.26.at.2, 4.  So once Batson made clear that he was set on discarding critical statutory protections against settling parties minimizing their own liability at the expense of non-settling ones, in favor of a process sure to exacerbate those already-skewed incentives, OxyChem and 10 other parties declined to participate in Batson's allocation.  D.Ct.Dkt.288-5.at.¶40.

Batson nevertheless treated these non-participants as "allocation parties" to be assigned a share of liability.  *See* D.Ct.Dkt.288-5.at.¶44 (noting 79 "allocation parties," 69 of which participated).  And once OxyChem opted out, a coordinated strategy of trying to assign all cleanup costs to OxyChem intensified.  Indeed, nearly all participating parties belong to the so-called Small Parties Group ("SPG")—a joint defense group that includes several major polluters and multinational corporations whose only claim to smallness is not being OxyChem.  *See* CA3.No.25-1049.Dkt.24; D.Ct.Dkt.309-19; *infra* pp.53-55.  Ignoring their obvious incentive to skew the process against OxyChem, Batson and EPA allowed participating parties to "contribute to the design of the allocation protocols, methodology and database" and "review and comment on the draft Allocation Recommendation Report." D.Ct.Dkt.288-4.at.79-80;  *see*  D.Ct.Dkt.288-5.at.¶35.  Predictably, the parties focused on trying to minimize their own liability and maximize OxyChem's.  *See*

D.Ct.Dkt.309-4.Ex.31.at.3-4 (noting "the sheer volume of data" they submitted "related to [OxyChem]").

### 4.  Batson assigns virtually all liability to OxyChem.

In December 2020, Batson released his "Allocation Recommendation Report."  Using a "protocol" methodology that the participating parties helped develop, Batson assigned an astonishing *99.94%* of responsibility for the cleanup to OxyChem (in absentia).  D.Ct.Dkt.289-8.at.ARR2005; *see* D.Ct.Dkt.288-8.at.¶18. The second and third largest "allocation shares"—a mere 0.028% and 0.015%— went to Nokia-Lucent Technologies and Pharmacia LLC, respectively. D.Ct.Dkt.289-8.at.ARR2005.  Other companies that spent decades operating major industrial facilities on the Passaic were assigned cartoonishly microscopic responsibility.  For example, for a hypothetical $1.82 billion cleanup effort, Batson's calculations indicate that Stanley Black & Decker, which operated on the Passaic for 100 years, should pay $321; General Electric, which operated two facilities on the Passaic for a collective 124 years, should pay $424; and Otis Elevator, which operated on the Passaic for 70 years, should pay just $63.    D.Ct.Dkt.288-14.B.8.at.¶55; D.Ct.Dkt.288-14.B.8.at.Fig.1.

Batson reached these nonsensical conclusions by using a "risk characterization" methodology that turns solely on each contaminant's potential adverse effect on human health, regardless of how much it costs to clean up.  *See*

Dkt.289.at.ARR0013. Under that approach, dioxins/furans were deemed the source of 83.92% of the total risk. *See, e.g.*, Dkt.289-15.at.ARR2576. Because Batson (erroneously) deemed OxyChem responsible for 99.997% of the roughly 38 kilograms of dioxins/furans in the Passaic, his starting assumption was that OxyChem would be on the hook for 83.91% of the total cleanup, Dkt.289-8.at.ARR2005—while the dozens of polluters that contributed 3.2 million kilograms of lead were collectively responsible for 0.01%, those that contributed 410,000 kilograms of PAHs were collectively responsible for 0.06%, and those that contributed 2.1 million kilograms of copper were collectively responsible for 0.69%, *see* Dkt.289-15.at.ARR2576; Dkt.298.at.ARR0029.

Batson further enhanced OxyChem's share by applying "culpability and cooperation" factors. *See* D.Ct.Dkt.289.at.ARR0032-33. The participating parties persuaded Batson to *double* OxyChem's base score because of its predecessors' "culpable conduct" and to give OxyChem *zero* reduction for cooperation, Dkt.289-15.at.ARR2586—despite its long history of funding and conducting cleanup efforts, *see supra* pp.14-15. Batson decided that all of OxyChem's past cooperation was negated by its decision not to participate in his "voluntary" allocation. Dkt.289-15.at.ARR2586. By contrast, many participating parties obtained a 20% reduction for far less cooperation. *See, e.g.*, Dkt.289-13.at.ARR2406, ARR2416, ARR2426, ARR2435, ARR2448.

Batson also assigned OxyChem nearly all responsibility for the sizable contamination attributable to "[o]rphan [p]arties"—entities that no longer exist or have no ability to pay.    D.Ct.Dkt.289.at.ARR0028; D.Ct.Dkt.288-8.at.¶19.n.5. Under the "protocol" methodology that the participating parties helped develop, this "orphan share" was redistributed "pro rata" among all allocation parties based on each party's relative responsibility (under Batson's calculation) for the overall contamination. D.Ct.Dkt.289.at.ARR0028; D.Ct.Dkt.288-8.at.¶19.  In other words, because Batson assigned OxyChem the bulk of the responsibility for the contaminants contributed by allocation parties (by weighting dioxins/furans so heavily), the "protocol" method assigned OxyChem the bulk of responsibility for the "orphan share," too.  D.Ct.Dkt.289.at.ARR0028.  So even though OxyChem bears little to no responsibility for contaminants such as PCBs, Batson held it responsible for most of the "orphan share" of them, producing a final "allocation share" of 99.94%.  D.Ct.Dkt.289.at.ARR0028, Dkt.289-15.at.ARR2005.

Apparently recognizing that this was facially absurd—or, in government-speak, "potentially inequitable"—Batson then came up with an "alternative" methodology that "shifts the reassignment of each orphan share to each Allocation Party in accord with their share of contribution of each [contaminant] and their related risks individually."    D.Ct.Dkt.289.at.ARR0028-29; D.Ct.Dkt.288-8.at.¶19. In other words, it spreads the orphan share of each contaminant among the parties

that actually contributed significant amounts of that contaminant.  This late-breaking "alternative calculation" reduced OxyChem's allocation share to 92.94%, mostly at the expense of Nokia and Pharmacia, each of which saw its share increase more than 100-fold, but still only to 3.28% and 1.83%, respectively.    D.Ct.Dkt.289-8.at.ARR2005.    The 76 other "allocation parties" were deemed collectively responsible for the remaining 1.95%, with allocation shares ranging from 0.37% to less than 0.01%.  D.Ct.Dkt.289-8.at.ARR2005.  Companies like Stanley Black & Decker, General Electric, and Otis Elevator faced less than $35,000 each, while OxyChem was on the hook for *$1.69 billion*.    D.Ct.Dkt.288-14.B.8.at.¶55; D.Ct.Dkt.288-14.B.8.at.Fig.1.

EPA immediately recognized that Batson's work suffered from serious flaws. Within weeks, it asked Batson to provide written responses to several pointed questions, including:

- The allocation "assumed that close to 100% of dioxins in OU2 sediments were contributed by OCC: *Does that assumption pre-judge the results of the allocation*?"

- "Why were OCC's remediation of OU1 and agreement to perform the OU2 remedial design not accounted for in the cooperation factor?"

- "In the assignment of culpability and cooperation factors, OCC's failure to participate in the allocation … seemed to have been given twice as much weight as OCC's implementation of the Tierra Removal … *Is that a fair assignment*, given that the Tierra Removal remediated the river and would have cost much more than participation in the allocation?"

Dkt.309-4.Ex.32.at.2-3 (emphasis added).  EPA also asked Batson to "walk through

the calculation of [OxyChem]'s share," including "how input values were derived"

and "combined to produce" the conclusion that OxyChem should foot 99.94% of the

bill.  D.Ct.Dkt.309-4.Ex.32.at.3.  Notably, this was the one question for which EPA

expressly instructed Batson to provide an "[o]ral [r]esponse only."  D.Ct.Dkt.309-

4.Ex.32.at.3.

### C.    Procedural History

#### 1.    EPA uses the Batson Allocation as the foundation for a proposed settlement.

Despite Batson's credulity-straining conclusions and EPA's own questions,

EPA pressed forward.  "Based on the results of the allocation, the United States

concluded that" all but four allocation parties—everyone except OxyChem, Nokia,

Pharmacia, and PSE&G Corp.—were "individually and collectively[] responsible

for a minor share of the response costs incurred" and invited them to settle.

D.Ct.Dkt.288-5.at.¶¶54, 57(c).  EPA then made two minor "adjustments" to Batson's

work.  D.Ct.Dkt.288-5.at.¶57.  First, it adopted his "[a]lternative [m]ethod," which

raised the collective responsibility of the parties invited to settle to 1.95%.

D.Ct.Dkt.288-5.at.¶57(a).    Second, it jettisoned Batson's "cooperation and

culpability adjustments," deeming them too "subjective."  D.Ct.Dkt.288-5.at.¶57(b).

That brought EPA's estimate of the 82 settling parties' collective responsibility up to

3.88%—still just 0.04% per party.  D.Ct.Dkt.288-5.at.¶57(c); *see* D.Ct.Dkt.309-16.

Although the Batson Report was expressly limited to OU2 (the lower 8.3 miles of the Passaic), *see, e.g.*, D.Ct.Dkt.289.at.ARR0006-ARR0007, EPA decided to expand the settlement to include OU4 (the entire 17 miles).  D.Ct.Dkt.288-5.at.¶55.  It calculated "the total costs on which the settlement amount would be based" as $1.89 billion, which is the sum of EPA's past costs ($50 million), the final remedy for OU2 (an estimated $1.38 billion) and the interim remedy for OU4 (then estimated at $460 million).  D.Ct.Dkt.288-5.at.¶56.  Notably, EPA did not account for the as-yet-undetermined final remedy for OU4.  D.Ct.Dkt.288-6.at.¶19.  EPA also added a "premium" of 100%, "to account for the fact that the remedies for OU2 and OU4 have not yet been implemented and the possibility of cost overruns." D.Ct.Dkt.288-5.at.¶57(d).  After EPA folded in a small payment related to an existing administrative order, the proposed collective settlement for all 82 parties came to a mere $150 million for a $1.89 billion cleanup.  D.Ct.Dkt.288-5.at.¶58.  The settling parties have never disclosed—even to the district court—how much each intends to pay toward that amount.

### 2.    EPA files suit and lodges a proposed consent decree.

On December 16, 2022, EPA sued 85 PRPs, asserting joint-and-several liability under CERCLA §107(a) "for all unreimbursed response costs … incurred by the United States in connection with OU2 and OU4."  D.Ct.Dkt.1.at.11.  EPA immediately gave notice that it was lodging a proposed settlement and consent

decree with the district court and soliciting "public notice and comment in accordance with Section 122(d)(2) of CERCLA."  D.Ct.Dkt.2, D.Ct.Dkt.2-1.at.¶42.

The public comments were overwhelmingly negative.  Not counting comments from the settling parties and OxyChem, only *two* comments supported the settlement, while *77* urged EPA to reject it.  D.Ct.Dkt.288-16; D.Ct.Dkt.309-2.Ex.2.  Some criticized EPA for letting so many large companies escape liability for a small fraction of the cleanup costs.  *See, e.g.*, D.Ct.Dkt.288-16.at.26-27; D.Ct.Dkt.288-16.at.139.  Others warned that the settlement would "send[] the wrong message"—i.e., "that polluting the environment is acceptable so long as the polluter is willing to pay a minimal fine."  D.Ct.Dkt.288-16.at.28-29.  EPA was unmoved.

On January 17, 2024, the government amended its complaint to include claims under both CERCLA §106 and §107(a).  D.Ct.Dkt.282.at.¶¶36-45.  It also dropped three defendants—Kearny Smelting & Refining, Conopco, Inc., and the Sherwin-Williams Company—but did not change the total settlement amount.  D.Ct.Dkt.288-1.at.24-25.  The same day, the government moved for a modified consent decree, which included a limited "reopener" provision under which it could seek to hold settling parties liable if the remedial actions for OU2 and OU4 exceed $3.68 billion (twice the current projection).  D.Ct.Dkt.288-1.at.25; *see* D.Ct.Dkt.283.at.¶15(f).

OxyChem opposed.  Among other things, it argued that EPA's creation and use of the Batson Report violated several requirements of CERCLA §122(e)(3); that

the consent decree violates §122(f)'s restrictions on covenants not to sue, D.Ct.Dkt.309.at.15; and that Batson's faulty methods and indefensible conclusions rendered the settlement arbitrary and substantively unfair.  D.Ct.Dkt.309.at.29-43.

### 3.    The district court enters the consent decree.

The district court granted the government's motion and entered the consent decree.  D.Ct.Dkt.393.  The court acknowledged that the government did not comply with CERCLA §122(e)(3) but concluded that "it did not need to," because (according to the court) the Batson allocation "was not an NBAR." D.Ct.Dkt.393.at.32.  *But see* D.Ct.Dkt.288-4.at.16, 71 (government admitting that it is a "non-binding allocation of responsibility").  The court also acknowledged that the consent decree "technically" violates §122(f) but waved away that violation by invoking "congressional intent," "the public interest," and the notion that CERCLA should be "construe[d] … liberally in furtherance of [its] purposes." D.Ct.Dkt.393.at.33.  And the court refused to engage with OxyChem's substantive criticisms of the settlement, summarily declaring that "the Government has adequately and coherently addressed these arguments" and that it would "defer to the Governments' [sic] expertise."  D.Ct.Dkt.393.35-36.

### SUMMARY OF ARGUMENT

This extraordinary consent decree—which leaves OxyChem holding the bag for practically all the estimated $1.84 billion cost of cleaning up the Lower Passaic,

while purporting to eliminate its right to seek contribution toward that cost from any settling party—cannot be sustained.  The statutory and regulatory provisions EPA ignored exist to prevent unfair and distorted outcomes like this one.  On both procedural and substantive grounds, the decision below cannot stand.

First, EPA's creation of and reliance on the Batson Report as the basis for the consent decree exceeded its statutory authority.  CERCLA §122(e)(3) authorizes EPA to facilitate settlement by providing PRPs with an NBAR, but it demands specific protections and limitations on that process, requiring, for example, that an NBAR be produced by a government employee and funded by the settling parties, and cannot be used as evidence in any proceeding.  Those protections are critical to ameliorate the powerful incentives to force *non*-settling parties to shoulder disproportionate blame.  Yet EPA defied all three restrictions here.  And the court's theory that, by failing to abide by these requirements, the NBAR became something other than an NBAR, gets matters backwards:  Just as an agency rulemaking conducted without the statutorily required notice and opportunity for public comment would be an invalid rulemaking, *see* 5 U.S.C. §553, an NBAR process that fails to comply with the statutory requirements of CERCLA §122(e)(3) is an invalid NBAR, not something altogether different and lawful.

The consent decree also runs afoul of §122(f).  Under that provision, the government may not provide parties with a covenant not to sue for future CERCLA

liability until *after* "[t]he response action has been approved" by EPA, and the covenant "shall not take effect until" remedial action has been completed. This ensures that the scope of liability is fixed before anyone is let off the hook, countering the skewed incentives to shift responsibility to the party taking the laboring oar in the cleanup. Yet the covenants not to sue here purport to have *already* taken effect, even though the final remedy for OU4 has not even been selected (let alone approved) and the final remedy for OU2 is nowhere near complete. The court acknowledged as much, but upheld the decree anyway based on its view that it furthers CERCLA's purposes even if it violates its commands. But the Supreme Court has made crystal clear that courts may not override clear statutory language in favor of what *they* perceive would best further Congress' intent.

Those procedural flaws are matched only by the consent decree's substantive unfairness. While a district court reviewing a CERCLA settlement need not engage in *de novo* review of scientific evidence, CERCLA requires meaningful, independent judicial review of the basis for the settlement to ensure that it is reasonable and does not unfairly disadvantage non-settling parties. The court failed to conduct that independent judicial review. As OxyChem explained in detail below, Batson repeatedly made egregious errors that led him to grossly understate the settling parties' liability—errors that were baked into the settlement even after EPA tried to paper over them. But the court refused to engage with those arguments, instead

announcing that "the Government ha[d] adequately and coherently addressed" them and that it would "defer to the Governments' [sic] expertise." D.Ct.Dkt.393.at.35-37. That is judicial abdication, not judicial review. Letting it stand would effectively nullify Congress' decision to protect non-settlors—and taxpayers—by requiring judicial review of CERCLA settlements, leaving no real check on the government's ability to settle away claims against some PRPs while forcing others to pick up the (open-ended) tab for work that has not even been completed.

This case vividly illustrates the importance of the procedural and substantive checks Congress created. Batson's conclusion that OxyChem bears *99.94%* of responsibility for cleaning up the Passaic—even though the river was hopelessly contaminated before OxyChem's predecessor began operations, and other companies undisputedly discharged more than 5 million kilograms of contaminants such as PCBs, PAHs, mercury, lead, and copper into the river over decades and decades—is nonsensical. And far from eliminating Batson's fundamental errors, EPA's minor adjustments to his work still let 82 settling parties walk away for an average of just *0.04%* of the total cost. Put simply, EPA's tweaks do not transform Batson's arbitrary conclusions into a rational measure of comparative fault.

To the contrary, the consent decree compounds the arbitrariness problems by using the Batson Report, which was expressly limited to *the lower 8.3 miles* of the Passaic (OU2), to allocate hundreds of millions of dollars of liability for the *entire*

17-mile river (OU4), which Batson *never evaluated at all*.  That indiscriminate expansion of Batson's erroneous conclusions about OU2 cannot be justified, particularly when EPA itself has long recognized that the lower 8.3 miles have substantially different characteristics from the upper 9 miles that result in different contamination patterns and call for different remedies.  And once again, the court conducted no substantive analysis of EPA's irrational approach; it just rubber-stamped EPA's submission with calls for deference that would have been out of place before *Loper Bright* and are hopelessly anachronistic in its wake.

The net effect of these errors is a blatantly unfair consent decree that lets major polluters off the hook for pennies on the dollar (if that), to the detriment of the party actually spearheading the cleanup.  That result furthers neither CERCLA's goals nor the public interest.  This Court should reverse.

### STANDARDS OF REVIEW

Whether a consent decree complies with CERCLA §122 is a question of law reviewed *de novo*.  *See Gov't Emps. Ret. Sys. of Virgin Islands v. Gov't of Virgin Islands*, 995 F.3d 66, 78 (3d Cir. 2021).  A decision to approve a consent decree is reviewed for abuse of discretion.  *Tutu Water Wells*, 326 F.3d at 207.  A court may not approve a consent decree unless it is "fair, reasonable, and consistent with CERCLA's goals"—i.e., it apportions liability "according to rational estimates of the

harm each party has caused," and the "measure of comparative fault on which the settlement terms are based" is not "arbitrary" or "capricious." *Id.*

## ARGUMENT

**I.    The Consent Decree Must Be Vacated Because EPA Failed To Comply With The Procedural Requirements Of CERCLA §122.**

### A.    EPA Violated §122 Several Times Over.

#### 1.    EPA flouted §122(e)(3)'s restrictions on the preparation and use of non-binding preliminary allocations of responsibility.

a. Cognizant of the potential for skewed incentives and outright abuse, Congress has imposed careful limits on EPA's authority to allocate liability among PRPs at a Superfund site. As explained, CERCLA §122 authorizes EPA to "provide a nonbinding preliminary allocation of responsibility," but mandates that an NBAR must be prepared solely by federal employees, must be paid for by settling parties, and "shall not be admissible as evidence in any proceeding." 42 U.S.C. §9622(e)(3)(A), (C), (D); *see* H.R. Rep. No. 99-962, at 254 (1986) (Conf. Rep.). The government admitted below that the Batson Report—which undisputedly served as "the foundation for the settlement," D.Ct.Dkt.288-1.at.3—is a "non-binding allocation of responsibility," D.Ct.Dkt.288-4.at.16. Yet its compilation and use of that report contravened each of these restrictions.

First, the government erred at the outset by disregarding CERCLA's requirement that an NBAR must be prepared by EPA *itself*. 42 U.S.C. §9622(e)(3)(A) (granting authority to "the President," who has delegated it to EPA).

That requirement is no technicality, as EPA has recognized.  *See* H.R. Rep. No. 99-962, at 254 ("Due to the enforcement-sensitive nature of NBARs, all such allocations must be prepared solely by Federal employees."); *Superfund Program; Non-Binding Preliminary Allocations of Responsibility (NBAR)*, 52 Fed. Reg. 19,919, 19,920 (May 28, 1987) ("[T]he allocation itself should be made by federal employees."). Yet EPA outsourced the NBAR to a private contractor (Batson), *see* D.Ct.Dkt.288-5.at.¶31, who treated OxyChem unfairly at every turn.

Second, EPA compounded that error by disregarding CERCLA's directive that the costs of preparing an NBAR "shall be reimbursed by" the settling parties.  42 U.S.C. §9622(e)(3)(D).  EPA treated the roughly $4 million it paid for the Batson Report as a general "response cost" reimbursable from the site's special account. *Compare* D.Ct.Dkt.309-5.Ex.39.at.3-22 (listing EPA payments to Batson allocation contractors), *with* D.Ct.Dkt.309-5.Ex.40.at.1-10 (listing EPA "non-billable" costs reimbursed from special site account).  The settling parties paid nothing, and non-settlors (including OxyChem) will end up footing the bill.

Third, having prepared the NBAR in violation of CERCLA, EPA then violated CERCLA's command that an NBAR "shall not be admissible as evidence in any proceeding."  42 U.S.C. §9622(e)(3)(C).  The government not only entered the Batson Report into the record below, *see* D.Ct.Dkt.289, but offered it as the primary evidence to support its contention that the consent decree "represents the collective

fair share of the Settling Defendants," D.Ct.Dkt.288-1.at.32.   The court relied heavily on the report in concluding that the consent decree "holds Settling Defendants accountable for more than their fair share of liability." D.Ct.Dkt.393.at.39.   And the decree *itself* confirms that the Batson Report supplied the sole evidentiary basis for assigning "relative shares of responsibility" to each PRP.   D.Ct.Dkt.398.at.6.   But Congress has said that an NBAR cannot be used as evidence "in any proceeding," full stop.   42 U.S.C. §9622(e)(3)(C).   And without the Batson Report, the government's justification for the settlement collapses.

In short, every step in the creation and use of the Batson Report violated CERCLA.   And those violations infect the entire consent decree, as the government has conceded that the Batson Report served as the "foundation" for its settlement, D.Ct.Dkt.288-1.at.3, and the district court explicitly "defer[red]" to that report in holding that the settlement satisfied CERCLA, D.Ct.Dkt.393.at.34-37.   The consent decree accordingly must be vacated.

b. The district court recognized that the government did not "abide by the strictures of §122(e)(3)," but held that it "did not need to"—because, according to the court, the Batson Report "was not, in fact, an NBAR."   D.Ct.Dkt.393.at.31-32. That holding defies the statutory text and common sense.

By its terms, §122(e)(3) applies to any "nonbinding preliminary allocation of responsibility."   42 U.S.C. §9622(e)(3).   That precisely captures what the Batson

Report is:  a nonbinding, preliminary allocation of responsibility for the cleanup of the lower 8.3 miles of the Passaic.  Indeed, the government has repeatedly conceded that the Batson Report is a "non-binding allocation of responsibility."  D.Ct.Dkt.288-4.at.16, 71.  By EPA's own telling, the report was developed to promote settlement by estimating "the relative equitable responsibility" of PRPs for "the costs of remediating" OU2, D.Ct.Dkt.289.at.ARR0006, which is precisely what an NBAR does, *see* 42 U.S.C. §9622(e)(3)(A) (NBARs are designed to "expedite settlement" by "allocat[ing] percentages of the total cost of response among potentially responsible parties").

The court nevertheless posited that the Batson Report must not be an NBAR because its preparation "differed in many ways from the standard NBAR procedures."  D.Ct.Dkt.393.at.31-32.  But violations of the statutory requirements for valid NBARs make for an invalid NBAR; they do not somehow transmute a flawed NBAR into something else or something lawful.  The court's contrary view— that an NBAR ceases to be an NBAR if EPA fails to follow the statutory requirements for preparing one, D.Ct.Dkt.393.at.32—is circular in the extreme and would deprive §122(e)(3)'s safeguards of any force.  No one would excuse an agency's failure to use notice-and-comment procedures when promulgating a new rule by claiming that violating 5 U.S.C. §553 made the proceeding something other than a rulemaking.  The argument works no better for NBARs.

The court also excused EPA's failure to abide by §122(e)(3) when preparing an NBAR because §122(e)(3) "merely states that the President 'may' provide an NBAR, not that he or she is required to." D.Ct.Dkt.393.at.32. That conclusion does not follow. To be sure, EPA is not *required* to prepare an NBAR. But that in no way excuses EPA from complying with statutory requirements when it pursues that non-mandatory course. "An agency, after all, literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022); *cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) (courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority"). CERCLA authorizes the government to prepare nonbinding allocations of responsibility, subject to certain restrictions; it nowhere authorizes EPA to prepare some other type of nonbinding allocation of responsibility that is somehow "not an NBAR," D.Ct.Dkt.393.at.32. *Cf. Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 757 (2002) (something that "walks, talks, and squawks very much like a lawsuit" is a lawsuit for Eleventh Amendment purposes).

The district court's contrary suggestion contravenes not only the plain text, but also the rule that courts should not construe a general grant of authority to "undermine limitations created by a more specific provision." *United States v. Rose*, 538 F.3d 175, 183 (3d Cir. 2008). If EPA truly had some free-floating "discretion"

to prepare quasi-NBARs on whatever terms it chooses, then neither §122(e)(3)(A)'s express grant of authority to "provide a nonbinding preliminary allocation of responsibility" nor the limits Congress established on that authority in §122(e)(3)(C) and (D) would serve any purpose. The court's approach thus would "nullif[y] textually applicable provisions meant to limit [the agency's] discretion." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001).

In short, it is undisputed that the Batson Report is a "non-binding allocation of responsibility," D.Ct.Dkt.288-4.at.16, and that it did not comply with several of §122(e)(3)'s procedural requirements for NBARs. Because that allocation—the "foundation" of the consent decree, D.Ct.Dkt.288-1.at.3—violated statutory restrictions on EPA's authority and cannot be used as evidence to support the consent decree in any event, *see* 42 U.S.C. §9622(e)(3)(C), the decree must be vacated.

### 2.    EPA flouted §122(f)'s limitations on covenants not to sue.

The consent decree also violates §122(f)'s restrictions on covenants not to sue. Congress authorized the government to "provide any person with a covenant not to sue," but no such covenant may be granted until "[t]he response action has been approved by [EPA]," and a covenant "shall not take effect until [EPA] certifies that remedial action has been completed." 42 U.S.C. §9622(f)(1), (3). Yet the consent decree provides covenants not to sue that purportedly took effect when the court approved the decree, D.Ct.Dkt.398.at.¶¶5, 13, 14; *see* D.Ct.Dkt.398—even though

the final remedy for OU4 has not even been selected and the final remedy for OU2 is nowhere near complete. *See, e.g.*, D.Ct.Dkt.288-6 ¶¶19, 26-28; Dkt.288-5 ¶¶16-17, 23, 57(d). These defects are fatal, as "a district court may not approve a consent decree that 'conflicts with or violates' an applicable statute." *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1185 (9th Cir. 2013) (quoting *Loc. No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 526 (1986)).

The court conceded that "the Covenant's Effective Date is technically before the President will have certified that remedial action is complete for OU2 and OU4." D.Ct.Dkt.393.at.33. Basic rules of chronology left it no other choice. The court nevertheless excused that glaring statutory violation because the decree includes "a Reopener provision that holds Settling Defendants liable for additional response actions or reimbursement should cleanup costs for OU2 and OU4 exceed" $3.68 billion, which is *twice* the current estimate. D.Ct.Dkt.393.at.33-34; *see* D.Ct.Dkt.398.at.¶15(f). But §122(f) contains no exception for settlements with a reopener. The court had no more power than the government to dismiss Congress' unequivocal limitations on covenants not to sue as mere "technical[ities]" that can be replaced with something more to the government's (and the settling parties') liking.

Nor may compliance with §122(f) be excused on the theory that CERCLA should be "'construe[d]… liberally' in furtherance of [its] purposes."

D.Ct.Dkt.393.at.33 (quoting *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258 (3d Cir. 1992)).  That mode of statutory construction has long been out of fashion:  The best guide to a statute's purpose is its text, which should be interpreted neither liberally nor conservatively, but fairly.  *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88-89 (2018).  Regardless, "even the most formidable policy arguments cannot 'overcome' a clear statutory directive." *BP P.L.C. v. Mayor & City Council of Balt.*, 141 S. Ct. 1532, 1542 (2021).  So even accepting the dubious proposition that it is desirable to let 82 PRPs off the hook before the OU2 and OU4 remedies have even begun to be implemented, our legal system "does not permit agencies to act unlawfully even in pursuit of desirable ends," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021) (per curiam).

### B.    EPA Cannot Evade §122 by Invoking the Attorney General's Inherent Settlement Authority.

Unable to credibly argue that it complied with §122(e)(3) and (f), the government argued below that §122 "does not apply," because (according to the government) §122 "regulates settlement-types not at issue here and does not otherwise restrict the Attorney General's inherent authority to resolve claims on behalf of the United States." D.Ct.Dkt.393.at.29; *see, e.g.*, D.Ct.Dkt.337.at.23.  The district court stopped short of accepting that argument, *see* D.Ct.Dkt.393.at.30-31, and for good reason:  It is irreconcilable with the litigation record—including the consent decree—and would render §122 a dead letter.

a. Section 122 broadly governs "Settlements" of CERCLA liability, and the government has repeatedly admitted that it governs this one. EPA followed notice-and-comment procedures "in accordance with Section 122(d)(2)." D.Ct.Dkt.398.at.¶42. Its publication in the Federal Register was entitled "Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act," 87 Fed. Reg. 78710, 78710 (Dec. 22, 2022), a title that "expressly and unequivocally states that the Consent Decree was entered into pursuant to CERCLA, not the government's inherent power to settle cases," *United States v. S. Jersey Clothing Store*, 976 F.Supp.2d 577, 590 (D.N.J. 2013). And the consent decree repeatedly refers to §122: It includes covenants not to sue pursuant to §122(f), D.Ct.Dkt.398.at.¶¶13-14, and requires "each Settling Defendant" to certify that it "has fully complied and will fully comply with … [§]122(e)," D.Ct.Dkt.398.at.¶27. Simply put, the government's assertion that §122 is inapplicable is "inconsistent with the record and procedural history of this case." *S. Jersey*, 976 F.Supp.2d at 589.

Regardless, the settlement could not be justified as a permissible exercise of the Attorney General's inherent authority, as it is well established that her authority "does not include license to agree to settlement terms that would violate the civil laws governing the agency." *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d 759, 762 (4th Cir. 1993); *see United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir.

2008); *Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476, 1481 (D.C. Cir. 1995). Whatever the scope of the Attorney General's settlement authority, it does not empower the government to violate the restrictions Congress has placed on CERCLA settlements generally or the use of NBARs in particular.

The government's contrary argument proves far too much. If the Attorney General's settlement authority were really a get-out-of-CERCLA-free card, then EPA could disregard not only Congress' express restrictions on NBARs and covenants not to sue, *see* 42 U.S.C. §9622(e)(3), (f), but also Congress' requirements to solicit public comments and submit settlements to judicial review, *see id.* §9622(d), (*i*). Congress imposed those restrictions to strike a careful balance among the competing interests of accomplishing prompt cleanups, incentivizing cooperation by PRPs, and guarding against the acute risk of unfairness to non-settlors that CERCLA's joint-and-several liability regime creates. *See supra* pp.7-10. Embracing the government's boundless view of the Attorney General's power would nullify Congress' considered judgment on how to accomplish those ends consistent with the public interest, the Constitution, and fundamental fairness.

b. The government's contrary argument "rel[ies] primarily on" *United States v. Hercules*, 961 F.2d 796 (8th Cir. 1992)—an out-of-circuit opinion that is both distinguishable and unpersuasive. *See* D.Ct.Dkt.393.at.29. According to that decision, §§122(a) through (f) apply only "to agreements for actual remedial action"

under §106, not "to agreements for the recovery of costs" under §107. 961 F.2d at 798-99. The Eighth Circuit therefore concluded that the Attorney General may settle cost-recovery claims under §107—but not remediation claims under §106—without complying with those provisions. That suffices to render *Hercules* inapposite here, because the United States brought, and the consent decree purports to resolve, both §106 remediation claims and §107 cost-recovery claims. D.Ct.Dkt.282.at.¶¶36-44.

That said, *Hercules* is neither binding nor persuasive. Its holding that subsections (a) through (f) of §122 apply only to "remedial action cleanup settlements," 961 F.3d at 799, cannot be squared with the plain text of those provisions. Section 122(c) mandates that "[*w*]*henever* the President … enter[s] into an agreement under *this section*," it "shall" include "a covenant not to sue in accordance with subsection (f)." 42 U.S.C. §9622(c)(1) (emphases added). Subsection (f), in turn, empowers the President to "provide … a covenant not to sue concerning *any* liability to the United States *under this chapter*." 42 U.S.C. §9622(f)(1) (emphases added). And in determining whether to provide such a covenant, subsection (f)(4) directs the President to consider (among other things) "[*w*]hether the remedial action will be carried out, in whole or in significant part, by the responsible parties themselves." *Id.* §9622(f)(4)(G). Both §122(c) and (f) thus apply whenever EPA settles CERCLA claims.

Section 122(e)(3) similarly authorizes the President to produce an NBAR "[w]hen it would expedite *settlements under this section*." 42 U.S.C. §9622(c)(1) (emphasis added). A cost-recovery settlement under §122 is a "settlement under this section," so §122(e)(3) covers cost-recovery actions under §107, not just remedial actions under §106. Unsurprisingly, EPA has in fact prepared and used NBARs to facilitate cost-recovery settlements under §107(a). *See, e.g.*, *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1014-15 (8th Cir. 2002).

*Hercules* engaged with none of that. It instead invoked the canon against surplusage, asserting that, if (a) through (f) applied to all settlements (instead of just remedial-action settlements), that "would render several subsections of the statute redundant because [some] topics are repeated" across different subsections. 961 F.2d at 799 (highlighting recurring topics such as covenants not to sue (subsections (f) and (g)), public-participation rules (subsections (d) and (*i*)), and liability of non-settlors (subsections (c), (g), and (h))). But the Eighth Circuit overlooked meaningful distinctions among those provisions, including, e.g., that subsection (g) builds on subsection (f) to provide distinct rules for de minimis settlements, and that subsection (h) provides settlement authority to a broader universe of actors. Moreover, the Supreme Court has made clear—as to CERCLA in particular—that "it is appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction that threatens to render the entire provision a nullity." *Atl.*

42

*Rsch. Corp.*, 551 U.S. at 137.  *Hercules* does the latter:  It limits multiple provisions of §122 to remedial-action settlements even though the statute expressly states that they apply to *all* settlements under §122.  Still worse, *Hercules* allows the Attorney General to wield her settlement authority to evade vital, congressionally mandated constraints whenever the government enters into a cost-recovery settlement.  Even if *Hercules* were relevant here (it is not, given the §106 claims), this Court should reject it.

## II.    The Consent Decree Is Not Substantively Fair, Reasonable, And Consistent With CERCLA's Goals.

The consent decree not only violates CERCLA's procedural requirements multiple times over but also is substantively unreasonable.  As both the district court and the government acknowledged, Batson's allocation of responsibility "was the foundation for the settlement."   D.Ct.Dkt.288-1.at.3; *accord* D.Ct.Dkt.393.at.13.  And Batson's bedrock conclusion on which all adjustments were based was that OxyChem should bear *99.94%* of the costs of cleaning up the Passaic—in other words, that "this is essentially a one-party, one-contaminant Site."  D.Ct.Dkt.306.at.4.

That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013).  The settling parties' own expert acknowledged that *thousands* of industrial facilities spewed contaminants of concern into the Passaic for more than 150 years.  *See* D.Ct.Dkt.289-19.at.ARR2915-17, 2935-42; *accord* D.Ct.Dkt.309-

2.Ex.6.at.12:18-20. The United States itself declared the Passaic's "[a]quatic life destroyed" as of *1926*—decades before OxyChem's predecessor came onto the scene. D.Ct.Dkt.309-2.Ex.7.at.12. Even assuming (contrary to EPA's own findings) that OxyChem's predecessor was the only contributor of dioxins, *compare* D.Ct.Dkt.289-15.at.ARR2575, *with* D.Ct.Dkt.288-14.at.B.9.¶44; D.Ct.Dkt.309-9.Ex.87.at.7-9, it is manifestly unfair to saddle OxyChem with virtually the entire cost of cleaning up more than 3 million kilograms of lead, 2 million kilograms of copper, 400,000 kilograms of PAHs, 42,000 kilograms of mercury, and 26,000 kilograms of PCBs that others dumped into the Passaic for decades and decades. *See* D.Ct.Dkt.289-19.at.ARR3245; D.Ct.Dkt.309-2.Ex.3.at.14-16, 21-41.

## A.     The District Court Failed to Meaningfully Review the Substantive Flaws in the Consent Decree.

In deciding whether to enter a proposed consent decree, a court must ensure that the allocation of responsibility on which it rests is not "arbitrary" or "capricious" and reflects a "rational estimate[] of the harm each party has caused." *Tutu Water Wells*, 326 F.3d at 207. Of course, a court reviewing a CERCLA settlement need not "engag[e] in a *de novo* review of the scientific evidence." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1424 (6th Cir. 1991). But it does have an "obligation to independently 'scrutinize' the terms of a settlement" to ensure that they are reasonable and fair to all potentially interested parties, including non-settlors. *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747 (9th Cir.

1995) (vacating CERCLA consent decree because court unduly "rel[ied] on the recommendations of [a] Special Master, who vouched for the settlement's fairness"). The court may not "mechanistically 'rubber stamp' the consent decree"; it must make its own judgment after "carefully consider[ing] the underlying facts and legal arguments." *BP Amoco Oil*, 277 F.3d at 1019.

Here, OxyChem presented a wealth of evidence showing that the settlement is substantively unfair and that Batson grossly underestimated the settling parties' comparative fault. *See, e.g.*, D.Ct.Dkt.309.at.29-31; D.Ct.Dkt.309-19. Among other things, Batson unreasonably refused to consider how much their actions contributed to the costs of remediation, D.Ct.Dkt.309.at.32-33; ignored an entire category of pollutants that EPA determined present significant environmental risks, D.Ct.Dkt.309.at.33-37; made egregious mathematical errors, D.Ct.Dkt.309.at.38-39; and arbitrarily treated OxyChem worse than the settling parties, D.Ct.Dkt.309.at.39-41.    And OxyChem explained why EPA's post-hoc "adjustments" could not transform Batson's error-riddled report into a viable measure of comparative fault.  D.Ct.Dkt.335.at.22-26.

Remarkably, the court refused to engage with *any* of these arguments.  It instead simply announced that "the Government ha[d] adequately and coherently addressed" them, and that it would "defer to the Governments' [sic] expertise." D.Ct.Dkt.393.at.35-37.  That is not the independent scrutiny the law requires.  While

an agency's "reasonable determination of fault and damages … is owed some deference," the court must still conduct its own assessment of the "measure of comparative fault." *Tutu Water Wells*, 326 F.3d at 207. Here, that means independently assessing whether Batson's allocation "derive[d] in a sensible way from a plausible interpretation of the record." *Id.* Instead of conducting that inquiry, the court summarily declared that the government had provided "plausible explanations" for Batson's "strategic and highly complex choices"—without even explaining what those explanations were, let alone how they could justify saddling one party with practically all responsibility for cleaning up more than a century of pollution from thousands of companies. D.Ct.Dkt.393.at.37. By refusing to engage with OxyChem's arguments, the court effectively nullified Congress' considered decision to protect non-settlors (and the broader public interest) by subjecting CERCLA settlements to judicial review. *See* 42 U.S.C. §9622(c)(1), (d)(1), (g)(4), (m); *cf. Ohio v. EPA*, 603 U.S. 279, 292 (2024) (courts must "ensure" that agency action is "reasonable and reasonably explained"); *Girsh v. Jepson*, 521 F.2d 153, 159 (3d Cir. 1975) (deeming it "essential" that district courts evaluating the fairness of a class-action settlement provide "well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors," not "mere boiler plate approval … unsupported by evaluation of the facts or analysis of the law").

At bottom, the decision below reflects not permissible "defer[ence]" to agency "expertise," *contra* D.Ct.Dkt.393.at.36, but an abdication of the court's statutory duty to ensure that the settlement is fair and reasonable. When, as here, "a district court fails to exercise its discretion, that is itself an abuse of discretion." *Cornelius v. CVS Pharmacy Inc.*, 133 F.4th 240, 251 (3d Cir. 2025); *see also United States v. Johnson*, 388 F.3d 96, 101 (3d Cir. 2004) ("If the district court does not articulate the reasons underlying its decision[,] there is no way to review its exercise of discretion."). That abdication is particularly unacceptable when Congress required judicial review as a check to ensure that the parties responsible for the settlement, including EPA, did not yield to the temptations to disadvantage non-participating PRPs. For that reason alone, the decision cannot stand.

### B. The Consent Decree Grossly Underestimated the Settling Defendants' Share of Responsibility for Polluting OU2.

Unsurprisingly, given the combination of the government's failure to abide by key procedural requirements and the district court's failure to conduct any meaningful substantive scrutiny, the consent decree is substantively unsustainable. The government's effort to saddle one party with practically all responsibility for cleaning up a century's worth of pollution from thousands of companies is not "based on" anything even approaching "a rational determination of comparative fault." *Tutu Water Wells*, 326 F.3d at 207.

1. **Batson's bedrock conclusion that OxyChem should bear more than 99.9% of the responsibility for cleaning up the Passaic is unsustainable.**

To reach its facially absurd conclusion that OxyChem should bear practically all responsibility for cleaning up the Passaic, the Batson Report relied on numerous arbitrary and unreasonable choices.

a. To begin, Batson arbitrarily apportioned liability for cleanup costs based on the health and environmental risk posed by contaminants rather than the cost to clean them up. That confuses considerations that might inform penalties with factors relevant to cost recovery, violating the commonsense rule that *cost-recovery* settlements must assign liability based on responsibility for *response costs*. *See Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 359 n.20 (3d Cir. 2018) (cost allocation methodology must "account for the varying costs across [remediation] activities"); *cf.* D.Ct.Dkt.288-5.at.¶20 (acknowledging that the settlement is intended to recoup "costs incurred by the government in taking response actions at OU2").

As its name suggests, the purpose of a §107(a) cost-recovery settlement is to recover the actual costs of remedying contamination. *See* D.Ct.Dkt.288-5.at.12. Here, EPA's chosen remedy for OU2 requires removing "6 kg of [dioxins], 3,000 kg of Total PCBs, 600 kg of Total DDx and 11,000 kg of mercury," and then installing an engineered bank-to-bank cap on the bottom of the riverbed. D.Ct.Dkt.309-

2.Ex.5.at.39.  EPA estimated that this will cost $1.38 billion.  D.Ct.Dkt.288-5.at.¶16; *see* D.Ct.Dkt.309-2.Ex.3.at.79-88.  Those are the OU2 cleanup costs that EPA apportioned in the settlement.  Yet instead of divvying up those costs based on who was responsible for the contaminants being dredged or contained, Batson assigned liability based on "[h]ow much harm" each settlor's pollution "pose[s] to humans and the environment."  D.Ct.Dkt.288-5.at.¶45(d).  In particular, he decided how much of each contaminant to attribute to each PRP, then "multiplied [those] shares" by the "relative risk numbers" that he attributed to each contaminant.  D.Ct.Dkt.288-5.at.¶45(d).

That decision jumps the tracks between punishment and cost-recovery.  The point of the settlement is to assign responsibility for cleanup costs, not to punish parties for actions that do not affect those costs.  By failing to appreciate that, Batson employed a methodology that produced a facially absurd apportionment of liability for the costs of cleaning up the contaminants at issue.  Because he believed that dioxins present the greatest health and environmental risk, and because he assigned nearly all the dioxins in the Passaic to OxyChem—and then gave OxyChem nearly all liability for the "orphan shares," to boot—he assigned 99.94% of the cleanup costs to OxyChem.  But pollution in the Passaic reached catastrophic (and costly to remediate) levels long before OxyChem's predecessor began operating.  And even after OxyChem's predecessor arrived, other parties continued to discharge untold

numbers of toxins into the river. *See supra* p.10. The truth is that, after more than a century of heavy industrial pollution, massive remediation would be necessary even if OxyChem's predecessor had never existed. D.Ct.Dkt.288-11.at.49-52, 62. So too if any one polluter were removed from the mix—which is why a rigorous allocation process was critical. Batson provided something altogether different. It was arbitrary for him to apportion virtually all the remediation costs to OxyChem just because he deemed dioxins more harmful than the other pollutants that undeniably contaminated the Passaic and are undeniably more costly to remove. D.Ct.Dkt.309-2.Ex.3.at.50-53, 63.

b. Even on the dubious assumption that EPA could permissibly rely on health risks rather than cleanup costs to allocate cleanup costs, the Batson Report miscalculated the comparative risk of dioxins. As explained, OU2 contains several contaminants of concern, including dioxins and PCBs. And there are specific PCBs—called dioxin-like PCBs—that pose risks comparable to dioxins. *See* D.Ct.Dkt.288-13.B.5.at.¶30. So, when EPA calculates PCB-related risk, it typically performs one calculation for dioxin-like PCBs and another for non-dioxin-like PCBs. *See* D.Ct.Dkt.309-6.Ex.53.at.5; D.Ct.Dkt.309-2.Ex.3.at.24.n.13. EPA then combines those numbers to assign overall PCB risk. *See* D.Ct.Dkt.309-6.Ex.54.at.8 ("risks ... from the dioxin-like and non-dioxin like PCBs should be combined to calculate the total cancer risks").

Although EPA specifically found substantial dioxin-like PCBs at OU2, *see* D.Ct.Dkt.309-2.Ex.3.at.29 (acknowledging "dioxin-like PCBs" as one of the "primary contributors to the excess risk" at OU2), Batson did *not* separate out and measure the risk of dioxin-like PCBs contributed by each PRP. He instead lumped all PCBs together for risk purposes, causing risk arising from dioxin-like PCBS to vanish from the relative risk number for PCBs and effectively increasing the dioxin risk:



D.Ct.Dkt.309.at.36; *see* D.Ct.Dkt.288-11.at.61-67; D.Ct.Dkt.288-13.B.4.at.¶¶5, 16-22; D.Ct.Dkt.288-13.B.5.at.¶¶10, 30-33.

This was no minor omission. There are at least 22 parties—14 of which are released in the settlement—with high levels of dioxin-like PCBs in their soil, making Batson's assessment of "PCB risks" far too low. Dkt.309-18.at.¶20.fig.5. By focusing on risk but arbitrarily ignoring dioxin-like PCBs, Batson ultimately assigned 84% of costs to dioxins, just 13% to PCBs, and only 3% to the remaining six contaminants combined. D.Ct.Dkt.289-3.at.ARR0336. That shifted hundreds of millions of dollars off of PCB contributors and onto parties like OxyChem—an error

with an impact (at least 11% of the total $1.84 billion cleanup cost) larger than the entire $150 million settlement. *See* D.Ct.Dkt.309-2.Ex.3.at.29. Far from "adequately and coherently address[ing]" this issue, D.Ct.Dkt.393.at.35, the government initially tried to justify Batson's assignment of 84% of costs to dioxins by comparing it to an EPA risk assessment that "*include[d]* dioxin-like PCBs," before ultimately conceding that Batson's figure exceeded the estimated range for "risk from dioxins alone" and self-contradictorily asserting that the EPA assessment was not the right comparator. Dkt.337.at.32-33 (emphasis added); *see* Dkt.288-1.at.10, 40.

c. The Batson Report also contains basic mathematical and factual errors. For example, Batson used the wrong units when calculating Diamond Alkali's purported dioxin contributions, leading him to a *million-fold* overestimate. In his calculations, Batson inadvertently translated *milligrams* to *kilograms* and parts per *billion* to parts per *million*, *see* D.Ct.Dkt.288-12.B.1.at.¶63 & tbl.6, causing him to incorrectly calculate a portion of Diamond Alkali's dioxin contributions as a million times higher than it was. And Batson concluded that dieldrin (an insecticide) was discharged from the Diamond Alkali facility, supposedly because it "was detected" in soil samples, D.Ct.Dkt.289-6.at.ARR1444, 1468, when in reality those soil samples came from *another facility* located half a mile away, *see* D.Ct.Dkt.288-14.B.9.at.¶¶32-33. As those examples illustrate, Batson's repeated errors render his

work as a whole unreliable, confirming that his report does not provide a "rational estimate[] of the harm each party has caused." *Tutu Water Wells*, 326 F.3d at 207.

d. Underscoring the more fundamental problem with the entire Batson enterprise, the settlement largely exonerates some of the river's worst polluters. By influencing the allocation methodology and strategically submitting (or withholding) evidence, many settlors that operated large industrial complexes for decades when "it was common practice to discharge wastewater into the river" convinced Batson to assign them only a minimal share of responsibility. D.Ct.Dkt.309-2.at.Ex.6.12:18-20;    D.Ct.Dkt.288-14.B.11.at.¶¶47-48,    54-62; D.Ct.Dkt.288-14.B.8.at.¶45.  Even a cursory review of the length, scope, and type of these parties' operations shows that the harm they caused was anything but "minor," D.Ct.Dkt.398.at.6.  *See* D.Ct.Dkt.309-15; D.Ct.Dkt.309-19.

Givaudan provides a striking example.  As noted, New Jersey identified dioxins in the soil of Givaudan's property as far back as 1983, *see* D.Ct.Dkt.309-2.Ex.9, and two EPA-sponsored studies have concluded that Givaudan was responsible for at least 5-15% of the dioxins in OU2, *see* D.Ct.Dkt.288-14.B.9.at.¶44. Even under Batson's flawed dioxin-focused methodology, that should make Givaudan *alone* responsible for approximately $150 million of the cost of cleaning up the Passaic—roughly the amount of the entire 82-party settlement. *See* D.Ct.Dkt.309-19.at.5-6.

Batson dramatically underestimated the responsibility of numerous other settling parties as well. For example, Batson posited that PPG Industries ("PPG") had discharged waste through sewers for treatment *before those sewers existed*. When OxyChem pointed that out, the government "recalculated PPG's base score" to be "approximately 10 times higher than [its] original base score," D.Ct.Dkt.288-4.at.116, but inexplicably allowed PPG to remain in the settlement and made no change to the settlement amount. Batson also posited that settling defendant Benjamin Moore discharged less than 30 pounds of PCBs into the Passaic River—about 4 one-gallon paint cans—over nearly a century of paint-producing operations on the Passaic, *see* D.Ct.Dkt.289-10.at.ARR2117, D.Ct.Dkt.309-19.at.1, even though PCBs were used in paints for over 50 years and Benjamin Moore purchased 7,000 pounds of PCB Aroclors for use at its Newark facility *in 1968-1970 alone*. D.Ct.Dkt.309-19.at.1; D.Ct.Dkt.309-6.Ex.69.at.LPCPG0000363-65. And Batson assigned STWB, Inc., *no* responsibility for direct discharges despite its sworn admissions that it poured untreated waste directly into the Passaic for decades. D.Ct.Dkt.309-19.at.9; D.Ct.Dkt.288-11.at.163-66.

The list goes on and on. Batson disregarded strong evidence that EnPro is liable for discharging significant quantities of PCBs as the corporate successor to Crucible Steel, which used massive quantities of oils containing PCBs over many decades and had *no* documented waste disposal practices *other than* to discharge

waste directly into the river.  D.Ct.Dkt.309-19.at.3-5; D.Ct.Dkt.309-7.Ex.74.at.¶¶4-

7.  He found that Legacy Vulcan discharged *no* PCBs from its Passaic-adjacent

facility, even though both Vulcan and its predecessor used PCBs and the facility's

soil was polluted with them.    D.Ct.Dkt.309-19.at.9-10;  D.Ct.Dkt.309-9.Ex.95.

Montrose Chemical manufactured DDT and dioxin-generating chemicals while

dumping its wastes into the river, yet Batson assigned it no liability for those

discharges.  D.Ct.Dkt.309-19.at.7; D.Ct.Dkt.309-9.Ex.89.  And Batson disregarded

decades of pollution by Cooper Industries under the assumption that Cooper was not

liable for the operations of its predecessor J. Wiss & Sons, D.Ct.Dkt.309-19.at.2,

even though a court has ruled precisely the opposite, *see Pub. Serv. Elec. & Gas Co.*

*v. Cooper Indus., LLC*, 678 F.Supp.3d 611, 629 (D.N.J. 2023).

### 2.    EPA's modest "adjustments" to Batson's work come nowhere close to remedying its fundamental flaws.

To its (limited) credit, EPA apparently recognized that Batson's allocation was

too glaringly flawed to adopt wholesale.  But rather than acknowledge that those

substantive flaws were owing to an irredeemably flawed process, EPA tried to paper

over them by making two "adjustments" to Batson's findings.  D.Ct.Dkt.393.at.36.

Those changes do not begin to transform Batson's error-riddled work into a "rational

determination of comparative fault." *Tutu Water Wells*, 326 F.3d at 207.

First, EPA discarded Batson's "protocol" method in favor of his *post hoc*

"alternative" method, which eliminated OxyChem's supposed liability for "orphan

shares" of contaminants that OxyChem's predecessor never discharged. *See* D.Ct.Dkt.289.at.ARR0028. But that "alternative" method is still infected by Batson's many methodological mistakes, including conflation of health risks and cleanup costs, miscalculation of the relative risks posed by dioxins and PCBs, and reliance on an evidentiary record with gaping holes. Rather than accurately reflecting relative responsibility, the "alternative method" largely shifts liability for the supposed "orphan share" of PCBs from one nonsettlor (OxyChem) to two others (Nokia and Pharmacia), while continuing to dramatically understate the liability of settling parties such as Givaudan, PPG, and Benjamin Moore—leaving the total share of responsibility of all 82 settling parties at just 1.95%. D.Ct.Dkt.288-5.at.¶57(a); *see* D.Ct.Dkt.289-8.at.ARR2005.

Second, EPA abandoned Batson's "cooperation and culpability adjustments," deeming them too "subjective." D.Ct.Dkt.288-5.at.¶57(b). While that at least eliminated the severe 100% culpability enhancement Batson had imposed on OxyChem, D.Ct.Dkt.289-15.ARR2586-87, it did not fix any of the many other errors in his work, *see supra* pp.48-55. Moreover, though EPA wisely declined to punish OxyChem for declining to participate in a statutorily unauthorized allocation, it failed to explain why it continued to give OxyChem no credit for its long and substantial history of voluntary cleanup efforts at the site. *See supra* pp.7-10. In the end, EPA still allocated just 3.88% of the total responsibility to the 82 settling

parties—an average of *just 0.04%* per party—leaving the vast majority on OxyChem's shoulders.  Given the abundant record evidence that Givaudan, PPG, Benjamin Moore, and other settling parties spent decades discharging huge amounts of toxic waste into the Passaic, that allocation remains objectively unreasonable even with EPA's tweaks.

### C.    The Consent Decree Arbitrarily Releases the Settling Parties From Liability for OU4 Based on a Study That Considered Only OU2.

As bad as the consent decree's flaws are with respect to OU2 (the lower 8.3 miles of the Passaic), they are even worse with respect to the rest of OU4 (the upper 9 miles)—an area that Batson did not even purport to consider.  As explained, *see supra* pp.11-12, OU2 and OU4 differ substantially in shape, depth, and contaminant load.  *See* D.Ct.Dkt.288-11.at.103; 309-2.Ex.3.at.2; D.Ct.Dkt.288-13.B.7.at.¶¶19-21; D.Ct.Dkt.288-14.B.9.at.¶62.  It therefore comes as no surprise that EPA determined that OU2 and OU4 demand different remedies.  OU2 needs "bank to bank" "dredg[ing]" of the river bottom and an "engineered cap" covering the entire lower 8.3 miles of the river.  D.Ct.Dkt.309-2.Ex.3.at.79-81.  OU4's interim remedy, by contrast, "will involve the targeted dredging and capping of … hot spots … in the upper 9 miles."  D.Ct.Dkt.288-1.at.10.

The Batson Report addressed only OU2.  *See, e.g.*, D.Ct.Dkt.289.at.6 (explaining that the report's objective was "to establish the relative equitable responsibility of certain parties for a portion of the costs *of remediating Operable*

*Unit 2*" (emphasis added)).  Batson did not purport to study—much less make findings about—how to allocate comparative fault among PRPs in OU4.  So even assuming *arguendo* that his report could provide a rational basis for allocating responsibility for OU2, it provides no basis at all for allocating responsibility for the additional *$441 million* of EPA-estimated response costs of the interim remedy for the OU4 area that Batson did not even consider—much less the unknown costs of the as-yet-undetermined permanent remedy for that area.  The consent decree accordingly is not based on any "rational estimate[] of the harm each party has caused" as to OU4.  *SEPTA*, 235 F.3d at 823.

The district court barely addressed that glaring problem.  In its background description of the consent decree, the court parroted EPA's justifications for including OU4 in the settlement, including its assertions that Batson's allocation considered releases of contaminants to the entire river, and that contaminated sediments are "commingled and deposited throughout" the river—without ever addressing the significant differences in the geography and hydrology of OU2 and OU4, or the corresponding differences in the levels and distribution of contamination and accompanying responsibility.  D.Ct.Dkt.393.at.12-13.  The court simply declared that the government had provided a "plausible explanation[]" for its purportedly "well-considered choice to extend the [consent decree] to OU4"—without even identifying what that explanation was.  D.Ct.Dkt.393.at.37.  That

cursory assertion is plainly insufficient to justify extending Batson's flawed allocation for OU2 to an additional 9 miles of the river (and $441 million in cleanup costs) that Batson never considered.

### D. The Consent Decree Contravenes CERCLA's Goals and the Public Interest.

The consent decree not only violates CERCLA's express requirements, *see supra* pp.31-43, but utterly fails to "further[] CERCLA's goals," *contra* D.Ct.Dkt.393.at.39-40. Instead of holding the 82 settling parties accountable for their extensive pollution of the Passaic, EPA let them off the hook for a collective payment of $150 million—a fraction of the $1.84 billion that EPA estimates the cleanup will cost—by estimating their collective share of responsibility at an average of just 0.04% per settling party. And the consent decree not only leaves OxyChem liable for virtually all the rest, but attempts to deprive OxyChem of its right to litigate who should actually be held responsible for what portion of the harm, by purporting to bar OxyChem from seeking contribution from the settling parties. CERCLA does not favor a settlement that places almost all burdens on one or two out of hundreds of polluters, seeks to confiscate the contribution claims of the only party actually doing cleanup work, and lets dozens of PRPs off the hook for a pittance.

Once again, the district court's contrary conclusion misses the mark. The court asserted that the settlement would hold the settling parties "accountable for more than their fair share of liability," Dkt.393.at.39, but that blinks reality: By any

reasonable measure, major polluters included among the 82 settling parties are responsible for more than a mere 0.04% on average of the estimated cleanup costs, and OxyChem should not be barred from bringing contribution actions to force them to pay their fair share.  And the consent decree does not remotely "preserve[] the Government's enforcement resources," *contra* Dkt.393.at.39; on the contrary, as OxyChem explained, it violates EPA's longstanding policy that settling claims "for less than a substantial proportion of cleanup costs or remedial actions at [a] site" is *not* "an effective use of government resources."  D.Ct.Dkt.309 at 46-47.

In sum, the consent decree violates clear statutory restrictions on CERCLA settlements and NBARs, rests on an arbitrary and unreasonable allocation of responsibility, and contravenes CERCLA's basic goals.  For any and all of those reasons, it cannot stand.

# CONCLUSION

This Court should vacate the consent decree.

Respectfully submitted,

s/Paul D. Clement

KATHY D. PATRICK
ANN T. LEBECK
NICK J. BEACHY
GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 751-5253
kpatrick@gibbsbruns.com


JOHN J. MCDERMOTT
LAUREN KROHN WILD
MCDERMOTT WILD LLC
900 Haddon Avenue, Suite 233
Collingswood, NJ 08018
(856) 746-7962
jmcdermott@mcdermottwild.com

PAUL D. CLEMENT
  *Counsel of Record*
ERIN E. MURPHY
C. HARKER RHODES IV
JOSEPH J. DEMOTT
PHILIP HAMMERSLEY*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar


LARRY SILVER
LANGSAM STEVENS SILVER &
  HOLLAENDER LLP
1818 Market St., Suite 2430
Philadelphia, Pennsylvania 19103
 (215) 732-3255
lsilver@lssh-law.com

*Counsel for Occidental Chemical Corp.*

July 28, 2025

## CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies pursuant to L.A.R. 46.1 that the lead attorney whose name appears on the foregoing brief was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit and is presently a member in good standing of the Bar of said court.

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

The undersigned hereby certifies that this brief complies with the type-volume requirements and limitations of Fed. R. App. P. 32(a).  Specifically, this brief contains 12,997 words in 14-point Times New Roman font.

## IDENTICAL PDF AND HARD COPY CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.1(c) because the text of the electronic brief is identical to the text in the paper copies.

## VIRUS SCAN CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.1(c) because the virus detection program SentinelOne, version 22.2.4.558, has been run on the file and no virus was detected.

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement