# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

OCCIDENTAL CHEMICAL CORPORATION,

*Intervenor-Appellant.*

NOKIA OF AMERICA CORPORATION,

*Intervenor-Appellant,*

v.

ALDEN LEEDS INC., et al.,

*Defendants-Appellees.*

On Appeal from the U.S. District Court for the District of New Jersey

## REPLY BRIEF FOR INTERVENOR-APPELLANT
## ENVIRONMENTAL RESOURCE HOLDINGS, LLC
## (FORMERLY OCCIDENTAL CHEMICAL CORPORATION)

KATHY D. PATRICK
ANN T. LEBECK
NICK J. BEACHY
GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 751-5253
kpatrick@gibbsbruns.com

PAUL D. CLEMENT
ERIN E. MURPHY
C. HARKER RHODES IV
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*(additional counsel on inside cover)*

*Counsel for Intervenor-Appellant Environmental Resource Holdings, LLC
(formerly Occidental Chemical Corporation)*

January 21, 2026

JOHN J. MCDERMOTT
LAUREN KROHN WILD
MCDERMOTT WILD LLC
900 Haddon Avenue, Suite 233
Collingswood, NJ 08018
(856) 746-7962
jmcdermott@mcdermottwild.com

LARRY SILVER
LANGSAM STEVENS SILVER &
  HOLLAENDER LLP
1818 Market St., Suite 2430
Philadelphia, Pennsylvania 19103
 (215) 732-3255
lsilver@lssh-law.com

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Circuit Rule 26.1, Environmental Resource Holdings, LLC (formerly Occidental Chemical Corporation) hereby certifies that its ultimate parent corporation is Occidental Petroleum Corporation, a Delaware corporation. Berkshire Hathaway Inc. indirectly owns 10% or more of the issued and outstanding shares of common stock of Occidental Petroleum Corporation. No other publicly traded company owns more than 10% of the common stock of Occidental Petroleum Corporation.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................... i

TABLE OF AUTHORITIES................................................................. iv

INTRODUCTION .............................................................................. 1

ARGUMENT ..................................................................................... 3

I.    The Consent Decree Must Be Vacated Because EPA Failed To Comply With The Procedural Requirements Of CERCLA §122 ................. 3

    A.    EPA Violated §122 Several Times Over................................ 3

        1.    EPA flouted §122(e)(3)'s restrictions on the preparation and use of non-binding preliminary allocations of responsibility ....................................... 3

        2.    EPA flouted §122(f)'s limitations on covenants not to sue ......................................................................... 7

    B.    Appellees' Efforts to Evade §122 Fail ................................ 9

        1.    The plain text of §122 imposes restrictions on EPA's authority that are subject to judicial review........................... 10

        2.    Context confirms that §122 limits EPA's authority to settle CERCLA claims ............................................. 15

        3.    Section 122 governs "cleanup" and "cashout" settlements alike.................................................... 18

II.    The Consent Decree Is Not Substantively Fair, Reasonable, And Consistent With CERCLA's Goals ............................................. 23

    A.    The District Court Failed to Meaningfully Consider the Substantive Problems With the Consent Decree................................ 23

    B.    The Consent Decree Grossly Underestimates the Settling Defendants' Share of Responsibility for Polluting OU2.................... 26

1. Batson's bedrock conclusion that OxyChem should bear more than 99.9% of the responsibility for cleaning up the Passaic is unsustainable .................................................. 26

2. EPA's modest "adjustments" to Batson's work come nowhere close to remedying its fundamental flaws ................. 30

C. The Consent Decree Arbitrarily Releases the Settling Parties From Liability for OU4 Based on a Study That Considered Only OU2 ........................................................................................ 31

D. The Consent Decree Contravenes CERCLA's Goals and the Public Interest ..................................................................................... 33

CONCLUSION ......................................................................................... 34

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE WITH WORD COUNT

IDENTICAL PDF AND HARD COPY CERTIFICATE

VIRUS SCAN CERTIFICATE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Castro v. United States*,
540 U.S. 375 (2003) ................................................................13

*Cornelius v. CVS Pharmacy Inc.*,
133 F.4th 240 (3d Cir. 2025) .................................................25

*Dravo Corp. v. Zuber*,
13 F.3d 1222 (8th Cir. 1994) ........................................ 14, 15

*Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*,
3 F.3d 759 (4th Cir. 1993) ............................................. 2, 12

*In re Tutu Water Wells CERCLA Litig.*,
326 F.3d 201 (3d Cir. 2003) ........................................ 26, 31

*Port of Seattle v. Boeing Co.*,
2022 WL 17176858 (W.D. Wash. Nov. 23, 2022) .................6

*Talley v. Clark*,
111 F.4th 255 (3d Cir. 2024) .................................................19

*United States v. Cannons Eng'g Corp.*,
899 F.2d 79 (1st Cir. 1990) ....................................................25

*United States v. Hercules, Inc.*,
961 F.2d 796 (8th Cir. 1992) .................................................13

**Statutes**

42 U.S.C. §9613(f)(2) .............................................................8

42 U.S.C. §9613(f)(3) .............................................................8

42 U.S.C. §9622(a) ........................................................ *passim*

42 U.S.C. §9622(b)(2) ...........................................................14

42 U.S.C. §9622(c)(1) ...........................................................14

42 U.S.C. §9622(d) ................................................................14

42 U.S.C. §9622(d)(1)................................................................. 12, 18

42 U.S.C. §9622(d)(2)..................................................................12

42 U.S.C. §9622(e)(1)..................................................................19

42 U.S.C. §9622(e)(3).............................................................. *passim*

42 U.S.C. §9622(e)(4)..................................................................19

42 U.S.C. §9622(f)(1) ........................................................... 7, 10, 20

42 U.S.C. §9622(f)(3) ........................................................ 7, 8, 9, 10

42 U.S.C. §9622(f)(4) ............................................................ 10, 20

42 U.S.C. §9622(g)......................................................................22

42 U.S.C. §9622(h)......................................................................22

42 U.S.C. §9622(m).....................................................................14

Pub. L. No. 99-499, 100 Stat. 1613 (1986)....................................16

## Regulations

52 Fed. Reg. 19919 (May 28, 1987) ......................................6, 11, 20

52 Fed. Reg. 28038 (July 27, 1987)....................................7, 8, 11, 20

53 Fed. Reg. 8279 (Mar. 14, 1988) ........................................... 19

## Other Authorities

Howard F. Chang, *Developments in Law - Toxic Waste Litigation*,
    99 Harv. L. Rev. 1458 (1986) ...........................................16

132 Cong. Rec. S14918 (daily ed. Oct. 3, 1986) ...................................17

Frank B. Cross, *Settlement Under the 1986 Superfund Amendments*,
    66 Or. L. Rev. 517 (1987) ..................................... 15, 16, 17

H.R. Rep. No. 99-253 (1985)....................................... 16, 17, 21

H.R. Rep. No. 99-962 (1986) (Conf. Rep.) ............................. 13, 14, 17

Martha L. Judy, Katherine N. Probst, *Superfund at 30*,
11 Vt. J. Envtl. L. 191 (2009) ............................................................ 17

James T. O'Reilly, *Superfund & Brownfields Cleanup* (Sept. 2025)....................... 6

James M. Strock, *Settlement Policy Under the Superfund Amendments
and Reauthorization Act of 1986*, 58 U. Colo. L. Rev. 599 (1988)....................15

*Superfund Clean-Up Policy and the Seymour Recycling Case:
Hearing Before H. Subcomm. on Investigations and Oversight*,
98th Cong., 2d Sess. (Mar. 13-15, 1984)...................................................... 16, 33

## INTRODUCTION

Appellees' response briefs confirm that the consent decree must be vacated. Appellees have no plausible argument that the government complied with CERCLA §122(e)(3) and (f), so they advance a series of extraordinary theories attempting to excuse its non-compliance. But none has any basis in the statute, and most would render Congress' detailed procedural requirements for CERCLA settlements a dead letter. Appellees likewise have no viable defense of Batson's absurd conclusion that OxyChem should bear more than 99.9% of the responsibility for cleaning up the Passaic River even though thousands of companies have discharged massive quantities of pollution into it over the past two centuries. Given those severe procedural and substantive flaws, the consent decree cannot stand.

In enacting §122, Congress placed clear limits on the government's authority to settle CERCLA claims and authorized courts to enforce those limits. Appellees' contention that compliance with §122 is optional ignores the statute's plain language and Congress' avowed purpose to clarify the limited circumstances in which CERCLA settlements are appropriate. The government lacks authority to provide a "non-binding allocation of responsibility" for CERCLA liability without complying with §122(e)(3), or to hand out covenants not to sue for CERCLA liability without complying with §122(f). And Appellees cannot circumvent §122 by invoking the Attorney General's settlement authority, as the statute's restrictions on "the

President" necessarily restrict his subordinates, and the Attorney General has no power "to agree to settlement terms that would violate the civil laws governing the agency." *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d 759, 762 (4th Cir. 1993). Appellees fare no better in claiming that §122(e)(3)'s limitations on NBARs and §122(f)'s restrictions on covenants not to sue apply only to "cleanup" settlements; both provisions explicitly apply beyond that limited context, and EPA's own guidance states that NBARs may be used for facilitating monetary settlements. This Court should reject the government's attempt to escape the restrictions that Congress placed on its authority to settle CERCLA claims.

Appellees' efforts to sidestep the consent decree's substantive flaws are similarly unavailing. Their plea for deference to the district court's analysis cannot be squared with the district court's failure to meaningfully scrutinize the proposed settlement or engage with OxyChem's substantive arguments. Appellees' efforts to distance themselves from Batson's allocation also fail, as the government expressly conceded below that the settlement cannot be upheld unless that allocation was "rational." D.Ct.Dkt.288-1.at.3, 27. And Batson's allocation was patently irrational; indeed, the government practically admits that Batson erroneously added more than $150 million to his estimate of OxyChem's liability just by understating the health risks posed by dioxin-like polychlorinated biphenyls ("PCBs"). Appellees also fail to justify EPA's decision to use Batson's study of contaminated sediment in OU2

(the lower 8.3 miles of the river) to release the settling parties from an estimated $441 million in liability for cleaning up OU4 (which includes the upper 9 miles of the river).  The Court should vacate this deeply flawed consent decree.

## ARGUMENT

### I.    The Consent Decree Must Be Vacated Because EPA Failed To Comply With The Procedural Requirements Of CERCLA §122.

The consent decree must be vacated because both its terms and the process through which it was entered violated CERCLA §122 several times over.  The government no longer even claims that it complied with §122(e)(3) or §122(f).  It instead attempts to evade §122 altogether.  That effort fails.  Section 122 imposes mandatory restrictions on "the President" that neither EPA nor the Attorney General may disregard, and the relevant provisions apply to "cashout" and "cleanup" settlements alike.

#### A.    EPA Violated §122 Several Times Over.

##### 1.    EPA flouted §122(e)(3)'s restrictions on the preparation and use of non-binding preliminary allocations of responsibility.

Section 122(e)(3) authorizes the government to prepare and use nonbinding allocations of responsibility ("NBARs"), but it places specific limits on that authority:  An NBAR must be prepared by federal employees, not private contractors; its costs "shall be reimbursed by" settling parties; and it "shall not be admissible as evidence in any proceeding." 42 U.S.C. §9622(e)(3)(A), (C), (D).  The government's creation and use of the Batson Report—which is concededly a "non-

binding allocation of responsibility," D.Ct.Dkt.288-4.at.16, 71 (EPA's "Responsiveness Summary")—violated all these requirements. *See* Oxy.Br.31-33.

The government no longer contends that it complied with §122(e)(3). For good reason: The Batson Report was not prepared by federal employees, the settling parties did not pay for it, and the government offered it below as its primary evidence to justify the settlement. Oxy.Br.31-33. The SPG nevertheless claims there was "no actual violation of §122(e)" because (it says) the Batson Report was not used as "*evidence*" in the district court. SPG.Br.39. The SPG never made that argument below, so it is forfeited. It is also meritless. The government submitted the Batson Report as an exhibit to its motion to approve the settlement, and the district court heavily relied on it. *See* D.Ct.Dkt.289.at.1; D.Ct.Dkt.393.at.23-28, 34-37. And even if that were consistent with §122(e)(3)(C)—which it was not—the SPG ignores the separate violations of §122(e)(3)(A) and (D).

Unable to show compliance with §122(e)(3), Appellees claim that the Batson Report "was not an NBAR." U.S.Br.35; *see* SPG.Br.37-39. That makes no sense. The Batson Report is *exactly* "what the statute describes," SPG.Br.39: It is "a nonbinding preliminary allocation of responsibility which allocates percentages of the total cost of response among potentially responsible parties at the facility," and it was "provide[d]" to PRPs to "expedite" a CERCLA "settlement[]." 42 U.S.C. §9622(e)(3)(A). Appellees observe that EPA consciously chose "not to use the …

procedures of Section 122(e)" and departed from its own NBAR guidance. U.S.Br.35-36; *see* SPG.Br.38. That is certainly true, but avowed disregard of legal obligations does not make them disappear. And Appellees cite no statute that even arguably empowers EPA to provide a "non-binding allocation of responsibility," D.Ct.Dkt.288-4.at.16, without complying with the conditions in §122(e)(3). Accepting Appellees' contention that EPA has free-floating authority to decline to follow §122(e)(3) when creating and using an NBAR would deprive §122(e)(3) of any force.

OxyChem's plain-text reading of §122(e)(3) is hardly a "breathtaking" limitation on the government's settlement authority. *Contra* U.S.Br.34-35; SPG.Br.40. No one contends that §122(e)(3) "govern[s] every settlement involving multiple parties or foreclose[s] other approaches to alternative dispute resolution." *Contra* U.S.Br.35. Section 122(e)(3) does not require EPA to prepare an NBAR in any, let alone every, case it seeks to settle; it does not apply when EPA is simply preparing an internal estimate of how responsibility should be allocated, *contra* U.S.Br.34; and it does not "preclude the use of other forms of allocations," *contra* SPG.Br.38.

Nor does §122(e)(3) affect EPA's "[t]ypical" approach to large, multiparty CERCLA settlements, as EPA *typically* lets PRPs "resolv[e] the allocation of settlement costs among [themselves], without government involvement." 2 James

T. O'Reilly, *Superfund & Brownfields Cleanup* §22:22 (Sept. 2025); *see* 52 Fed. Reg. 19919, 19919 (May 28, 1987); *Port of Seattle v. Boeing Co.*, 2022 WL 17176858, at *2-3 (W.D. Wash. Nov. 23, 2022) (describing PRP-led allocation). Section 122(e)(3) also leaves EPA free to become "informally involved in the PRP allocation process." 2 *Superfund & Brownfields Cleanup* §22:22. It just prescribes procedures that the government must use when it chooses to "prepar[e]" and "provide" an NBAR itself. 42 U.S.C. §9622(e)(3)(A).

That suffices to defeat Appellees' breathless claim that enforcing §122(e)(3) "would make consent decrees impossible and §122 self-defeating," SPG.Br.40. If EPA finds §122(e)(3) too burdensome, it can simply let PRPs prepare their own allocation, as it frequently does. Indeed, by the SPG's own account, "NBARs are exceedingly rare." SPG.Br.38. And CERCLA gives EPA several other options for addressing contamination, including issuing a unilateral administrative order, bringing an abatement action, or performing the cleanup itself and then seeking reimbursement. *See* Oxy.Br.6. But when, as here, EPA chooses to "provide a nonbinding preliminary allocation of responsibility" in hopes of "expedit[ing]" a "settlement[]," 42 U.S.C. §9622(e)(3)(A), it cannot escape the statutory requirements Congress has imposed on that device by summarily declaring that what it admits is *in fact* a nonbinding allocation of responsibility is somehow "not an NBAR within the meaning of §122(e)," SPG.Br.38.

## 2.     EPA flouted §122(f)'s limitations on covenants not to sue.

The consent decree is doubly inconsistent with §122(f), which limits the government's power to grant "covenant[s] not to sue concerning any liability to the United States … resulting from a release or threatened release of a hazardous substance addressed by a remedial action." 42 U.S.C. §9622(f)(1).  First, the decree violates §122(f)(1) by releasing the settling defendants from liability for the final remedy for OU4, even though that final "response action" has not "been approved by" EPA.  42 U.S.C. §9622(f)(1)(D).  Second, it violates §122(f)(3) by releasing the settling defendants from *all* future liability for OU2 and OU4—i.e., "any additional response activities" beyond those "set forth in the Record of Decision" for OU2 and the interim ROD for OU4, *see* 52 Fed. Reg. 28038, 28040 (July 27, 1987)—even though EPA has not yet "certifie[d] that remedial action has been completed" in OU2 or OU4.  42 U.S.C. §9622(f)(3).

The government notably does not defend the district court's reasons for concluding that the consent decree "complies with §122(f)(1)" and "does no violence to §122(f)(3)."  D.Ct.Dkt.393.at.33.  That is no surprise.  The court had no power to brush aside §122(f)'s requirements as "technical[ities]" or to nullify them under the guise of construing CERCLA "'liberally' in furtherance of [its] purposes," OxyChem.Br.37-38 (quoting D.Ct.Dkt.at.33).  Appellees' alternative efforts to evade those requirements are equally unpersuasive.  The government briefly asserts that

OxyChem's straightforward interpretation of §122(f)(1) would "conflict with CERCLA §113(f)(2) and (3)," U.S.Br.40. Not so. Once a response action has been approved, the government may reach a settlement that requires a PRP to perform or pay for only *some* of that response action, *cf.* U.S.Br.40, and the settling PRP may then bring (and enjoy protection against) claims for contribution regarding that "matter[]," 42 U.S.C. §9613(f)(2), (3). Preventing the government from handing out covenants not to sue for response actions that have not even been *approved*—such as the final remedy for OU4—in no way "foreclose[s]" the United States from reaching settlements before "all remedial action is complete." *Contra* U.S.Br.40.

The government's assertion that §122(f)(3) conflicts with §113(f)(2) and §113(f)(3) is wrong for similar reasons. Section 122(f)(3) provides that a covenant not to sue concerning *future* liability "shall not take effect until [EPA] certifies that remedial action has been completed" at the relevant "facility." 42 U.S.C. §9622(f)(3). Under that provision, while PRPs may resolve their liability for a particular response action as soon as it is approved, they cannot be relieved at that point from potential liability for additional response activities that have not yet been identified. *See* 52 Fed. Reg. at 28040 (defining "future liability"). Again, that does not prevent the United States from obtaining "less than complete relief" or PRPs from receiving contribution protection "for partially completed actions." *Contra* U.S.Br.40. But it does provide an important safeguard against allowing PRPs to cash

out before the full cost of cleanup is even ascertainable, reducing the risk that early settlors will pay less than their fair share.

Appellees suggest that §122(f)(3) is "inapposite" because it applies only to covenants not to sue concerning future liability. *See* U.S.Br.38; SPG.Br.41-42. But the consent decree is not limited to present liability (i.e., costs EPA has already incurred or remedies EPA has already identified); it purports to broadly release the settling defendants from *all* liability for OU2 and OU4, including the yet-to-be-determined final remedy for OU4. *See* D.Ct.Dkt.398.at.12(¶13); D.Ct.Dkt.398.at.15(¶23); D.Ct.Dkt.288-6.at.6-7(¶19). That violates §122(f)(3).

The SPG emphasizes the decree's "reopener" provision, *see* SPG.Br.42-43, but that does not fix the problem. Section 122(f)(3) provides that any covenant not to sue for future liability "shall not take effect" until "remedial action has been completed," 42 U.S.C. §9622(f)(3), and these covenants already "t[ook] effect" even though remedial action is far from complete. *See* D.Ct.Dkt.398.at.8(¶5), 12(¶14). EPA cannot replace §122(f)(3)'s mandate with a reopener approach that it deems close enough—which presumably explains why the government does not defend this aspect of the district court's holding.

## B. Appellees' Efforts to Evade §122 Fail.

Apparently recognizing that the consent decree violates multiple provisions of §122, Appellees spend most of their energy arguing that the government is free to

ignore §122 entirely when entering into CERCLA settlements. That position is as unpersuasive as it sounds. Both the text of §122 and the context in which it was enacted squarely refute Appellees' remarkable claim that a provision expressly designed to restrict the government's authority to settle CERCLA claims is merely "optional," U.S.Br.2.

### 1. The plain text of §122 imposes restrictions on EPA's authority that are subject to judicial review.

a. Nothing in the text of §122 even hints that subsections (e) and (f)—let alone the balance of its provisions—lay out "optional procedures" that "do not restrict" the government's settlement authority. *Contra* U.S.Br.25-26, 28-30; SPG.Br.30-31. To be sure, EPA's decision *whether* to prepare an NBAR for a particular CERCLA site is discretionary. *See* 42 U.S.C. §9622(e)(3)(A). But when (as here) EPA *does* provide a "non-binding allocation of responsibility," D.Ct.Dkt.288-4.at.16, the statute imposes mandatory requirements. *See, e.g.*, 42 U.S.C. §9622(e)(3)(C) ("shall not be admissible"); *id.* §9622(e)(3)(D) ("shall be reimbursed"). Similarly, EPA is not *required* to provide a covenant not to sue (except as stated in §122(f)(2)). But when EPA *does* provide one, the statute again imposes mandatory requirements. *See, e.g.*, *id.* §9622(f)(1) ("may … *if* each of the following conditions is met") (emphasis added); *id.* §9622(f)(3) ("shall not take effect"); *id.* §9622(f)(4) ("shall consider").

EPA itself has recognized the statute's mandatory nature. Less than a year after §122 was enacted, EPA announced that §122(e)(3) "authorizes [it] to provide

NBARs," but that an NBAR "cannot be admitted as evidence or reviewed in any judicial proceeding," and that "the costs incurred by EPA in preparing an NBAR shall be reimbursed by [settling] PRPs." 52 Fed. Reg. at 19919. EPA similarly acknowledged that "§122(f) permits [it] to issue covenants not [to] sue for CERCLA liability, including future liability, *if certain criteria are met*." 52 Fed. Reg. at 28038 (emphasis added). Those candid assessments of the recently enacted statute, not the strained litigation positions concocted years later, represent EPA's "contemporaneous … interpretation" of §122(e) and (f). *Contra* U.S.Br.29-30.

Section 122(a)'s statement that EPA may "decide[] not to use the procedures in this section," 42 U.S.C. §9622(a), does not alter the analysis. Again, settlement is just one of several tools for addressing CERCLA liability. *See supra* p.6; Oxy.Br.6. Section 122(a) accordingly clarifies that EPA is not *required* to pursue settlement—or provide an NBAR, or grant a discretionary covenant not to sue—in any particular case. But that does not excuse EPA from complying with §122 when it *does* pursue settlement (or provide an NBAR, or grant a covenant not to sue). *See supra* pp.4-6. Indeed, reading §122(a) as empowering EPA to decline to abide by §122 would render the statute a nullity. In all events, the full sentence from §122(a) (of which Appellees quote just a snippet) provides that "[*i*]*f* [EPA] decides not to use the procedures in this section, [EPA] *shall* notify" PRPs of that decision "in writing" and provide "the reasons why use of the procedures is inappropriate." 42 U.S.C.

§9622(a) (emphases added). EPA does not even claim to have complied with that notice-and-explanation requirement here.

EPA cannot escape §122 by invoking the Attorney General's power to settle litigation involving the United States. Appellees do not dispute that the Attorney General lacks authority "to agree to settlement terms that would violate the civil laws governing the agency." Oxy.Br.39 (quoting *Exec. Bus. Media*, 3 F.3d at 762). And their assertion that §122 contains no "clear and unambiguous directive" limiting the Attorney General's authority, U.S.Br.27; SPG.Br.25, is flat wrong. Section 122's imposition of detailed restrictions on "the President" plainly binds his subordinates, including the EPA Administrator and the Attorney General. Furthermore, §122 explicitly addresses the Attorney General's role in the settlement process, belying any suggestion that it leaves her a free agent who may pursue a CERCLA settlement without public notice or judicial review. *See, e.g.*, 42 U.S.C. §9622(d)(1), (d)(2)(B). And Appellees have no answer to the point that 28 U.S.C. §516's general grant of authority to the Attorney General cannot be construed to undermine §122's "more specific provision[s]" addressing CERCLA settlements. Oxy.Br.35.[1]

b. Appellees' assertion that §122(a) precludes judicial review of EPA's failure to comply with the rest of §122, *see* U.S.Br.29-30; SPG.31-34, is weaker still—

---

[1] EPA has disclaimed reliance on the ADR Act "to 'justify' or provide a basis of authority for the [Batson] allocation." D.Ct.Dkt.288-4.at.26. *Contra* SPG.Br.31.

which presumably explains why they never raised this argument below. As noted, the penultimate sentence of §122(a) directs EPA to give PRPs notice and a reasoned explanation of any "decision" "not to use the procedures in this section." 42 U.S.C. §9622(a). The final sentence then exempts any decision "to use or not to use the[se] procedures"—i.e., to pursue or not pursue a settlement under §122(a)—from judicial review. *Id.* OxyChem is not challenging a discretionary decision about whether to pursue a settlement; it instead challenges EPA's failure to follow §122 *once it made that discretionary decision*. Section 122(a) poses no barrier to judicial review of whether EPA complied with §122 once it decided to pursue a settlement. *See, e.g.*, *United States v. Hercules, Inc.*, 961 F.2d 796, 798-800 (8th Cir. 1992) (reviewing compliance with §122); H.R. Rep. No. 99-962, at 252 (1986) (Conf. Rep.) (§122(a) does not "diminish[] the responsibility of or preclude[] the court from reviewing [a] consent decree to determine whether relevant requirements of the Act have been met").

Appellees' contrary position not only renders most of §122 nugatory but also defies other basic rules of statutory interpretation. For one, statutory limitations on judicial review must be narrowly construed. *See, e.g.*, *Castro v. United States*, 540 U.S. 375, 381 (2003). For another, courts must strive to give meaning to the entire statute. Appellees' exceedingly broad reading of §122(a)'s limitation on judicial review is at odds with §122(d) and §122(m), which authorize judicial review of

CERCLA consent decrees and reaffirm "the applicability of general principles of law regarding the setting aside or modification of consent decrees or other settlements." 42 U.S.C. §9622(d), (m). Appellees' reading is also at loggerheads with §122(c)(1), which provides that "[n]othing in" §122 "shall limit or otherwise affect the authority of any court to review [a covenant not to sue] in the consent decree process." *Id.* §9622(c)(1).

The SPG's attempt to cast §122(a) as a broad bar on judicial review, and §122(c)(1) as a "limited exception," SPG.Br.34, thus gets matters backwards. The general rule is judicial review of CERCLA settlements, including "whether relevant requirements of the Act have been met." H.R. Rep. No. 99-962, at 252. That rule is subject to several narrow exceptions—e.g., whether to pursue settlement at all, 42 U.S.C. §9622(a), "decisions regarding the availability of [Super]fund financing," *id.* §9622(b)(2), and decisions to reject certain settlement offers, *id.* §9622(e)(3)(E). Those classic discretionary determinations are nothing like the specific restrictions that Appellees' broad interpretation of §122(a) would render superfluous. Appellees' reading also would negate provisions of §122 that impose detailed restrictions on EPA's settlement authority and specifically contemplate judicial review. That is not a plausible reading of the statute.

Appellees identify just one case holding that §122(a) precluded judicial review—*Dravo Corp. v. Zuber*, 13 F.3d 1222, 1227-28 (8th Cir. 1994)—and it is

readily distinguishable. *Dravo* did not even involve judicial review of a CERCLA consent decree. It held only that a party bringing a contribution claim against a PRP that had entered into "a de minimis agreement that [wa]s embodied in an administrative order" could not collaterally challenge whether the PRP was actually "eligible for such an agreement." *Id.* at 1227-28. That is nothing like this case, which presents a direct challenge to a consent decree presented for judicial approval under §122 on the ground (among others) that it violates §122. No court has ever accepted the radical proposition that courts cannot review CERCLA consent decrees for compliance with §122's clear mandates.

### 2. Context confirms that §122 limits EPA's authority to settle CERCLA claims.

While the text of §122 forecloses Appellees' contention that it merely lays out "optional procedures," SPG.Br.30, the historical background against which §122 was enacted confirms that beyond cavil. As originally enacted in 1980, CERCLA "provided no directives regarding either settlement procedures or the form that such agreements should take." Frank B. Cross, *Settlement Under the 1986 Superfund Amendments*, 66 Or. L. Rev. 517, 518 (1987). That statutory silence left the government with "virtually unfettered discretion" over whether and how to settle with any particular party. James M. Strock, *Settlement Policy Under the Superfund Amendments and Reauthorization Act of 1986*, 58 U. Colo. L. Rev. 599, 601 (1988).

Within just a few years, Congress grew alarmed about how the government was exercising that unbounded discretion. From 1982 to 1985, multiple congressional committees launched investigations into EPA's CERCLA settlement practices. *See, e.g.*, *Superfund Clean-Up Policy and the Seymour Recycling Case: Hearing Before H. Subcomm. on Investigations and Oversight*, 98th Cong., 2d Sess. (Mar. 13-15, 1984). Based on those investigations, members of Congress expressed serious concern that the government was allowing some PRPs to enter early, unduly generous "cashout" settlements, leaving other PRPs (or taxpayers) to bear a disproportionate share of cleanup costs. For example, members of Congress heard testimony that EPA had "singled out 24 companies for settlement on favorable terms" at the Seymour Recycling site in Indiana, allowing them to "pa[y] less than their proportionate fair share" and giving non-settlors "only 10 days notice" of the agreement. *Id.* at 1172-94; *see also* Cross, *supra*, at 520.

Those early "sweetheart deals" led to "severe criticism" of EPA's settlement practices. Howard F. Chang, *Developments in Law - Toxic Waste Litigation*, 99 Harv. L. Rev. 1458, 1505-06 (1986). By mid-1985, Congress was working on legislation to "clarif[y] the authorities of the EPA to enter into settlements with parties responsible for Superfund sites." H.R. Rep. No. 99-253, at 54 (1985). After each chamber passed its own version of legislation amending CERCLA, the differences

were resolved at conference, resulting in the Superfund Amendments and Reauthorization Act ("SARA"), Pub. L. No. 99-499, 100 Stat. 1613 (1986).

SARA "sought to alleviate concerns" about EPA's settlement practices "by giving EPA clear guidance on their settlement authorities, including specific direction about clauses that may be included with any settlement agreements and specific procedures for settlement." Martha L. Judy, Katherine N. Probst, *Superfund at 30*, 11 Vt. J. Envtl. L. 191, 222 (2009). In particular, "prompted by shortcomings in the EPA's largely discretionary settlement program," Congress set forth in §122 "relatively detailed prescriptions for some aspects of Superfund settlement negotiations." Cross, *supra*, at 536.

As this history makes clear, §122 was not enacted to afford the government "broad discretionary authority to enter into certain settlements without restricting the United States' ability to enter into others." *Contra* U.S.Br.28. It was enacted to restrict the government's settlement discretion by "clarif[ying] the limited circumstances in which [CERCLA] settlements are appropriate," 132 Cong. Rec. S14918 (daily ed. Oct. 3, 1986); *see also, e.g.*, H.R. Rep. No. 99-253, at 54 (similar); H.R. Rep. No. 99-962, at 252 (emphasizing that §122 was "intended as a restraint and limit on the President's … authority").

### 3. Section 122 governs "cleanup" and "cashout" settlements alike.

Seizing on various references to "response action[s]" and "remedial action" in §122(a) through (f), Appellants argue that *all* those provisions should be read to apply *only* to "cleanup" settlements, not to "cashout" settlements. *See* U.S.Br.30-32, 37-38; SPG.Br.25-29. That argument defies the statutory text, as several of those provisions plainly cover non-"cleanup" settlements. *See* Oxy.Br.41-42. It also would have the bizarre result of leaving §122 imposing restrictions on the government's ability to enter into virtually everything *but* cashout settlements—a result profoundly at odds with the historical context just described. Congress clearly intended to require public notice and judicial review of cashout and cleanup settlements alike.

The SPG focuses heavily on the first sentence of §122(a), which authorizes agreements "to perform any response action." SPG.Br.25-26. But it ignores the second sentence, which provides an overarching instruction that *all* "agreements under this section"—a category that all agree includes several types of *non*-cleanup settlements—should be "in the public interest and consistent with the National Contingency Plan in order to expedite effective remedial actions and minimize litigation." 42 U.S.C. §9622(a).

Subsections (b) through (d) likewise all refer to "agreements under this section," confirming that those subsections are decidedly *not* limited to "agreements

to do work." *Contra* SPG.Br.25-26. Far from limiting the consent-decree process to "remedial cleanup actions," U.S.Br.31, §122(d) requires EPA to use that process "[w]henever" it "enters into an agreement … *with respect to* remedial action under" CERCLA §106, 42 U.S.C. §9622(d)(1) (emphasis added), which includes both settlements requiring performance of a remedial action and settlements requiring monetary payment toward a remedial action. *See, e.g.*, *Talley v. Clark*, 111 F.4th 255, 262 (3d Cir. 2024) (emphasizing breadth of "[t]he phrase 'with respect to'"). Moreover, §122(d)(1)(A) exempts *de minimis* cashout settlements "referred to in subsection (g)" from its consent-decree procedures, confirming that those procedures would otherwise apply to such settlements. On top of that, §122(e)(4) covers "proposal[s] for undertaking *or financing*" remedial action. 42 U.S.C. §9622(e)(4) (emphasis added). And EPA itself has long recognized that §122(b)(3) applies to a "cash-out" settlement in which "PRPs pay the Agency for a portion of the costs" of cleanup. 53 Fed. Reg. 8279, 8280 (Mar. 14, 1988).

The provisions EPA violated here—§122(e)(3) and (f)—likewise are not "specific to cleanup settlements." *Contra* SPG.Br.27; U.S.Br.32, 34. By its terms, §122(e) covers negotiations designed to "facilitate an agreement with potentially responsible parties for taking response action (including any action described in section 9604(b) of this title) and [to] expedite remedial action." 42 U.S.C. §9622(e)(1); *see, e.g.*, *id.* §9622(a). It nowhere says that the response or remedial

action must be taken by the settling PRPs themselves, and its cross-reference to 42 U.S.C. §9604(b) confirms that it need not be. That presumably explains why EPA's own guidance states that "[an] NBAR may … be useful in" facilitating *monetary* settlements. 52 Fed. Reg. at 19921. And Appellees cannot deny that EPA has used NBARs to facilitate such settlements, *see* Oxy.Br.42.

It is equally apparent that §122(f) is not limited to cleanup settlements. Section 122(f)(1) broadly governs "covenant[s] not to sue concerning *any* liability to the United States *under this chapter*." 42 U.S.C. §9622(f)(1) (emphasis added). And §122(f)(4) confirms that subsection (f) is not limited to consent decrees that require the PRP to conduct the cleanup, as it sets forth multiple factors that EPA "shall consider" "[i]n assessing the appropriateness of a covenant not to sue," including "[w]hether the remedial action will be carried out … by the responsible parties themselves." 42 U.S.C. §9622(f)(4)(G); *see* Oxy.Br.41. What is more, §122(c)(1) provides that "[w]henever" EPA "enter[s] into an agreement under *this section*"—which, again, is not limited to cleanup settlements—the settling parties' liability "shall be limited … pursuant to a covenant not to sue in accordance with subsection (f)." Congress could hardly have been clearer that §122(f) generally applies to covenants not to sue over CERCLA liability—which, again, explains why EPA itself has long recognized that §122(f)(3) covers "*any* covenant not to sue concerning future liability." 52 Fed. Reg. at 28038 (emphasis added).

The SPG—but, notably, not the government—argues that, by requiring settling parties to be "'in full compliance with a consent decree under' §106 'for *response* to the release or threatened release concerned,'" §122(f)(1)(C) implicitly limits subsection (f) to "cleanup settlements." SPG.Br.27. But as the government apparently recognizes, most cashout settlements purport to discharge liability for response actions. This is a case in point: The consent decree resolves both the government's §107 claims and its §106 claims, and it expressly "addresse[s] … all response actions taken or to be taken and all response costs incurred or to be incurred" by the settling parties "in connection with OU2 and OU4." D.Ct.Dkt.398.at.15(¶23); *see* D.Ct.Dkt.282.at.¶¶41-45.

All of that is unsurprising. Congress enacted §122 to constrain EPA's settlement authority following the "sweetheart deals" of the early 1980s. *See supra* pp.15-17. Given Congress' well-documented desire to prevent EPA from letting favored PRPs cash out for too little money, too early in the cleanup process, it would make no sense for §122 to restrict settlements with parties that actually agree to perform the cleanup but not early "cashout[s]" for parties that "do[] no work," SPG.Br.42. Indeed, the legislators who drafted §122 "specifically note[d]" their "disapproval" of EPA's *Seymour Recycling* settlement precisely because it released a group of PRPs "from any future liability" in exchange for an early cashout settlement covering about $7.5 million of an estimated $30 million cleanup. H.R.

Rep. No. 99-253, at 102-03, 283. Yet by Appellees' telling, §122 does not impose *any* restrictions on EPA's power to enter into the far more egregious and disproportionate "cashout" settlement here. That cannot be right.

Appellees' position makes even less sense given that §122 imposes specific restrictions on "[d]e minimis settlements" of both §106 remedial-action claims and §107 cost-recovery claims. *See* 42 U.S.C. §9622(g). Why would Congress have taken such care to impose procedural requirements on *de minimis* cashouts, while imposing *no* restrictions on more substantial ones? Appellees' argument also does not square with subsection (h), which authorizes "the head of any department or agency" to settle claims for funds spent conducting a cleanup, subject to several restrictions. 42 U.S.C. §9622(h). Why would Congress have imposed constraints on these low-stakes "cost recovery" settlements while imposing no constraints whatsoever on the very cash-out-early-with-no-work settlements that prompted it to enact §122 in the first place?

In yet another alternative argument, the SPG suggests that the challenged settlement "was not governed by § 122" *at all* and therefore was not subject to *any* of its requirements. SPG.Br.24; *see* SPG.Br.29, 34, 36-37. Not so. EPA has no authority to resolve §106 claims without using the consent-decree procedures of §122(d), to prepare an NBAR without complying with §122(e)(3), or to provide a covenant not to sue concerning CERCLA liability without complying with §122(f),

(g)(2), or (j)(2).  That is why the consent decree itself states that it was "lodged …

in accordance with Section 122(d)(2) of CERCLA," not some other statute.

D.Ct.Dkt.398.at.20.

At bottom, it is not OxyChem's but Appellees' position that has

"breathtaking" implications.  The government claims unreviewable authority to

release dozens of major polluters from joint-and-several liability for an estimated

$1.8 billion cleanup without giving the public prior notice, responding to public

comments, or following *any* of the other procedures codified in §122.  That position

would come as a shock to Congress, which enacted SARA to impose new and

detailed restrictions on CERCLA settlements and thus prevent EPA from letting non-

*de minimis* polluters cash out early for less than their fair share.  This Court should

not countenance Appellees' effort to render §122's detailed mandates a dead letter.

Because the government failed to comply with those mandates here, the consent

decree must be vacated.

II.    **The Consent Decree Is Not Substantively Fair, Reasonable, And Consistent With CERCLA's Goals.**

A.    **The District Court Failed to Meaningfully Consider the Substantive Problems With the Consent Decree.**

Recognizing that the government has little incentive to play hardball when

negotiating a CERCLA settlement—because it is generally non-settlors, not the

government, who end up footing the bill for a sweetheart deal—Congress has

subjected CERCLA settlements to notice-and-comment procedures and judicial review. *See* Oxy.Br.7-10. For those safeguards to be effective, district courts must "independently scrutinize the terms of [CERCLA] settlement[s]," meaningfully engage with non-settlors' concerns, and reject settlements that are unfair or contrary to the public interest. Oxy.Br.44-45. The district court here did not live up to those obligations; it instead "defer[red] to the Governments' [sic] expertise" on a host of critical issues, without any meaningful examination of the serious flaws OxyChem identified. D.Ct.Dkt.393.at.36. That approach would have been misplaced even in the heyday of *Chevron* deference, and it is a non-starter today.

Appellees' responses mischaracterize both OxyChem's position and the proceedings below. No one contends that courts must review CERCLA settlements "afresh," *contra* SPG.Br.58, or "exhaustively rebut, point-by-point, an objector's every argument," *contra* U.S.Br.42-43. But CERCLA does require meaningful judicial review of CERCLA settlements, not reflexive deference to EPA.

The government effectively concedes that the district court ignored many of OxyChem's substantive arguments, but blames OxyChem, claiming that OxyChem's district-court briefing "offer[ed] a scattershot of factual objections with little development," U.S.Br.42-43. That is completely inaccurate. OxyChem filed a well-organized brief identifying myriad problems with the Batson allocation. D.Ct.Dkt.309. Indeed, the district court never suggested that it could not *understand*

OxyChem's arguments; it just chose to trust the government rather than grapple with those arguments itself. Implicitly recognizing as much, the SPG makes the contrary—and equally specious—claim that the court *did* "carefully address[]" OxyChem's arguments. SPG.Br.56. The court's opinion refutes that characterization on its face: It dismisses multiple serious critiques of the consent decree with no meaningful explanation. D.Ct.Dkt.393.at.35.

At the very least, the district court's refusal to engage in meaningful judicial review forecloses Appellees' pleas for "double deference." U.S.Br.50; *see, e.g.*, U.S.Br.41-42; SPG.Br.44-45. The premise of the double-deference standard is that approval of a consent decree represents "a reasoned exercise" of "the trial court's informed discretion." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). When, as here, the district court refuses to even hold a hearing on a settlement involving one of the most expensive CERCLA cleanups in history, and openly "defer[s] to the Governments' [sic] expertise" on whether a settlement is fair and reasonable, D.Ct.Dkt.393.at.36, the consent decree is not "encased in a double layer of swaddling," *Cannons Eng'g*, 889 F.2d at 84. On the contrary, the district court's "fail[ure] to exercise its discretion" was "itself an abuse of discretion" that warrants vacatur. *Cornelius v. CVS Pharmacy Inc.*, 133 F.4th 240, 251 (3d Cir. 2025).

**B.    The Consent Decree Grossly Underestimates the Settling Defendants' Share of Responsibility for Polluting OU2.**

**1.    Batson's bedrock conclusion that OxyChem should bear more than 99.9% of the responsibility for cleaning up the Passaic is unsustainable.**

A consent decree cannot be approved if it is "based on" a "measure of comparative fault" that is "arbitrary, capricious, [or] devoid of a rational basis." *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003). That standard dooms this consent decree because the Batson allocation is not a rational measure of comparative fault. Batson assigned OxyChem virtually all liability for cleaning up the Passaic based on his view that OxyChem contributed nearly all the dioxins in the river, even though hundreds of other parties undisputedly contributed huge amounts of seven other contaminants that also pose serious risks to human health and the environment. *See* Oxy.Br.48-50. Batson not only saddled OxyChem with responsibility for cleaning up those other contaminants, but significantly overstated the comparative risk posed by dioxins by failing to account for dioxin-like PCBs (for which OxyChem bore no responsibility). *See* Oxy.Br.50-52. The net effect is a settlement that releases several of the river's worst polluters from present and future liability for far less than their fair share of the cost. *See* Oxy.Br.52-55.

Unable to credibly defend Batson's allocation, Appellees urge this Court not to review it. *See* U.S.Br.43; SPG.Br.46-47. That is a remarkable departure from their position below. The government conceded below that, when it "crafts a

CERCLA settlement that is based on an underlying allocation" (like the Batson Report), that allocation "must be rational." D.Ct.Dkt.288-1.at.3; *accord* D.Ct.Dkt.288-1.at.27. And Appellees continue to rely on Batson's work even now. For instance, his allocation is the entire basis for the SPG's implausible claim that its members are paying "hundreds of times more than their collective share of the site's cleanup costs." SPG.Br.17; *see also, e.g.*, SPG.Br.47 (risk-based methodology); SPG.50 (PRPs' relative contributions of dioxins); U.S.Br.50-51 (proportionate health risk from PCBs).

Appellees also spend considerable space arguing that an allocation may focus on the risk posed by each contaminant, rather than the extent to which each contributes to the cleanup costs. *See* U.S.Br.44-48; SPG.Br.48-49. But even assuming that a risk-based allocation is appropriate in some settings, Batson's exclusive focus on risk, without *any* consideration of the costs of cleaning up each contaminant, was not a reasonable way to allocate responsibility here. Indeed, "the circumstances of this site" are especially *poorly* suited to a "risk-based approach." *Contra* SPG.Br.49. The Passaic is polluted not only with dioxins, but with massive quantities of lead, copper, PAHs, mercury, and PCBs that were discharged by thousands of companies over two centuries. *See* Oxy.Br.13-14. While dioxins may have triggered the Passaic's designation as a Superfund site, all eight contaminants pose serious risks and must be cleaned up. *See* D.Ct.Dkt.309-2.Ex.3.at.55-82.

Treating dioxins as the *sole* driver of liability, as Batson effectively did, is patently unreasonable.

The SPG's assertion that dioxins were "the main cost driver" for EPA's selected remedy, SPG.Br.47-48, badly misstates the record. The relevant portion of EPA's "Responsiveness Summary" describes dioxins only as "*a* driver of remedial costs," and notes that "disposal of dredged material containing dioxin … *could* drive up remedial costs." D.Ct.Dkt.288-4.at.50-52 (emphasis added). Appellees do not deny that PCBs and other contaminants are also significant cost drivers. The government claims that dioxins "influenced the remedial design in ways that increase the costs," asserting that dioxins require the cap on the river bottom to be "thicker" and contain "more additives." U.S.Br.9, 46. Even if that were true, it would hardly suggest that dioxins are responsible for anything remotely approaching 99.9% (or even 85%) of the estimated costs. Yet Batson never even tried to estimate the amount (if any) by which dioxins will increase the total cost.

Appellees' efforts to defend Batson's conclusion that OxyChem is responsible for virtually all the dioxins in the Passaic also fall flat. Appellees contend that this conclusion was "support[ed]" by the "data in [Batson's] allocation," SPG.Br.50; U.S.Br.49-50, but they do not discuss the EPA-funded studies indicating that Givaudan was responsible for at least 5-15% of the dioxins in OU2. *See* D.Ct.Dkt.288-14.B.9.at.¶44. And OxyChem's experts did not opine that Givaudan

contributed only a small amount of dioxins, as the SPG misleadingly suggests. *Compare* SPG.Br.50 (citing the SPG's *own* expert), *with* D.Ct.Dkt.288-12.B.1.at.25-48 (OxyChem's expert criticizing Batson's approach), *and* D.Ct.Dkt.288-12.at.66 (OxyChem's expert disclaiming the SPG's interpretation of his study).  In any event, even crediting EPA's suggestion that the "dioxin signal" from Givaudan is "approximately 20 times smaller" than the one "attributable to Diamond Alkali's historical releases," Dkt.288-4.at.54-55, Givaudan alone should pay roughly the entire settlement amount.  Oxy.Br.53.

Appellees similarly lack any coherent response to Batson's failure to properly account for the risk of dioxin-like PCBs—an error that increased OxyChem's purported share of the cleanup costs by about $150 million.  *See* Oxy.Br.50-52; D.Ct.Dkt.309-2.at.70 (EPA risk assessment assigning 11% to 12% of cancer risk to dioxin-like PCBs).  The SPG misses the point entirely; the problem is not that Batson failed to "consider[] dioxin-like PCBs separately from 'dioxins alone,'" SPG.Br.51, but that he erroneously treated all PCBs as if they were the less dangerous variety. *See* Oxy.Br.51; D.Ct.Dkt.309.at.33-37.   PVSC contends that Batson "implicitly accounted for" dioxin-like PCBs, PVSC.Br.15, but that is incorrect; Batson assigned only 13% of the risk to PCBs, while EPA's risk assessments for OU2 and OU4— which *did* account for dioxin-like PCBs—estimated it at 16% to 28%. D.Ct.Dkt.309.at.37; *accord* D.Ct.Dkt.337.at.32-33 (conceding the disparity).  The

government's only response is to claim that Batson's number is "*generally consistent*

*with EPA's risk assessments*," U.S.Br.50 (emphasis added)—i.e., close enough for

government work. Had the district court actually scrutinized this settlement, rather

than rubber-stamping it, it could not have approved a $150-million error that the

government cannot justify even now.

Finally, Appellees blame OxyChem for its decision not to participate in the

voluntary Batson process. *See* U.S.Br.44; SPG.19, 46. But OxyChem was entirely

justified in declining to participate in that deeply flawed exercise—which one SPG

member aptly described as an "EPA-improvised process" with "no statutory basis,"

D.Ct.Dkt.309-3.Ex.24.at.1-2. And OxyChem certainly did not forfeit its ability to

dispute Batson's findings by not participating—particularly given the government's

repeated assurances that participation was voluntary and the results would be non-

binding. "[T]he appropriate time" to challenge Batson's allocation is now, when it

is being used to foist "disproportionate liability" upon OxyChem via a deeply flawed

consent decree. *Contra* U.S.Br.44.

## 2. EPA's modest "adjustments" to Batson's work come nowhere close to remedying its fundamental flaws.

Appellees make much of the fact that EPA did not embrace Batson's

conclusions wholesale. But neither of EPA's minor adjustments to Batson's analysis

addressed the manifold problems just discussed. *See* Oxy.Br.55-57. Nor did they

fix the fundamental defect in Batson's approach—namely, treating OU2 as "a one-

party/one-contaminant site," PVSC.Br.1, even though it contains *eight* contaminants that pose significant "risks to human health and the environment," D.Ct.Dkt.309-2.Ex.3.at.14.

Appellees offer little in response. The government tries to reframe the inquiry, asserting that OxyChem has not "establish[ed] that the Settling Defendants bear more than an 8% share of the comparative fault." U.S.Br.44. That is wrong for at least three reasons. First, it is not OxyChem's burden to quantify the settling defendants' liability; it is the government's burden to show that Batson's allocation is a rational "measure of comparative fault," *Tutu Water Wells*, 326 F.3d at 207. Second, the "adjusted" allocation puts the settling parties' collective responsibility at 3.88%, not 8%. *See, e.g.*, U.S.Br.19. Third, OxyChem introduced ample evidence (much of which the district court ignored) establishing that the settling defendants' collective share of liability should be far greater than 3.88% (or 8%). *See, e.g.*, Dkt.309-19.at.1-10 (summarizing evidence for ten settling defendants). A settlement based on an irrational allocation of responsibility that results in a substantively unfair distribution of liability cannot stand.

## C. The Consent Decree Arbitrarily Releases the Settling Parties From Liability for OU4 Based on a Study That Considered Only OU2.

Even if the Batson Report were a rational allocation of fault with respect to OU2, it was patently unreasonable to reflexively extend that same allocation to OU4. The Batson allocation was expressly cabined to OU2, the lower 8.3 miles of the

Passaic; it did not cover OU4, which includes the upper 9 miles. Dkt.289.at.6. And all agree that OU2 and OU4 differ substantially in shape, depth, and contaminant load, which is why EPA decided to treat them as distinct operational units. *See* Oxy.Br.11-12, 57. Because the Batson allocation does not even purport to provide an estimate of comparative fault for pollution in OU4, it was arbitrary for EPA to use Batson's allocation to discharge the settling parties from present and future liability for OU4, including the estimated $441 million interim remedy and the unknown costs of the yet-to-be-determined final remedy.

Appellees' assertion that Batson *did* consider releases of contaminants to OU4 is both forfeited and wrong. The government relies on a snippet from an EPA employee's declaration, *see* U.S.Br.58 (citing D.Ct.Dkt.288-5.at.37), but neither the government nor its declarant cites anything in the Batson Report itself to support that assertion—because nothing does. Appellees also invoke a portion of EPA's "Responsiveness Summary" stating that the allocation "included facilities along the entire 17-mile [river]," SPG.Br.56; U.S.Br.58, without mentioning that the *immediately preceding sentence* acknowledges that the allocation was "performed for OU2," not OU4, D.Ct.Dkt.288-4.at.84. None of that remotely supports the contention that Batson actually meant (contrary to everything in his report) for his allocation to cover OU4 as well.

Appellees claim that EPA could reasonably extend Batson's allocation for OU2 to OU4 because contaminants "are transported" and "commingled" across the entire lower Passaic. U.S.Br.58; *see* SPG.Br.55-56. That is far too slender a reed on which to discharge over 80 polluters from an estimated $441 million in joint-and-several CERCLA liability—especially when EPA itself concluded that the differing pollutants, hydrology, and geology in each area require different remedies. The notion that the settlement adequately reflects the conceded "differences" between OU2 and OU4 because the government took Batson's allocation for OU2 and multiplied it by $441 million, U.S.Br.58-59, is risible. And it is no mystery what additional information would need to be considered in allocating responsibility for OU4, *contra* U.S.Br.58: The allocation would assess the actual contaminants found in OU4 sediments, *cf.* Dkt.289.at.6, the extent to which they contributed to the costs of the distinct remedy for OU4, and PRPs' comparative fault for those contaminants. EPA's irrational decision to apply Batson's (erroneous) OU2 allocation to OU4 independently requires vacatur.

### D. The Consent Decree Contravenes CERCLA's Goals and the Public Interest.

Finally, the consent decree utterly fails to further CERCLA's goals or the public interest. Like the "sweetheart deals" of the early 1980s that impelled Congress to enact §122, it lets dozens of significant polluters off the hook for "less than their proportional fair share." *Cf. Superfund Clean-Up Policy*, *supra*, at 1173.

That neither "expedite[s] effective remedial action" nor otherwise serves "the public interest," 42 U.S.C. §9622(a). For those reasons too, the consent decree cannot stand.

## CONCLUSION

This Court should vacate the consent decree.

Respectfully submitted,

s/Paul D. Clement

KATHY D. PATRICK
ANN T. LEBECK
NICK J. BEACHY
GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
(713) 751-5253
kpatrick@gibbsbruns.com

PAUL D. CLEMENT
  *Counsel of Record*
ERIN E. MURPHY
C. HARKER RHODES IV
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

JOHN J. MCDERMOTT
LAUREN KROHN WILD
MCDERMOTT WILD LLC
900 Haddon Avenue, Suite 233
Collingswood, NJ 08018
(856) 746-7962
jmcdermott@mcdermottwild.com

LARRY SILVER
LANGSAM STEVENS SILVER &
  HOLLAENDER LLP
1818 Market St., Suite 2430
Philadelphia, Pennsylvania 19103
(215) 732-3255
lsilver@lssh-law.com

*Counsel for Appellant Environmental Resource Holdings, LLC*
*(formerly Occidental Chemical Corporation)*

January 21, 2026

## CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies pursuant to L.A.R. 46.1 that the lead attorney whose name appears on the foregoing brief was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit and is presently a member in good standing of the Bar of said court.

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

The undersigned hereby certifies that this brief complies with the type-volume requirements and limitations of Fed. R. App. P. 32(a), as expanded by this Court's order of January 14, 2026.  *See* Case No. 25-1049, Dkt.141.  Specifically, this brief contains 7,499 words in 14-point Times New Roman font.

## IDENTICAL PDF AND HARD COPY CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.1(c) because the text of the electronic brief is identical to the text in the paper copies.

## VIRUS SCAN CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.1(c) because the virus detection program SentinelOne, version 22.2.4.558, has been run on the file and no virus was detected.

**CERTIFICATE OF SERVICE**

I hereby certify that on January 21, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement