Nos. 25-1049, 25-1272

# In the United States Court of Appeals for the Third Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

OCCIDENTAL CHEMICAL CORPORATION,
*Intervenor-Appellant*,

NOKIA OF AMERICA CORPORATION,
*Intervenor-Appellant*,

*v.*

ALDEN LEEDS INC., ET AL.,
*Defendants-Appellees*.

On Appeal from the U.S. District Court for the District of New Jersey

**FINAL BRIEF OF SMALL PARTIES GROUP APPELLEES**

Jeffrey D. Talbert
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 W 55th Street
New York, NY  10019

John P. Elwood
Elisabeth S. Theodore
Samuel F. Callahan
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001

Joseph A. Greenaway Jr.
ARNOLD & PORTER
  KAYE SCHOLER LLP
One Gateway Center, Suite 1025
Newark, NJ  07102
Tel: (973) 776-1900
Fax: (973) 776-1919
joseph.greenaway@arnoldporter.com

*Counsel for Small Parties Group Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the Small Parties

Group Appellees hereby certify as follows:

| | Appellee | Disclosures |
|---|---|---|
| 1 | Arkema Inc. (f/k/a the Pennwalt Corporation / Atochem North America, Inc. / Elf Atochem North America, Inc. / ATOFINA Chemicals, Inc.) | Arkema Inc. is a wholly-owned subsidiary of Arkema Delaware, Inc. There are no publicly held companies that own 10% or more of the stock of Arkema Inc. However, Arkema Inc. is indirectly owned by Arkema, S.A., a French public company. |
| 2 | Ashland Inc. (f/k/a Ashland LLC) | As of August 1, 2022, Ashland LLC merged into its direct parent, Ashland Chemco Inc., and immediately thereafter, merged with Ashland Global Holdings Inc., and changed its legal name to Ashland Inc. There is no parent corporation of Ashland Inc. No publicly held corporation owns at least 10% of the stock of Ashland Inc. |
| 3 | Atlantic Richfield Company | Atlantic Richfield Company is a wholly-owned subsidiary of BP America Inc. |

i

| 4 | BASF Corporation<br><br>BASF Catalysts LLC (a wholly owned subsidiary of BASF Corporation) | BASF Corporation is a wholly-owned subsidiary of BASF USA Holding LLC, a Delaware limited liability company. BASF USA Holding LLC is a wholly- owned subsidiary of BASF Nederland BV, a Dutch limited liability company.<br><br>BASF Nederland BV is a wholly-owned subsidiary of BASF SE (*Societas Europaea*), a publicly held European corporation. No publicly held corporation owns ten percent or more of BASF Corporation's stock.<br><br>BASF Catalysts LLC's parent company is BASF Alpha Holding LLC. BASF Catalysts LLC and BASF Alpha Holding LLC are indirect, wholly-owned subsidiaries of BASF SE (*Societas Europaea*), a publicly held European corporation. No other publicly held corporation owns ten percent or more of BASF Catalysts LLC. |
| 5 | Benjamin Moore & Co. | Berkshire Hathaway Inc. owns one-hundred percent of Benjamin Moore & Co., Inc.'s stock. |
| 6 | Canning Gumm, LLC | Canning Gumm, LLC is a privately held company, wholly-owned by W. Canning USA, LLC, which is also privately held. W. Canning USA, LLC is wholly-owned by MacDermid, Incorporated, a privately held company. MacDermid, Incorporated is wholly-owned by Element Solutions Inc., a publicly traded company. |

| 7 | Chevron Environmental Management Company for itself and on behalf of Texaco Inc., TRMI-H LLC (formerly known as Getty Refining and Marketing Company, and Getty Oil Company (Eastern Operations) Inc.) and Four Star Oil & Gas Company (f/k/a Getty Oil Company and Tidewater Oil Company) | Chevron Environmental Management Company is a wholly-owned indirect subsidiary of Chevron Corporation. Texaco Inc. is a wholly-owned indirect subsidiary of Chevron Corporation. TRMI-H LLC is a wholly owned indirect subsidiary of Chevron Corporation. Four Star Oil & Gas Company is a wholly-owned subsidiary of FrontStreet Indonesia LLC. |
|---|---|---|
| 8 | CNA Holdings LLC (for Rome and Ferry Streets) CNA Holdings LLC/Celanese Ltd. (by and through its general partner Celanese International Corporation), and its contractual indemnitor Essex County Improvement Authority (for Doremus Avenue) | CNA Holdings LLC and Celanese Ltd. are wholly-owned subsidiaries of Celanese Corporation, a publicly held corporation. |
| 9 | Coats & Clark, Inc. | Spinrite Intermediate Holdings, Inc. is the 100% owner of issued stock in Coats & Clark, Inc. and is not a publicly-held corporation. |
| 10 | CC Oldco Corporation (f/k/a Congoleum Corporation) and the Liquidation Trust for CC Oldco Corporation (f/k/a Congoleum Corporation), improperly named as Congoleum Corporation | There is no parent corporation or any publicly held corporation that owns 10% or more of CC Oldco Corporation (f/k/a Congoleum Corporation) or the Liquidation Trust for CC Oldco Corporation (f/k/a Congoleum Corporation). |

| 11 | Cooper Industries, LLC, as successor-by-merger to Cooper Industries, Inc., which was the successor-by-merger to McGraw-Edison Company (formed by the merger of McGraw Electric Company and Thomas A. Edison, Inc.) as successor to liabilities associated with the Belmont Facility and the Glen Ridge Facility of (1) Thomas A. Edison, Inc., (2) Thomas A. Edison, (3) Edison Storage Battery Company, (4) Storage Battery Division of Thomas A. Edison, Inc., (5) Edison Storage Battery Company (also known as the Chemical Works Division and/or the Active Materials Division), (6) Cooper Industries, Inc.'s former subsidiary, Battery Products, Inc.<br><br>Cooper Industries, LLC, as successor to J. Wiss & Sons, Inc. with respect to liabilities associated with the Littleton Facility and the Bank Street Facility of J. Wiss & Sons, Inc. / Jacob Wiss and other Wiss family members / Fredken Corp. | Cooper Industries, LLC is a subsidiary of Eaton Corporation plc, which is traded on the NYSE. Eaton Corporation plc has no parent corporation and no publicly held company owns ten percent or more of its stock. |

iv

| 12 | Reworld Essex Company f/k/a Covanta Essex Company, a New Jersey general partnership and its former and current partners. Covanta Essex LLC (f/k/a ARC Essex LLC and Duke/UAE Essex LLC) and Covanta Essex II, LLC (f/k/a Covanta Essex II, Inc., ARC Essex II, Inc. and Duke/UAE Essex II, Inc.) | Reworld Essex Company is a New Jersey General Partnership. The General Partners of Reworld Essex Company are Limited Liability Companies that are not publicly traded. The General Partners of Reworld Essex Company are wholly-owned, indirect subsidiaries of Reworld Holding Corporation, which is indirectly owned by EQT AB (listed on NASDAQ Stockholm). |
|---|---|---|
| 13 | Croda Inc. | Croda Inc. is a nongovernmental corporate party, and Croda's parent corporation, and all publicly held corporations owning 10% or more of Croda's stock is Croda Investments, Inc. (parent corporation). |
| 14 | DII Industries, LLC | DII Industries, LLC is a wholly-owned subsidiary of Halliburton Energy Services, Inc., which is a wholly-owned subsidiary of Halliburton Holdings LLC, which is a wholly-owned subsidiary of Halliburton Company. |
| 15 | EnPro Holdings, Inc., as successor to the liabilities of EnPro Industries, Inc. (n/k/a Enpro Inc.), Coltec Industries Inc., Colt Industries Inc., Crucible Steel Corporation, Crucible, Inc., and Crucible Steel Company of America, and EnPro Industries, Inc. as indemnitor to Crucible Materials Corporation | Enpro Inc. f/k/a EnPro Industries, Inc. does not have any publicly held corporation owning more than 10% of its stock. Enpro Inc. is the only publicly held corporation owning more than 10% of EnPro Holdings Inc.'s stock. |

v

| 16 | EPEC Polymers Inc., on behalf of itself and El Paso Tennessee Pipeline Co. | EPEC Polymers, Inc. is a Delaware corporation, which is 100% owned by El Paso Remediation Company, a Delaware corporation, which is 100% owned by Kinder Morgan, Inc., a DE corporation. |
| --- | --- | --- |
| | | El Paso Tennessee Pipeline Co., L.L.C. is a Delaware corporation, which is 100% owned by Kinder Morgan, Inc., a Delaware corporation. |
| | | EPEC Polymers, Inc. is an indirect wholly-owned subsidiary of Kinder Morgan, Inc. and El Paso Tennessee Pipeline Co., L.L.C. is a direct wholly-owned subsidiary or Kinder Morgan, Inc. |
| 17 | Essex Chemical Corporation, including Essex Industrial Chemicals, Inc. as its wholly owned subsidiary | Essex Chemical Corporation is a wholly-owned subsidiary of The Dow Chemical Company, which is a wholly-owned subsidiary of Dow Inc. |
| 18 | Franklin-Burlington Plastics, Inc. | Franklin-Burlington Plastics, Inc. is a wholly-owned subsidiary of Laconian Holding Company. Laconian Holding Company is a wholly-owned subsidiary of Avient Corporation (f/k/a PolyOne Corporation), which is a publicly held corporation. BlackRock, Inc., a publicly held corporation, owns more than 10% of Avient Corporation. |
| 19 | Garfield Molding Company, Inc. | Garfield Molding Company, Inc. is a nongovernmental corporate party and it does not have a parent corporation, nor is there any publicly held corporation that owns 10% or more of its stock. |
| 20 | General Electric Company | General Electric Company is a publicly held company, and it has no parent corporation, nor is there any publicly held corporation that owns 10% or more of its stock. |

| 21 | Givaudan Fragrances Corporation | Givaudan Flavors and Fragrances Inc. is the parent corporation of Givaudan Fragrances Corporation. No publicly held corporation owns at least 10% of the stock of Givaudan Fragrances Corporation. |
|---|---|---|
| 22 | Goodrich Corporation for itself, Kalama Specialty Chemicals, Inc., and Noveon Kalama Inc. (f/k/a Kalama Chemical, Inc., f/k/a BF Goodrich Kalama, Inc.) | Goodrich Corporation's parent corporation, and the only corporation that holds 10% or more of its stock, is RTX Corporation. |
| 23 | Hexcel Corporation | Hexcel Corporation is a publicly held corporation that does not have a parent corporation. Based on publicly available information as of March 23, 2023, the only publicly held corporation owning 10% or more of Hexcel Corporation stock is BlackRock, Inc. |
| 24 | Hoffmann-La Roche Inc. | Hoffmann-La Roche Inc. is a subsidiary of Roche Holdings, Inc., a Delaware corporation. Hoffmann-La Roche Inc., ultimately, is wholly owned by Roche Holding Ltd. Novartis AG, a publicly held company, owns more than 10% of the voting shares of Roche Holding Ltd. Novartis AG has no representation on Roche Holding Ltd.'s board of directors and does not in any way control Roche Holding Ltd. or any of its subsidiaries. |
| 25 | Honeywell International Inc. | Honeywell International Inc. does not have a parent corporation and no publicly held corporation owns 10% or more of Honeywell International Inc.'s stock. |
| 26 | ISP Chemicals LLC | ISP Chemco LLC is the parent corporation of ISP Chemicals LLC. No publicly held corporation owns at least 10% of the stock of ISP Chemicals LLC. |

| 27 | L3Harris Technologies, Inc., (f/k/a Harris Corporation), successor in interest to Exelis Inc., successor in interest to ITT Corporation with respect to its former facility in Clifton and Nutley, NJ | Effective June 29, 2019, Harris Corporation's name changed to L3Harris Technologies, Inc. L3Harris Technologies, Inc. has no parent corporation. The Vanguard Group owns more than 10% of the stock of L3Harris Technologies, Inc. |
|---|---|---|
| 28 | Leemilt's Petroleum, Inc. (successor to Power Test of New Jersey, Inc.), on its behalf and on behalf of Power Test Realty Company Limited Partnership and Getty Properties Corp., the General Partner of Power Test Realty Company Limited Partnership | Leemilt's Petroleum, Inc., certifies that 100% of its stock is owned by Getty Properties Corp., a publicly traded company. |
| 29 | Legacy Vulcan, LLC | Legacy Vulcan, LLC is a nongovernmental party. Legacy Vulcan, LLC's parent corporation, and all publicly held corporations owning 10% or more of stock are Vulcan Materials Company. |
| 30 | Mallinckrodt LLC (f/k/a Mallinckrodt Inc.) | The parent corporation is Mallinckrodt Enterprises LLC. No publicly held corporation owns at least 10% of the stock of Mallinckrodt LLC. |
| 31 | National-Standard LLC (f/k/a National-Standard Company) | National-Standard LLC is a direct subsidiary of Heico Holding, Inc. Neither National-Standard LLC nor Heico Holding, Inc. are publicly traded companies. |

| 32 | Newell Brands Inc. on behalf of itself and Berol Corporation<br><br>Newell Brands Inc. on behalf of itself and its indemnitee and former subsidiary Goody Products, Inc. | Newell Brands Inc. is a nongovernmental corporate party with no parent corporation. Three publicly held companies, BlackRock Fund Advisors, Pzena Investment Management, LLC, and The Vanguard Group, Inc., each own more than 10% of Newell Brands Inc.'s stock.<br><br>Berol Corporation is a wholly-owned subsidiary of Newell Operating Company, which in turn is a wholly-owned subsidiary of Newell Brands Inc.<br><br>Goody Products, Inc.'s indirect parent company is ACON Equity Partners IV, L.P. No publicly held corporation owns ten percent or more of Goody Products, Inc. |
|----|------|------|
| 33 | Novelis Corporation (f/k/a Alcan Aluminum Corporation) | Novelis Corporation is a subsidiary of Novelis Incorporated. Neither Novelis Corporation, nor Novelis Incorporated are publicly-traded corporations. |
| 34 | Otis Elevator Company | Otis Elevator Company's parent corporation, and the only publicly-traded corporation owning 10% or more of its stock, is Otis Worldwide Corporation. |
| 35 | Pabst Brewing Company, LLC | Pabst Brewing Company, LLC is not a publicly traded corporation. Pabst Brewing Company, LLC is wholly-owned by Pabst Holdings, LLC, which is privately held. |
| 36 | Paramount Global (f/k/a ViacomCBS f/k/a CBS Corporation) | Paramount Global is a wholly owned subsidiary of Paramount Skydance Corporation, a publicly traded company. Harbor Lights Entertainment, Inc. (formerly known as National Amusements, Inc.), a privately held company, beneficially owns all of the Class A voting stock of Paramount Skydance Corporation. Members of the Ellison family and affiliates of RedBird Capital Partners LLC each directly or indirectly own 10% or more of Paramount Skydance Corporation's Class A and Class B stock. |

| 37 | Pitt-Consol Chemical Company and E.I. du Pont de Nemours and Company on its own behalf and on behalf of Pitt- Consol Chemical Company | Pitt-Consol Chemical Company is a wholly owned indirect subsidiary of Corteva, Inc., a publicly held corporation. EIDP, Inc. (f/k/a E.I. du Pont de Nemours and Company) states that 100% of its common stock is owned, directly by Corteva, Inc., a publicly held corporation. |
|----|----|----|
| 38 | PPG Industries, Inc. | PPG Industries, Inc. is a publicly held company, and it has no parent corporation, nor is there any publicly held corporation that owns 10% or more of its stock. |
| 39 | Primary Products Ingredients Americas LLC (f/k/a Tate & Lyle Ingredients Americas LLC f/k/a A.E. Staley Manufacturing Company) | Tate & Lyle Ingredients Americas LLC's name is now Primary Products Ingredients Americas LLC. Its parent is Primary Products Finance LLC, a Delaware LLC. 50.1% of Primary Products Finance LLC is privately held, and the remaining 49.9% is owned by TLHUS, Inc., which is wholly owned by Tate & Lyle LP, a Delaware limited partnership, which is wholly owned by Tate & Lyle Investments Ltd., which is wholly owned by Tate & Lyle PLC, a United Kingdom publicly listed company. |
| 40 | Purdue Pharma Technologies, Inc., and Nappwood Land Corporation (a subsidiary of Purdue Pharma Technologies Inc.) | Purdue Pharma Technologies Inc. is a privately held corporation and no public corporation holds 10% or more of its stock. Nappwood Land Corporation is a private corporation whose corporate parent is Purdue Pharma Technologies Inc. and no public corporation holds 10% or more of its stock. |
| 41 | Quality Carriers, Inc. and Quala Systems, Inc. | Quality Carriers, Inc.'s parent corporation, and all publicly held corporations owning 10% or more of its stock, is CSX Corporation. Quala Systems, Inc.'s parent corporation, and all publicly held corporations owning 10% or more of its stock, is Quality Carriers, Inc. |

x

| 42 | Revere Smelting and Refining Corporation | Ecobat Resources New York, LLC (f/k/a Revere Smelting and Refining Corporation) is a privately held company headquartered in Dallas, Texas. It is 100% owned by Ecobat Resources US, LLC, a privately held corporation also headquartered in Dallas, Texas. No publicly held corporation owns a ten percent (10%) or greater share of stock. |
| 43 | Royce Associates, a Limited Partnership | Royce is a nongovernmental corporate party, and does not have a parent company and no publicly held corporation owns 10% or more of its stock. |
| 44 | RTC Properties, Inc. | RTC Properties, Inc., is a wholly-owned subsidiary of Neu Brothers Holdings, Inc. No publicly-held corporation owns 10% or more of RTC Properties, Inc.'s stock. |
| 45 | Safety-Kleen Envirosystems Company, by McKesson Corporation, and McKesson Corporation | Safety-Kleen Envirosystems Company is not a publicly-held corporation. It is a wholly-owned subsidiary of Safety-Kleen Systems, Inc., which is a wholly- owned subsidiary of Safety-Kleen, Inc., which is a wholly-owned subsidiary of Clean Harbors, Inc., which is a publicly-held corporation. No other publicly-held corporation owns 10% or more of Safety-Kleen Envirosystems Company's stock. McKesson Corporation is a publicly-held corporation. It has no parent corporation. No other publicly-held corporation owns 10% or more of its stock. |

| 46 | Sequa Corporation (n/k/a Chromalloy Corporation) | Sequa Corporation (n/k/a Chromalloy Corporation) is a privately held corporation, owned by Casablanca Buyer, Inc., a privately held corporation, which in turn is ultimately owned by Veritas Capital Fund VIII, LP, a privately held fund, and Veritas Capital Fund Management, L.L.C., a limited liability company. Effective April 28, 2023, Sequa Corporation changed its name to Chromalloy Corporation. The updated corporate disclosure statement was filed at D.Ct.Dkt.242. |
| 47 | Stanley Black & Decker, Inc. (f/k/a The Stanley Works) | Stanley Black & Decker, Inc. is a publicly-traded corporation that does not have a parent corporation. No other publicly-held corporation owns 10% or more of its stock. |
| 48 | STWB Inc. | STWB Inc. is a Delaware corporation and is not publicly traded. The stock of STWB Inc. is 100% owned by Bayer Corporation. Bayer Corporation is an indirect, wholly-owned subsidiary or Bayer AG. Bayer AG is a German company whose stock is publicly traded in Germany. Bayer AG has no parent company and no publicly held company owns 10 percent or more of its stock. |
| 49 | Sun Chemical Corporation (f/k/a Sun/DIC Acquisition Corporation), and DIC Americas Inc. as guarantor | Sun Chemical Corporation is a subsidiary of Sun Chemical Group Coöperatief U.A. and its ultimate parent corporation is DIC Corporation, which is publicly- traded on Japan's Nikkei Stock Exchange. |
| 50 | Textron, Inc. | The Vanguard Group, Inc. owns 12.3% of Textron Inc. |
| 51 | TFCF America, Inc. (f/k/a 21st Century Fox America, Inc.) | TFCF America, Inc., is an indirect wholly-owned subsidiary of The Walt Disney Company, which is a publicly held corporation. Fox Corporation is an indemnitor to the Walt Disney Company with respect to certain matters relating to TFCF America, Inc. |

| 52 | The Hartz Consumer Group, Inc. as successor to certain liabilities of The Hartz Mountain Corporation, on its behalf, and on behalf of The Hartz Mountain Corporation | The Hartz Consumer Group, Inc. is a privately held corporation, organized under the laws of the State of Delaware. Its stock is 100% owned by The Hartz Group, Inc., a privately held corporation organized under the laws of the State of Delaware.

The Hartz Mountain Corporation is a privately held corporation organized and existing under the laws of the State of New Jersey. Unicharm Corporation, a publicly held Japanese corporation, and Sumitomo Corporation, a publicly held Japanese corporation, each own more than ten percent (10%) of the stock of The Hartz Mountain Corporation. |
| --- | --- | --- |
| 53 | The Newark Group, Inc., on its behalf and as successor to Newark Boxboard Company | The Newark Group, Inc. is a wholly owned subsidiary of Greif, Inc., which is a publicly traded company. No other company owns more than 10% of Greif, Inc.'s stock. |
| 54 | The Okonite Company, Inc. | The Okonite Company, Inc. is a New Jersey Corporation. It has no parent companies and no other publicly held company owns ten (10) percent or more of its stock. |
| 55 | The Sherwin-Williams Company | The Sherwin-Williams Company is a publicly held nongovernmental corporation, which has no parent corporation and, as of the date of this filing, is not aware of any publicly held corporation that owns 10% or more of its stock. |
| 56 | Tiffany and Company | Tiffany and Company is a wholly owned direct subsidiary of Tiffany & Co., which is a wholly owned indirect subsidiary of LVMH Moët Hennessy Louis Vuitton (LVMH), a publicly listed company on Euronext Paris. Christian Dior SE, a publicly listed company on Euronext Paris, owns more than 10% of LVMH. |

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................. xvi

INTRODUCTION ................................................................................1

STATEMENT OF ISSUES ...................................................................4

STATEMENT OF THE CASE ...............................................................5

    A.    Congress Enacts CERCLA to Facilitate Cleanups and Settlements to Fund Cleanups ........................................................5

    B.    OxyChem Intentionally Discharges Dioxin and Other Highly Toxic Chemicals Directly into the Passaic River................................7

    C.    EPA Designates OxyChem's Facility as a Superfund Site and Confirms that OxyChem is Overwhelmingly Responsible for Pollution in the Passaic ........................................................10

    D.    EPA Works to Develop a Remedy, and OxyChem Fights to Evade its Responsibility ........................................................11

    E.    EPA's Initiation of the Settlement Process and OxyChem's Refusal to Participate................................................................14

    F.    The Allocation Process................................................................15

    G.    Procedural History................................................................17

SUMMARY OF ARGUMENT ...............................................................21

ARGUMENT ................................................................................23

I.    Section 122 Does Not Apply to this Settlement, and Provides No Basis for Setting Aside the Consent Decree.................................23

    A.    This Consent Decree Was Negotiated Under the Attorney General's Inherent Authority, Not § 122................................24

    B.    Section 122's Procedures are Discretionary Even When They Do Apply, and the Court Lacks Jurisdiction to Review the Government's Exercise of Discretion ................................29

    C.    The Process Here Accorded with § 122 in any Event........................37

II.  The District Court Did Not Abuse Its Discretion by Approving the Consent Decree ................................................................................44

   A.  Appellate Review of Orders Entering Consent Decrees is Doubly Deferential ................................................................44

   B.  The Consent Decree is Fair, Reasonable, and Consistent with CERCLA's Goals .........................................................45

   C.  OxyChem's Objections Lack Merit ....................................47

   D.  Nokia's Arguments Are Meritless and Forfeited ...............58

CONCLUSION ............................................................................61

COMBINED CERTIFICATIONS ................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. v. Components Inc.*,
   66 F.3d 213 (9th Cir. 1995) ...............................................................25, 29

*In re ASARCO LLC*,
   No. 05-21207, 2009 WL 8176641 (Bankr. S.D. Tex. June 5, 2009) .................25

*Ass'n of Irritated Residents v. EPA*,
   494 F.3d 1027 (D.C. Cir. 2007).................................................................59

*BP P.L.C. v. Mayor & City Council of Balt.*,
   141 S. Ct. 1532 (2021).............................................................................35

*Brown v. Philip Morris Inc.*,
   250 F.3d 789 (3d Cir. 2001) .....................................................................60

*Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*,
   609 A.2d 440 (N.J. Super. Ct. App. Div. 1992) .............................2, 3, 7, 8, 9, 51

*Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*,
   No. C-3939-84 (N.J. Super. Ct. Ch. Div. Apr. 12, 1989).............................9, 10

*Dravo Corp. v. Zuber*,
   13 F.3d 1222 (8th Cir. 1994) ....................................21, 32, 33, 34, 35

*Heckler v. Chaney*,
   470 U.S. 821 (1985).................................................................................59

*Litgo N.J. Inc. v. Comm'r N.J. Dep't of Env't Prot.*,
   725 F.3d 369 (3d Cir. 2013) ...............................................................16, 48

*Loper Bright Enterprises v. Raimondo*,
   603 U.S. 369 (2024).................................................................................57

*In re LTL Mgmt., LLC*,
   64 F.4th 84 (3d Cir. 2023) ..........................................................................1

xvi

*Lyondell Chem. Co. v. Occidental Chem. Corp.*,
    608 F.3d 284 (5th Cir. 2010) ........................................................49

*Niagara Mohawk Power Corp. v. Chevron USA, Inc.*,
    596 F.3d 112 (2d Cir. 2010) .........................................................48

*Patel v. Garland*,
    596 U.S. 328 (2022)......................................................................35

*Riley v. Bondi*,
    145 S. Ct. 2190 (2025)..................................................................32

*Seven County Infrastructure Coalition v. Eagle County*,
    145 S. Ct. 1497 (2025)..................................................................57

*Swift & Co. v. United States*,
    276 U.S. 311 (1928)......................................................................24

*TD Bank N.A. v. Hill*,
    928 F.3d 259 (3d Cir. 2019) .........................................................32

*Trinity Industries, Inc. v. Greenlease Holding Co.*,
    903 F.3d 333 (3d Cir. 2018) .........................................................49

*In re Tutu Water Wells CERCLA Litig.*,
    326 F.3d 201 (3d Cir. 2003) .......................... 3–4, 18, 22, 38, 44, 45, 49, 55, 56

*United States v. Acton Corp.*,
    733 F. Supp. 869 (D.N.J. 1990)....................................................48

*United States v. Alcan Aluminum, Inc.*,
    25 F.3d 1174 (3d Cir. 1994) ........................................................5, 6

*United States v. ASARCO, Inc.*,
    814 F. Supp. 951 (D. Colo. 1993)..................................................25

*United States v. Atlas Lederer Co.*,
    494 F. Supp. 2d 629 (S.D. Ohio 2005) ..........................................25

*United States v. BP Amoco Oil PLC*,
    277 F.3d 1012 (8th Cir. 2002) ......................................................38

*United States v. Cannons Eng'g Corp.*,
   899 F.2d 79 (1st Cir. 1990)............................................. 18, 19, 44, 45, 47, 48, 58

*United States v. E.I. Dupont de Nemours & Co. Inc.*,
   432 F.3d 161 (3d Cir. 2005) .....................................................................5

*United States v. Hercules, Inc.*,
   961 F.2d 796 (8th Cir. 1992) ...............................................................25, 28, 29

*United States v. Morgan*,
   222 U.S. 274 (1911)..............................................................................25

*United States v. Occidental Chem. Corp.*,
   200 F.3d 143 (3d Cir. 1999) ...............................................................5, 6, 25, 26

*United States v. Pesses*,
   Civ. A. No. 90-654, 1994 WL 741277 (W.D. Pa. Nov. 7, 1994)......................25

*United States v. S. Jersey Clothing Co.*,
   976 F. Supp. 2d 577 (D.N.J. 2013)............................................................29

*United States v. SEPTA*,
   235 F.3d 817 (3d Cir. 2000) ...............................................................5, 35, 44, 45

*United States v. Seymour Recycling Corp.*,
   554 F. Supp. 1334 (S.D. Ind. 1982).......................................................6, 25

*United States v. Vertac Chem. Corp.*,
   756 F. Supp. 1215 (E.D. Ark. 1991)..........................................................29

*Washington v. Davis*,
   426 U.S. 229 (1976).............................................................................60

**Statutes and Rules**

5 U.S.C.
   § 551(4).........................................................................................39
   § 553.............................................................................................39
   § 572(a) .........................................................................................31

28 U.S.C. § 516....................................................................................24

42 U.S.C.

§ 9613(f)(1) ..................................................................................... 49

§ 9617(b)(3) .................................................................................... 31

§ 9622(a) .......................................................... 6, 7, 25, 26, 30, 32

§ 9622(b) ............................................................................................ 6

§ 9622(b)(1) .................................................................................... 30

§ 9622(c) ............................................................................................ 6

§ 9622(c)(1) .................................................................................... 30

§ 9622(d) ..................................................................................... 6, 34

§ 9622(d)(1)(A) .............................................................................. 30

§ 9622(d)(3) .................................................................................... 30

§ 9622(e) ............................................................................................ 6

§ 9622(e)(1) .................................................................................... 27

§ 9622(e)(3) ................................................................. 27, 30, 37–38

§ 9622(f) ............................................................................................ 6

§ 9622(f)(1) ......................................................................... 27, 30, 41

§ 9622(f)(3) ............................................................................... 34, 42

§ 9622(g) ........................................................................................ 32

§ 9622(g)(6) .................................................................................... 30

§ 9622(j)(2) ..................................................................................... 30

Pub. L. No. 99-499, title I, § 113(b),
    100 Stat. 1647-48 (Oct. 17, 1986) ........................................... 31

Fed. R. Evid. 408 ................................................................................ 39

**Legislative Materials**

H.R. Rep. 99-253 (1985) .................................................................. 6, 26

S. Rep. 96-848 (1980) ........................................................................ 8, 48

**Executive Branch Materials**

Dep't of Justice & EPA, Mem., *Defining "Matters Addressed" in
    CERCLA Settlements* (Mar. 14, 1997) ...................................... 24

Dep't of Justice, *Occidental to Pay $129 Million in Love Canal
    Settlement* (Dec. 21, 1995), https://perma.cc/BP9R-4BAG ............... 8

EPA, *A Town, a Flood, and Superfund: Looking Back at the Times Beach Disaster Nearly 40 Years Later*, https://perma.cc/3GQX-HARV ...................................................................8

EPA, *Record of Decision: Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site* (Mar. 2016), https://semspub.epa.gov/work/02/396055.pdf................................................51, 52

EPA, *Superfund Program; Covenants Not to Sue*, 52 Fed. Reg. 28038 (July 27, 1987)..............................................................41, 42

*The Attorney General's Role as Chief Litigator for the United States*, 6 Op. O.L.C. 47 (1982)..................................................................................24

Unilateral Administrative Order for Remedial Design, CERCLA Dkt. 02-2023-2011 (Mar. 2, 2023) ...................................................14

**Other Authorities**

Brief of the United States, *United States v. Atlantic Res. Corp.*, 551 U.S. 128 (2007), 2007 WL 669263 ........................................................6, 26

N.J. Exec. Order No. 40 (June 2, 1983)....................................................................53

N.J. Dep't Env't Prot. Admin. Order EO-40-1 (June 1, 1983)..............................53

N.J. Dep't Env't Prot. Admin. Order EO-40-17 (Oct. 19, 1983) ...........................53

**INTRODUCTION**

Early in its brief, the company formerly known as OxyChem[1] quips that the main factor distinguishing the "Small Parties Group" is that they are "not … OxyChem." OxyChem.Br.17. There is much to that distinction—but probably not in the way that OxyChem meant. The Small Parties overwhelmingly used municipal sewer systems to legally discharge common industrial wastes—the same kinds found in hundreds of urban rivers that are *not* Superfund sites. By contrast, OxyChem's predecessor Diamond Alkali, manufacturer of the deforestation chemical Agent Orange, "has a storied history of egregious waste disposal practices." JA7. Unlike the Small Parties, OxyChem's predecessor directly and

---

[1] Two business days ago, Appellant filed a ministerial-sounding document stating that, because of a purported "internal corporate reorganization," Appellant "is now known as Environmental Resource Holdings LLC." Dkt.114. Based on a preliminary investigation, it appears that nearly a month before Appellant's last-minute filing, the New York corporation that filed this appeal ceased to exist, having merged into a new Texas entity—Snowcone, LLC—on September 26, 2025. That new Texas LLC then divided itself into two entities, Environmental Resource Holdings LLC and Occidental Chemical Company, LLC. Appellant represents that the only portion of the former Occidental Chemical Corporation that remains a party to this case is the fraction that no longer bears the name of the company that filed the opening brief.

Appellees sought information to determine whether Environmental Resource Holdings LLC is the real party in interest, but Appellant refused to provide it. Further investigation may be necessary to determine whether Environmental Resource Holdings LLC is a proper party to this appeal, which entity or entities have appellate standing, and whether both purported successors to Snowcone, LLC must be joined as parties, among other questions. *Cf. In re LTL Mgmt., LLC*, 64 F.4th 84, 96 (3d Cir. 2023) (dismissing bankruptcy petition dependent on similar strategy).

1

illegally discharged huge amounts of 2,3,7,8-TCDD dioxin, commonly recognized as among *the most toxic-man-made substances* in history. And it did so with "full awareness of [the] devastating impact upon the environment." *Diamond Shamrock Chemicals Co. v. Aetna Cas. & Sur. Co.*, 609 A.2d 440, 454 (N.J. Super. Ct. App. Div. 1992).

OxyChem discharged this apex toxin in an unabashed effort to save money, dumping not just dioxin but DDT and other chemicals straight into the Passaic River, even installing an alarm system to ensure that regulators would not catch it. EPA has said that but for OxyChem's years of illegally discharging massive quantities of apex toxins directly into the Passaic, it might not even be a Superfund site at all. JA613; JA457-59.

Yet OxyChem has steadfastly refused to take responsibility for its devastation of the Passaic, instead grudgingly contributing toward cleanup efforts under EPA orders. To move restoration forward, EPA in 2016 began a yearslong effort to coordinate a settlement. While OxyChem refused to participate, the settling parties agreed to pay $150 million, atop another $157-million-plus to which they have already contributed. There is no serious question that figure reflects far more than the settling parties' actual share of responsibility.

Having intentionally sat out of the settlement process, OxyChem now seeks to blow up a judicially-approved consent decree and derail a long-overdue cleanup

of the river it polluted. OxyChem relies on an unprecedented reading of CERCLA that disregards not only its text but how settlements have been done for decades—and that would make voluntary multi-party settlements, one of CERCLA's main mechanisms for funding cleanups, practically impossible. According to OxyChem, the settlement practices that the Department of Justice used for years to settle CERCLA cases tacitly became illegal when Congress later granted additional settlement tools in § 122—even though Congress explicitly made those new tools optional and made the choice to use them not subject to judicial review. OxyChem identifies not a single court that has thrown out a settlement on the grounds it invented.

As the district court correctly concluded, the settlement is more than fair to OxyChem, whose predecessor's decades-long "waste disposal policy" of "'dumping everything' into the Passaic River" is why we are here today. *Diamond Shamrock*, 609 A.2d at 447-48. The district court was amply justified in approving this consent decree, following a years-long, transparent settlement process spanning multiple presidential administrations. The district court's opinion, which carefully reviewed EPA's approach to settlement amid this complex history and sprawling record, would pass muster under any standard of review. But it easily satisfies what this Court has recognized is a "doubl[y]" deferential standard for

such settlements—a standard OxyChem barely acknowledges. *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003).

Nor does Nokia's appeal present any reason to disturb the settlement. Its arguments, as the district court recognized, boil down to objections that the government has not yet settled with it—an argument that is both unripe (given ongoing settlement discussions that Nokia acknowledges) and meritless (given the government's broad discretion over whether and in what order to settle). Even if this Court believed that the government should *also* settle with Nokia, that would provide no basis for undoing a settlement with over 80 other parties.

## STATEMENT OF ISSUES

1.    Whether CERCLA § 122 applies to this cashout settlement and, if so, whether its explicitly optional procedures prohibit the district court's entry of the consent decree.

2.    Whether the district court abused its discretion in concluding that the consent decree was fair, reasonable, and consistent with CERCLA's goals.

**STATEMENT OF THE CASE**

A.    **Congress Enacts CERCLA to Facilitate Cleanups and Settlements to Fund Cleanups**

The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9675, also known as the Superfund statute, gives the federal government "a variety of tools for achieving the efficient and cost-effective cleanup of the nation's hazardous waste sites." *United States v. Occidental Chem. Corp.,* 200 F.3d 143, 147 (3d Cir. 1999).

One stands out: "[E]ncouraging settlement" is a "fundamental CERCLA policy." *United States v. E.I. Dupont de Nemours & Co. Inc.*, 432 F.3d 161, 175-76 (3d Cir. 2005). The statute favors "early settlement" over litigation, because litigation delays cleanups and can exacerbate pollution. *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1184 (3d Cir. 1994); *see United States v. SEPTA*, 235 F.3d 817, 823 (3d Cir. 2000). By contrast, early, voluntary settlements can finance and thus "accelerat[e]" further cleanup efforts. *Occidental*, 200 F.3d at 150.

Some CERCLA settlements—often referred to as "cleanup" or "response action" agreements—"involve agreements to do work." *Id.* at 147. "[O]thers"—like the agreement here—"are 'cash out' settlements in which a party pays a portion of the past, or future, response costs in exchange for a release from liability." *Id.* "In either case, settlements with the United States under CERCLA

5

typically include a covenant not to sue and contribution protection for matters addressed in the settlement." *Id.*

In the early days after CERCLA's enactment, the government successfully negotiated cashout settlements, but negotiating cleanup settlements proved trickier. H.R. Rep. 99-253, pt. 3, at 29 (1985); Brief of the United States at 40, *United States v. Atlantic Res. Corp.*, 551 U.S. 128 (2007), 2007 WL 669263. In 1986, Congress thus enacted § 122 to "encourage quicker, more equitable settlements, decrease litigation and thus facilitate cleanups." H.R. Rep. 99-253, pt. 1, at 59 (1985); *see Alcan*, 25 F.3d at 1184. Section 122 established a set of procedures that could facilitate "agreement[s] with any person … to perform any response action … if the President determines that such action will be done properly by such person." 42 U.S.C. § 9622(a); *see* § 9622(b)-(f).

Congress made clear, however, that § 122 was intended to expand rather than contract the government's settlement options. Before 1986, the federal government had entered numerous CERCLA settlements, including under the Attorney General's inherent authority to settle litigation. *See, e.g.*, *United States v. Seymour Recycling Corp.*, 554 F. Supp. 1334, 1336 (S.D. Ind. 1982). Congress preserved existing avenues for settlement like those used in this case, emphasizing that § 122's procedures were not mandatory and instead were ones that "[t]he President, in his discretion, may" use. 42 U.S.C. § 9622(a). Underscoring their

optional nature, Congress emphasized that the President's decision "to use or not to use the procedures in this section is not subject to judicial review." *Id.*

### B.    OxyChem Intentionally Discharges Dioxin and Other Highly Toxic Chemicals Directly into the Passaic River

This CERCLA settlement involves decades-long efforts to address contamination from the release of dioxin and other chemicals at the now-defunct Diamond Alkali Company manufacturing facility in Newark, New Jersey, on the bank of the Passaic River.

Diamond Alkali produced hazardous chemicals there during the 1950s and 60s, including herbicides and pesticides. *Diamond Shamrock*, 609 A.2d at 447. OxyChem purchased Diamond Alkali in 1986, after the facility had been designated a Superfund site. OxyChem is Diamond Alkali's corporate successor, and is responsible for its environmental liabilities. *See Occidental Chem. Corp. v. 21st Century Fox Am.*, No. 2:18-cv-11273 (D.N.J. Sept. 11, 2020), ECF 1105 at 4.

Among the facility's products were two now-banned chemicals: DDT, an agricultural pesticide, and Agent Orange, an infamous herbicide blend used during the Vietnam War to defoliate jungles. *Diamond Shamrock*, 609 A.2d at 477. OxyChem's manufacturing process for Agent Orange and other herbicides produced an extremely toxic form of the chemical dioxin, known as 2,3,7,8-TCDD dioxin. Dioxin causes cancer and other adverse health effects at even extremely low levels. It is one of the most lethal substances ever identified. JA627-28, 629-

7

31; JA680-82. Indeed, dioxin discharges, including from OxyChem itself, helped spur CERCLA's passage in the first place. S. Rep. 96-848, at 9-10 (1980). After OxyChem's predecessor dumped dioxin and other chemicals into a New York canal, President Carter declared two emergencies, officials had to remove dioxin to protect children who played nearby, and hundreds of residents had to be relocated.[2] Dioxin is so toxic that EPA was forced to buy and condemn *another* entire town and relocate all 2,000 residents after flooding spread dioxin-contaminated oil across the area.[3]

OxyChem made no effort to protect the public from the dioxin, DDT, and other toxic chemicals it was discharging into the Passaic. Quite the contrary. As a New Jersey court later found, management "knew of the hazardous nature of dioxins at a relatively early stage." *Diamond Shamrock*, 609 A.2d at 462. But the company "conscious[ly]" rejected adopting a manufacturing process "by which dioxins could be eliminated, or at least reduced"—because "[p]rofits came first." *Id.* Instead, the company engaged in a "deliberate and willful course of misconduct," "knowingly and routinely discharg[ing] contaminants over a period of 18 years." *Id.* at 455, 461.

---

[2] Dep't of Justice, *Occidental to Pay $129 Million in Love Canal Settlement* (Dec. 21, 1995), https://perma.cc/BP9R-4BAG.

[3] EPA, *A Town, a Flood, and Superfund: Looking Back at the Times Beach Disaster Nearly 40 Years Later*, https://perma.cc/3GQX-HARV.

Most egregiously, OxyChem deliberately and illegally discharged its chemical waste directly "into the Passaic River." *Id.* at 448. The Passaic Valley Sewerage Commission had begun operating a water treatment plant in 1924. JA445. Yet OxyChem continued to discharge *all* wastes directly into the River through 1956. JA384. In 1956, OxyChem purported to connect the plant to the sewer—but it deliberately declined to connect the building that generated dioxin, even as it *lied* to regulators and told them that it had connected the entire plant. *See id.*; *Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.* (*Aetna I*), No. C-3939-84, at 8-12, 32-34 (N.J. Super. Ct. Ch. Div. Apr. 12, 1989).[4] Agent Orange ingredients "were 'always on the floor'" of the facility, and employees regularly "washed down [the floor] with sulfuric acid with the waste water flowing into trenches which led outside the building into the river." *Diamond Shamrock*, 609 A.2d at 448.

Meanwhile, the company discharged so much DDT that "mid-river 'mountain[s]'" formed, and so OxyChem deployed employees surreptitiously to break up the mountains of DDT. *Id.* It installed an alarm system to alert its employees if inspectors were coming. *Aetna I*, No. C-3939-84, at 9.

This policy of "known violation" was "consciously adopted by Diamond's management" to cut costs. *Id.* at 10. As a New Jersey court found, "even by the

---

[4] nj.gov/dep/passaicdocs/docs/SummaryJudgment/Exhibits/Exhibit15.pdf.

standards of the 1951–1969 time period," OxyChem's conduct at the plant "was unacceptably wrong and irresponsible." *Id.* at 11. Other entities operating near the River produced nothing approaching OxyChem's highly toxic dioxin discharges, and they primarily discharged waste via a municipal sewer system, not directly and deliberately into the Passaic.

### C. EPA Designates OxyChem's Facility as a Superfund Site and Confirms that OxyChem is Overwhelmingly Responsible for Pollution in the Passaic

EPA and the State of New Jersey first detected high levels of dioxin at Diamond Alkali's facility in 1983. JA457. The State immediately authorized emergency measures, including securing the property and covering exposed soil to prevent the chemicals from migrating. JA458-59. In 1984, EPA listed the Diamond Alkali facility as a Superfund site. JA457. Its testing quickly confirmed the presence of dioxin, DDT, and other contaminants from the facility in the Passaic. *Id.*

In its 40 years of investigation and remediation efforts, EPA has repeatedly confirmed that OxyChem's discharges into the River were overwhelmingly responsible for the dangerous contamination. The "geographic extent" of the site, EPA explained, is "defined by the presence of dioxin and other" contaminants of concern "released from the Diamond Alkali facility." JA382. Dioxins in particular were "the most significant risk-driver for the Lower Passaic River." JA375-76,

10

382. And virtually all of the dioxin in the River was attributable to OxyChem's decades of systematic, illegal, and clandestine discharges. *See* JA730-35 (OxyChem's expert).

Other regulators, and courts, have reached the same conclusion. In an enforcement action brought under New Jersey's Spill Act, a court found OxyChem jointly and severally liable for *all costs* that the State incurred in responding to discharges in the lower 17 miles of the River. JA239-41. OxyChem and its indemnitors ended up settling for 90% of the $355 million in damages the State recovered.[5]

EPA has explained that there might not have been a need for *any* Superfund cleanup if OxyChem's facility had been out of the picture. It was "not a given that in the absence of the Diamond Alkali operations and releases" of dioxin, DDT, and other chemicals, "the Lower Passaic River … would have been listed" as a Superfund site. JA612-13; *see* JA382-83.

### D. EPA Works to Develop a Remedy, and OxyChem Fights to Evade its Responsibility

EPA has divided the site into four "operable units" or "OUs" to help prioritize cleanup efforts. Reflecting the central importance of Diamond Alkali's

---

[5] *New Jersey Dep't of Env't Prot. v. Occidental Chem. Corp.*, No. L9868-05 (N.J. Super. Ct. Law Div.), Consent Judgment (Dec. 12, 2013), https://www.nj.gov/dep/passaicadrec3/docs/njdepvocc/10-consent-judgment.pdf.

pollution in the region, the facility and an adjacent lot were designated OU1. The settlement here concerns OU2 and OU4. OU2 is the lower 8.3 miles of the River, while OU4 is the broader 17-mile tidal reach that includes OU2, extending from Newark Bay to the Dundee Dam. JA456-58. Diamond Alkali's facility is adjacent to OU2. *Id.*; *see* JA863.[6]

*OU2.* In devising a cleanup strategy, EPA beginning in 2002 approached the 17-mile stretch as an integrated whole. JA460-62. But data showed that the lower 8.3-mile portion was especially contaminated and was contaminating the rest of the area, so EPA changed course to select a cleanup remedy to address OU2's contaminated sediments while continuing to study the larger area. JA460-62.

In March 2016, EPA issued a record of decision with its selected remedy for OU2, which EPA estimated will cost a total of $1.38 billion. JA464-65. Among other measures, EPA's remedy includes the construction of an engineered "cap" to cover the bottom of the River from one bank to the other. *Id.*

In addition to dioxin, EPA identified several other substances in Passaic sediment, including polychlorinated biphenyls (or "PCBs"), lead, copper, and mercury. *Id.* Because dioxin was more toxic than these chemicals "by an overwhelming margin," however, the unique risks of dioxin and the need to stop its

---

[6] OU3 is a portion of Newark Bay for which no remedial action has been selected. JA456-58.

spread shaped EPA's remedy. JA630-31. In particular, "[g]iven the high toxicity of dioxin, the consequences of dioxin breakthrough to human health and the environment are particularly serious," so EPA designed a cap that was "thicker and contain[ed] more additives" to "prevent [the chemicals] from breaking through." JA466.

*OU4.* EPA took a similar dioxin-driven approach in designing an interim remedy for OU4, finding that the "comingled" sediments merited an approach similar to OU2. JA414-18. In September 2021, EPA selected an interim remedy for the River's upper nine miles. JA465. That remedy targets dioxin through a process of selectively dredging and capping areas of the River. According to EPA, "[t]he OU4 interim remedy is intended to complement the OU2 remedy," *id.*, "resulting in cost efficiencies for parties conducting the remedial action," minimizing "disruption to the river ecology and [to] the many communities along the river," and "expedit[ing] recovery of the river," JA599. While "EPA may yet require a final remedial action for OU4," JA1646, EPA has included in the estimated $441 million cost of the OU4 interim remedy "long-term monitoring that will lead to a final record of decision" for the entire area, JA599-600.

13

While other parties worked with EPA voluntarily, EPA was forced to issue unilateral administrative orders commanding OxyChem to help clean up or fund the remediation efforts. In 2012, EPA ordered OxyChem to perform or pay for the remediation of a particular River segment where the dioxin contamination necessitated time-sensitive removal. *See* JA54. A group of other parties, including many Appellees here, voluntarily performed that work under an agreement with EPA. *Id.* OxyChem did not join the agreement—and the money it was eventually ordered to contribute was largely covered by its indemnitors. *Id.*; JA1274; JA1486. EPA had to issue another unilateral order in 2023, this time directing OxyChem to perform the remedial design for OU4's interim remedy under EPA oversight. JA599.[7]

### E.    EPA's Initiation of the Settlement Process and OxyChem's Refusal to Participate

In March 2016, EPA sent notifications to over 100 parties potentially responsible for OU2's contamination. JA466. EPA explained to parties that it was not "us[ing] the 'special notice' procedures of Section 122(e) of CERCLA," because EPA did "not believe that those procedures would facilitate an agreement or expedite remedial action at the Site." JA501.

---

[7] Unilateral Administrative Order for Remedial Design, CERCLA Dkt. 02-2023-2011 (Mar. 2, 2023), semspub.epa.gov/work/02/642227.pdf.

EPA proposed to hire a third-party neutral under the Alternative Dispute Resolution (ADR) Act, 28 U.S.C. §§ 571-584, to perform an "allocation," which would help EPA identify parties that could be eligible for settlement based on their relative responsibility. JA468-69, 471.

Among the parties that participated in the allocation were the 66 companies that comprise the Small Parties Group, Appellees here. Before this settlement, Appellees had, along with other parties, collectively spent more than $157 million in response costs under agreements with EPA. JA1604-05.

Just as it had refused to voluntarily participate in the 2012 cleanup, OxyChem refused to participate in the allocation. JA475. The United States made repeated overtures to OxyChem and attempted to address OxyChem's concerns in meetings and in writing. JA475-76. Those efforts failed. OxyChem instead initiated litigation against over 100 parties, which has now been pending since 2018. JA476; *Occidental Chem. Corp. v. 21st Century Fox Am., et al.*, No. 2:18-cv-11273 (D.N.J.); *Occidental Chem. Corp. v. Givaudan Fragrances Corp.*, No. 2:23-cv-1699 (D.N.J.).

### F.    The Allocation Process

An experienced third-party allocation firm called AlterEcho conducted the allocation, using an EPA-approved process the district court termed "multiphasic

and collaborative." JA9; *see* JA472-74. After assembling an extensive record, AlterEcho issued a draft Allocation Recommendation Report that proposed shares of responsibility using the "Gore factors" commonly used in allocating CERCLA liability. JA640. These factors consider each party's distinguishing features, the amount of hazardous waste involved, the degree of the waste's toxicity, the party's involvement in the production or disposal of the substance, the degree of care that the party exercised, and its cooperation with the government's efforts. *See Litgo N.J. Inc. v. Comm'r N.J. Dep't of Env't Prot.*, 725 F.3d 369, 387-88 (3d Cir. 2013).

Following party comments on a draft report, AlterEcho issued a final allocation report in December 2020. JA485. The report grouped parties into five tiers based on their relative responsibility, with OxyChem alone in the first tier bearing 99.94% responsibility. JA491. AlterEcho also provided calculations using an "alternative method" that took a different approach to "orphan shares"— quantities of chemicals that could not be attributed to one of the allocation parties. JA481-83. Whereas the primary method distributed those shares based on each party's total responsibility for all chemicals, the alternative method went chemical-by-chemical—meaning that a facility that contributed no PCBs, for example, would be given no shares for any unattributed PCBs. JA482-83.

With the allocation recommendation report as a "starting point," the United States and the settling parties began an eighteen-month, arm's-length negotiation process. JA491. As a part of these negotiations, the government considered the allocation's alternative method, which assigned a much lower share of responsibility to OxyChem (92%, a nearly 8% reduction). JA394-95; JA491. The United States also eliminated any consideration of two factors traditionally used in CERCLA allocations—culpability and cooperation—that would have substantially increased OxyChem's share. JA364. The United States then demanded that settling parties pay a 100% premium, *doubling* their share of the estimated $1.84 billion in OU2 and OU4 remedial action costs. JA419.

In the final agreement, memorialized in the consent decree with the United States, 82 settling parties agreed to pay $150 million—on top of over $157 million they and others had already contributed—representing hundreds of times more than their collective share of the site's cleanup costs.

## G.    Procedural History

In December 2022, the government filed a CERCLA complaint and lodged the proposed consent decree with the district court. That launched a 90-day public comment period, and 53 parties, including OxyChem, filed 25,000 pages of

17

comments and exhibits.[8] The government took nine months to carefully review those comments, produced a detailed response, and made several significant adjustments to address OxyChem's concerns—including by adding a "reopener clause" reserving the government's rights regarding settling parties' liability in the event of cost overruns. JA419-20.

In December 2024, the district court entered the modified consent decree. JA1-47. Following extensive briefing, the court held that the consent decree was "fair, reasonable, and consistent with CERCLA's goals." JA21 (quoting *Tutu Water Wells*, 326 F.3d at 207). The court emphasized that while its review "should not mechanically rubberstamp the agency's suggestions, neither should [it] approach the merits of the contemplated settlement de novo." *Id.* (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990)).

In finding the settlement to be procedurally fair, the court credited the "candor, openness and bargaining balance" of multi-year negotiations, where participants "were encouraged to shape the methodology, the process, and how

---

[8] OxyChem characterizes (Br.25) the public comments as "overwhelmingly negative," failing to mention the number of similarly worded comments that closely tracked misstatements made in OxyChem's anti-consent-decree advertising campaign. *Compare, e.g.,* JA1666-67 (OxyChem-sponsored article falsely criticizing decree for "letting 85 companies … off the hook," leaving "taxpayers and communities to bear a significant share"), *with* JA790, 793, 794-95, 797, 798, 801, 803, 807, 808, 809, 810, 811, 812, 813, 815, 816 (public comments using "off the hook" language); JA793, 794, 795 ("taxpayers bearing the burden"); JA791, 792, 796, 800-01, 804-06, 812, 814 (similar).

information was stored" and could "submit data, expert reports, and briefs to address the liability of themselves and other PRPs." JA21, 23. The court emphasized that OxyChem had "refused its seat at the table and waited until the allocation concluded to claim it was treated unfairly." JA25-26. Even "assuming … that OxyChem was prejudiced by failing to participate in the allocation, that is a risk it may have reasonably assumed." JA26.

Regarding substantive fairness, the court found that the government had adequately explained AlterEcho's allocation methodology and "adjustments the Government made to the allocation's results for the purposes of settlement." JA36. The settlement, moreover, extracted $150 million from the settling parties— "significantly more than their estimated liability"—that could be put to immediate use in cleanup efforts while preserving government enforcement resources to "focus on cleanup and more culpable offenders." JA39. The settlement contained "ample reservations of rights," the court explained, including a reopener provision triggering additional enforcement if costs exceed $3.68 billion, ensuring the public would be "satisfactorily compensate[d] … for the actual (and anticipated) costs of remedial and response measures." JA33-34, 39 (quoting *Cannons*, 899 F.2d at 90). The court also considered and rejected Nokia's arguments, which largely challenged "the Government's failure to settle with them on different terms." JA19.

The district court likewise rejected OxyChem's challenges under CERCLA § 122, emphasizing that "[t]he Attorney General … retains authority to enter settlements resolving CERCLA litigation," JA20-21, apart from the specific procedures § 122 creates. And the court found that, even if § 122's procedures governed, the consent decree did "not violate the portions of the statute" that OxyChem invoked. JA31.

The court ultimately found that the consent decree was "an important next step in holding these companies accountable for their acts and will further cleanup of the" Passaic River. JA47. The court accordingly ordered entry of the consent decree "without further delay." *Id.*

On October 23, Appellant filed a "supplemental corporate disclosure statement" stating that, as of September 30, OxyChem had "completed an internal corporate reorganization" and changed names. Dkt.114. Appellees requested information to determine the correct real party in interest. Appellant refused to provide it. *Supra* p.1 n.1.

## SUMMARY OF ARGUMENT

The district court properly concluded that the consent decree is procedurally and substantively fair, and § 122 provides no basis for upending it. OxyChem's and Nokia's challenges rest on unprecedented readings of CERCLA that disregard key statutory text and that would paralyze the settlement process that the statute was designed to facilitate.

I.      The government pursued this settlement not under § 122, but under its long-recognized inherent authority to craft cashout settlements. Section 122 generally—and § 122(e) and (f) specifically—apply to cleanup settlements. They do not apply to cashout settlements like this. Even if they applied, the plain text of these provisions renders them discretionary, directing that EPA "may"—not "must"—use them.

OxyChem's arguments that EPA was *required* to use § 122's procedures are not only wrong but, by § 122(a)'s express terms, "not subject to judicial review." This provision withdraws jurisdiction over challenges like OxyChem's. Nor can OxyChem evade the review bar by seeking to relabel EPA's discretionary decision *not* to use § 122 as an alleged *violation* of § 122. *See Dravo Corp. v. Zuber*, 13 F.3d 1222 (8th Cir. 1994). But even if § 122(e) or (f) applied and were mandatory, EPA complied with both: the third-party allocation was not a statutory "nonbinding preliminary allocation of responsibility," or NBAR; and the decree's covenant not

to sue does not impermissibly preclude future liability, and is cabined by a robust reopener provision that precludes any risk of a premature release.

**II.**     Appellate review of CERCLA settlements is "doubl[y]" deferential, giving weight both to EPA's technical expertise and to the district court's broad discretion. *Tutu Water Wells*, 326 F.3d at 207. The decree easily clears that bar. Settling parties, despite their minimal responsibility, agreed to pay $150 million to advance cleanup of the Passaic, in addition to $157-million-plus they, and other parties, had already paid toward remediation. The settlement followed years of arm's-length negotiations and a transparent allocation process, from which OxyChem voluntarily absented itself. The district court carefully reviewed the record, found the settlement procedurally fair and substantively sound, and correctly concluded it serves CERCLA's central goal: expediting remediation through settlement rather than yet more litigation.

OxyChem, whose predecessor's direct discharges of highly toxic dioxin defined this Superfund site, cannot credibly claim unfairness in a settlement that leaves it responsible for less than its full share. Its attacks on risk-based allocation, for example, ignore CERCLA's commonsense recognition that toxicity—not just volume—drives liability and remedy selection. Its rhetoric of judicial "abdication" disregards the deferential standard of review and the district court's thorough opinion. OxyChem fails to acknowledge that *every* decisionmaker that has

22

examined this issue has attributed the overwhelming, disproportionate share of risks—and costs—to OxyChem's dioxin discharges.

Nokia's objections boil down to dissatisfaction with not being included in this round of settlement—a decision that rests squarely within the government's enforcement discretion. Such arguments are both unripe and would provide no basis for invalidating a decree that equitably resolves liability for 80-plus parties and provides nine-figure funding for remediation. The district court's decision should be affirmed.

## ARGUMENT

### I. Section 122 Does Not Apply to this Settlement, and Provides No Basis for Setting Aside the Consent Decree

OxyChem's principal argument is that EPA failed to follow procedures in § 122(e) and (f) that restrict nonbinding allocations of responsibility and covenants not to sue. But OxyChem's § 122 arguments face several independent and insurmountable threshold hurdles. *First*, this settlement rests on the Attorney General's inherent settlement authority, not § 122—and § 122 by its express terms does not apply to cashout settlements like this one. *Second*, even where § 122's procedures apply, the statute expressly makes them *optional*—and EPA's decisions about whether to use them are not subject to judicial review. *Third*, even if § 122(e) or (f) covered this settlement, there was no violation of either provision. The

23

district court was correct that § 122 provides no basis to discard this settlement. JA28-34.

### A. This Consent Decree Was Negotiated Under the Attorney General's Inherent Authority, Not § 122

The government pursued settlement and sought approval of the consent decree in this case under the Attorney General's inherent authority to settle litigation, wholly apart from § 122. And the cashout settlement at issue here was not governed by § 122 in the first place.

**1.** OxyChem does not dispute that the Attorney General has inherent authority to settle litigation on behalf of the United States. This power derives in part from 28 U.S.C. § 516, which provides that, "[e]xcept as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General." This overarching authority to supervise litigation includes the authority to "settle litigation." *The Attorney General's Role as Chief Litigator for the United States*, 6 Op. O.L.C. 47, 59 (1982) (citing 38 Op. Att'y Gen. 124 (1934)); *see Swift & Co. v. United States*, 276 U.S. 311, 331-32 (1928).

The Department of Justice has long recognized "the Attorney General's inherent authority to settle" CERCLA cases, notwithstanding § 122. DOJ & EPA, Mem., *Defining "Matters Addressed" in CERCLA Settlements* 10 (Mar. 14, 1997).

24

And DOJ has routinely used that inherent settlement authority, both before and after § 122's enactment. *United States v. Seymour Recycling Corp.*, 554 F. Supp. 1334, 1336 (S.D. Ind. 1982); *United States v. ASARCO, Inc.*, 814 F. Supp. 951, 957 (D. Colo. 1993); *United States v. Pesses*, Civ. A. No. 90-654, 1994 WL 741277, at *12 (W.D. Pa. Nov. 7, 1994); *Ariz. v. Components Inc.*, 66 F.3d 213, 216 (9th Cir. 1995); *United States v. Atlas Lederer Co.*, 494 F. Supp. 2d 629, 639 (S.D. Ohio 2005); *In re ASARCO LLC*, No. 05-21207, 2009 WL 8176641, at *46 (Bankr. S.D. Tex. June 5, 2009).

**2.** OxyChem contends that § 122 limits the Attorney General's inherent settlement authority, that all CERCLA settlements must comply with § 122, and that § 122(e) and § 122(f) accordingly govern this settlement. These arguments are irreconcilable with § 122's plain text. Congress must provide a "clear and unambiguous directive" if it wishes to diminish the Attorney General's inherent power to settle litigation. *United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir. 1992) (citing *United States v. Morgan*, 222 U.S. 274, 282 (1911)). Congress clearly indicated the opposite.

To start, § 122's text does not even *contain* procedures for the type of settlement at issue here—a cashout settlement. As its very first sentence explains, § 122 authorizes agreements with private parties "to perform any response action." 42 U.S.C. § 9622(a). Those are "cleanup" agreements—"agreements to do work."

25

*Occidental*, 200 F.3d at 147. Subsections (b) through (f) then establish discretionary procedures to facilitate these cleanup settlements. And subsections (g), (h), and (j) provide additional procedures that EPA may use in a few other discrete categories of settlements—namely, "de minimis" response-cost settlements (§ 122(g)), "administrative" cost-recovery settlements (§ 122(h)), and settlements concerning damage to natural resources (§ 122(j)). No one contends that any of those provisions govern here.

By contrast, § 122 does not address "'cash out' settlements" like this, "in which a party pays a portion of the past, or future, response costs in exchange for a release from liability." *Occidental*, 200 F.3d at 147. That makes sense, because the purpose of § 122 is to "'facilitate' negotiated settlements leading to supervised cleanups." Brief for the United States at 41, *Atlantic Res. Corp.*, 551 U.S. 128 (quoting 42 U.S.C. § 9622(a)).

In contrast to "supervised cleanups," cashout settlements are a foundational type of litigation settlement long available under federal law; there was no need for Congress to create specialized procedures to "facilitate" them through § 122. To the contrary, Congress specifically pointed to successful settlements outside of § 122 and emphasized that "[n]othing in new section 122 of CERCLA should be construed to restrict or prohibit such settlements." H.R. Rep. 99-253, pt. 3, at 30.

26

**3.**   The two provisions of § 122 that OxyChem invokes—subsection (e), which addresses so-called "non-binding preliminary allocations of responsibility," or NBARs, and subsection (f), which addresses covenants not to sue—only confirm that § 122 does not apply to cashout settlements.

Subsection (e)'s NBAR provisions are specific to cleanup settlements. Subsection (e) deals with "agreement[s] with potentially responsible parties *for taking response action*." 42 U.S.C. § 9622(e)(1) (emphasis added). When EPA provides an NBAR, it must also provide "a written explanation" if the parties provide "a substantial offer *providing for response*" that EPA rejects. § 9622(e)(3)(E) (emphasis added). This provision does not cover settlements like this one, which do not compel—or even address—private remedial "action" or "response."

The same goes for § 122(f), whose optional provisions address "covenant[s] not to sue" for liability "resulting from a release or threatened release of a hazardous substance *addressed by a remedial action*." § 9622(f)(1) (emphasis added). These covenants require that the recipient is "in full compliance with a consent decree under" § 106 "for *response* to the release or threatened release concerned." § 9622(f)(1)(C) (emphasis added). Subsection (f)(3), which OxyChem invokes, makes clear that this provision is addressing covenants in cleanup settlements: the covenants shall not take effect until EPA "certifies that *remedial*

27

*action has been completed.*" (Emphasis added.) Cashout settlements like this one don't require settling parties to "complete[]" any "remedial action"; they require parties to *pay*. Neither provision can sensibly be read to cover this settlement, which rests on the Attorney General's authority, not § 122.

**4.** The sole appellate decision to address this question has held that "CERCLA § 122 does not clearly and unambiguously limit the Attorney General's plenary authority over the control and conduct of litigation in which the United States is a party." *Hercules*, 961 F.2d at 799. The Eighth Circuit explained that § 122 is an "affirmative grant of settlement authority" to the President's delegee, not a "limitation on the power of the Attorney General to settle litigation." *Id.* at 800. It accordingly rejected a nonsettling party's argument that the government's "cost recovery" settlement violated "provisions of CERCLA § 122." *Id.* at 795, 799-800.

*Hercules* emphasized the disconnect between § 122's text and cashout settlements. The limitations "in subsections (a) through (f) … consistently refer to agreements for actual remediation action as opposed to agreements for the recovery of costs occasioned by environmental damage." *Id.* at 799. Those provisions thus contained no "clear and unambiguous limitation on the Attorney General's plenary ability to enter into settlements of cost recovery litigation." *Id.* Other courts have picked up this distinction, recognizing that "Section 9622(a)

28

through (f) refer only 'to actual remedial actions as opposed to agreements for the recovery of costs occasioned by environmental damage.'" *Ariz. v. Components Inc.*, 66 F.3d 213, 216 (9th Cir. 1995) (quoting *Hercules*, 961 F.2d at 799).[9]

OxyChem attempts to distinguish *Hercules* on the theory that it did not settle remediation claims, just cost-recovery claims. OxyChem.Br.39. OxyChem is simply wrong. The *Hercules* consent decree, just like the consent decree here, required only the payment of money—but it *extinguished all claims* for "abatement costs, removal costs, remedial costs, and all other response costs," including claims for "injunctive relief." *United States v. Vertac Chem. Corp.*, 756 F. Supp. 1215, 1224 (E.D. Ark. 1991), *aff'd sub nom. Hercules*, 961 F.2d 796. Section 122 does not apply, and OxyChem's procedural arguments can be rejected on that basis alone.

### B. Section 122's Procedures are Discretionary Even When They Do Apply, and the Court Lacks Jurisdiction to Review the Government's Exercise of Discretion

Even if § 122(e) and (f) had anything to say about this cashout settlement, what they say is that their measures are *discretionary*. To the extent OxyChem contends that EPA was required to follow them, § 122(a) precludes judicial review of that argument.

---

[9] OxyChem cites (Br.39) a district court's determination that a particular CERCLA case had not been settled "pursuant to the inherent authority of the Attorney General." *United States v. S. Jersey Clothing Co.*, 976 F. Supp. 2d 577, 589 (D.N.J. 2013). That fact-specific conclusion depended on the record being devoid of reference to the Attorney General's settlement authority. *Id.* at 590.

### 1. Section 122(e) and (f) are optional procedures.

Section 122's text, structure, and history confirm that its procedures are optional, not mandatory. The first subsection—§ 122(a)—makes that clear. It states that the President, "in his discretion, *may*" use § 122's procedures and that he may "decid[e] *not* to use the procedures in this section." 42 U.S.C. § 9622(a) (emphasis added). Section 122 uses discretionary language in the particular provisions OxyChem invokes—stating that EPA "may … provide" an NBAR to expedite settlements, § 9622(e)(3), and "may ... provide any person with a covenant not to sue," § 9622(f)(1). And Congress repeatedly stated that the procedural requirements described in § 122 only apply to "an agreement under this section," *e.g.*, § 9622(a), (b)(1), (c)(1), (d)(1)(A), (d)(3), (j)(2), confirming that the provisions have no effect on other settlement agreements. OxyChem's theory that *every* settlement must comply with § 122 makes all of this discretionary language meaningless.

Section 122 also repeatedly recognizes the continued viability of non-§ 122 settlements. In the 1986 law creating § 122, Congress added specific provisions for contribution protection for those settling under § 122. *E.g.*, § 9622(g)(6). But in the same law, Congress also added a catch-all provision—in § 113—providing contribution protection for any "person who has resolved its liability to the United States … in an administrative or judicially approved settlement," whether under

30

§ 122 or not. Pub. L. No. 99-499, title I, § 113(b), 100 Stat. 1647-48 (Oct. 17, 1986). At the same time, Congress required the President to disclose certain changes to remedial plans following "any settlement or consent decree under section 9606 of this title *or* section 9622 of this title"—a disjunctive statement that would make no sense if, as OxyChem posits, § 9622 were CERCLA's *sole* provision governing settlements. § 9617(b)(3) (emphasis added); *see* 100 Stat. 1655.

Congress has since enacted other dispute-resolution tools outside of CERCLA, reaffirming that § 122 is not the be-all and end-all of CERCLA settlements. That includes the ADR Act, which EPA used here in enlisting AlterEcho to conduct the preliminary allocation, and which generally authorizes agencies to use voluntary "dispute resolution proceeding[s]" with third-party neutrals. 5 U.S.C. § 572(a).

### 2. Section 122 expressly bars judicial review of EPA's choice not to use its procedures.

OxyChem nevertheless contends that EPA was required to follow § 122's procedures and "disregard[ed]" them. OxyChem.Br.30. As explained, there were no procedures to "disregard" because § 122 is both inapplicable to cashout settlements and optional on its face. But the Court need not even decide those questions. That is because the agency's decision whether to use § 122's settlement procedures is not only discretionary, but unreviewable.

**a.** Section 122(a) provides that "[a] decision of [EPA] to use or not to use the procedures in this section *is not subject to judicial review*." 42 U.S.C. § 9622(a) (emphasis added). Statutes providing that matters are "not subject to judicial review" have "jurisdictional status." *Riley v. Bondi*, 145 S. Ct. 2190, 2202 (2025).[10]

Section 122(a)'s judicial review bar necessarily encompasses OxyChem's claims that the government failed to comply with specific provisions of § 122—because that is just another way of second-guessing the government's decision "not to use" § 122's procedures. § 9622(a). In *Dravo Corp. v. Zuber*, 13 F.3d 1222 (8th Cir. 1994), a company found liable for cleanup costs sought contribution from several entities that had previously settled with EPA under §122's procedures governing "de minimis" settlements. *Id.* at 1225 (citing § 9622(g)). The company claimed that the settling parties did not "qualify[] for a de minimis settlement" because they had "contributed to the contamination of the site in more than a de minimis way." *Id.* at 1227.

The Eighth Circuit held that § 122(a) precluded judicial review of that argument. "The EPA's decision that the defendants were eligible for the de

---

[10] Appellees asserted below that § 122's procedures were inapplicable, but did not specifically invoke § 122(a)'s judicial review bar. This Court may nevertheless affirm based on § 122(a)'s bar for two independent reasons. First, the bar is jurisdictional, meaning the Court must address it regardless of whether the parties did. *Riley*, 145 S. Ct. at 2201. Second, no party *waived* reliance on § 122(a), and this Court "may affirm on any ground supported by the record." *TD Bank N.A. v. Hill*, 928 F.3d 259, 276 n.9 (3d Cir. 2019).

minimis agreement," the court explained, was "a necessary precondition for such an agreement and is thus itself a decision 'to use or not to use' the de minimis procedures" of § 122. *Id.* For that reason, "the explicit language of" § 122(a) "specifically preclude[d] judicial review." *Id.* Bolstering this conclusion was § 122's "structure," which "generously gives the President discretion to use settlement mechanisms," and the "objective of CERCLA's settlement provisions, which is to allow expedient and efficient settlements of potential liability." *Id.* Together, those indicators made "clear that Congress did not authorize judicial review of the issues [the company] wants reviewed here." *Id.*

**b.** Section 122(a) precludes judicial review of OxyChem's procedural challenges. OxyChem asserts that EPA "failed to comply with the procedural requirements of CERCLA § 122." OxyChem.Br.29 (capitalization altered). But EPA's compliance or noncompliance with § 122 boils down to "a decision 'to use or not to use' the procedures" of § 122—for which § 122(a) "specifically precludes judicial review." *Dravo*, 13 F.3d at 1227.

Specifically, OxyChem asserts that the government violated § 122(e)'s NBAR procedures by having a third party prepare an allocation and then using that allocation as the basis for the ultimate settlement. But that is nothing more than a challenge to EPA's decision "not to use the procedures in this section," *see* § 122(a), namely, "the procedures in" § 122(e) governing NBARs.

Likewise, OxyChem asserts that the consent decree's covenant not to sue violates § 122(f) because the covenant purportedly "take[s] effect" before EPA has "certifie[d] that [the] remedial action has been completed." 42 U.S.C. § 9622(f)(3). This, too, is merely a claim that EPA should have "use[d] the procedures in" § 122(f) and failed to do so. And while § 122(c)(1) permits judicial review "in the consent decree process *under subsection (d)* of any covenant not to sue contained in an agreement *under this section*," that limited exception to the judicial review bar does not apply here. The consent decree is not "under" § 122, and that decision "not to use" § 122 is unreviewable. And the cashout consent decree here certainly is not "under subsection (d)," which by its terms exclusively covers consent decrees ordering "cleanups" or abatement actions. § 9622(d).

OxyChem, of course, characterizes its arguments as identifying "violations" of § 122, OxyChem.Br.32, rather than decisions "not to use" § 122's procedures. But *any* decision not to employ § 122's settlement procedures could be styled as a supposed violation of those procedures. That was true in *Dravo*, where the challengers contended that other parties "were not *eligible* for a de minimis agreement" under § 122. 13 F.3d at 1227 (emphasis added). Under § 122(a), what matters is whether the substance of the claim ultimately requires a court to decide whether EPA "use[d]" or did "not … use" those procedures.

34

###### 3.    OxyChem's policy arguments cannot overcome § 122's plain text.

OxyChem makes no effort to explain how § 122's procedures could be mandatory notwithstanding their facial inapplicability, their nonbinding language, and their express preclusion of judicial review. OxyChem instead argues that § 122's procedures *should be* mandatory to avoid a "get-out-of-CERCLA-free card." OxyChem.Br.38.

But "'even the most formidable policy arguments cannot overcome a clear statutory directive.'" OxyChem.Br.36 (quoting *BP P.L.C. v. Mayor & City Council of Balt.*, 141 S. Ct. 1532, 1542 (2021)). As with other "jurisdiction-stripping statute[s]" whose "plain meaning" forecloses review, § 122 "clearly indicate[s] that judicial review" of EPA's discretionary decision whether to follow § 122's procedures "is precluded." *Patel v. Garland*, 596 U.S. 328, 347 (2022).

OxyChem's policy objections are also overstated. Preclusion of judicial review "does not leave affected parties such as [OxyChem] completely without recourse." *Dravo*, 13 F.3d at 1228. All CERCLA consent decrees—under § 122 or otherwise—are reviewable prior to their entry to ensure they are "fair, reasonable, and consistent with CERCLA's goals." *SEPTA*, 235 F.3d at 823. OxyChem's challenges under this standard, while wrong, are judicially reviewable. And the government provided for public comment here, reaffirming the procedural fairness of the decree.

OxyChem also argues (Br.37-38) that the government has invoked § 122 in this consent decree. But OxyChem's descriptions of the consent decree are simply inaccurate. For example, the consent decree's covenant-not-to-sue provision does not "refer[] to §122," or describe itself as a "covenant[] not to sue pursuant to §122(f)," OxyChem.Br.38. Quite the contrary, the decree's covenant states that the United States "covenants not to sue … under Sections 106 and 107(a) of CERCLA," without mentioning § 122 once. JA62. The title of the *Federal Register* notice OxyChem cites (Br.37) says nothing about § 122 and just references CERCLA in general. And the requirement that settlors "fully comply with any and all EPA requests for information under Sections 104(e) and 122(e)," JA66, just means that *if* EPA invokes § 122(e) in the future to issue an information-gathering subpoena to facilitate future settlements, the settling parties will comply. That language does not suggest that EPA *already* sent a subpoena under § 122(e) to facilitate the settlement.

Nor did the government invoke the NBAR procedures. As OxyChem concedes, EPA at the outset of the settlement process expressly notified parties that it was *not* using § 122's procedures regarding NBARs. *See* OxyChem.Br.15. OxyChem notes that the government later described the AlterEcho allocation as a "non-binding allocation of responsibility." OxyChem.Br.34 (quoting JA346). Yet again, OxyChem omits key context. EPA used that generic description—*not* the

36

term of art used in § 122(e)—in response to OxyChem's argument that EPA had imposed a "*binding* allocation." JA346 (emphasis added). On the very next page of the cited document, the government expressly stated that the allocation recommendation "is not a NBAR as that term is used in Section 122(e)(3) of CERCLA." JA347. The government went on to discuss at length the "several differences between an NBAR and the allocation supporting the proposed settlement in this case." JA348.

### C.    The Process Here Accorded with § 122 in any Event

Even if § 122(e) and (f)(3) applied to cashout settlements, and even if the provisions were mandatory despite § 122(a)'s statements that they are discretionary, and even if the Court had jurisdiction to review the government's decision not to use § 122 despite § 122(a)'s statement that it doesn't, OxyChem's arguments would still fail. As the district court concluded, the consent decree did not violate § 122(e) or (f)(3).

### 1.    The allocation report was not an NBAR.

Section 122(e) provides that EPA "may, after completion of the remedial investigation and feasibility study, provide a nonbinding preliminary allocation of responsibility [commonly abbreviated "NBAR"] which allocates percentages of the total cost of response among potentially responsible parties at the facility." 42 U.S.C. § 9622(e)(3)(A). OxyChem argues that EPA violated this provision by

hiring a third-party neutral to prepare an initial report and then by citing that third party's allocation in explaining the settlement to the court.

But § 122(e)'s provisions do not preclude the use of other forms of allocations. Indeed, contrary to OxyChem's depiction of these provisions as foundational, NBARs are exceedingly rare. Only a handful have ever been completed, with the Eighth Circuit decision OxyChem cites (Br.40) being one of the rare examples. *See United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1014-15 (8th Cir. 2002). By contrast, CERCLA consent decrees are routinely approved based on other types of allocations. In *Tutu Water Wells*, for example, a Virgin Islands official (with EPA's help) "prepared a spreadsheet to allocate fault percentages to the various parties," without following any NBAR procedures. 326 F.3d at 206.

The neutral's original report was not an NBAR within the meaning of § 122(e). EPA specifically told parties during the settlement process that it would *not* be preparing an NBAR. *Supra* p.14. The report was prepared "by a third-party neutral, not EPA." JA31-32; *see* 42 U.S.C. § 9622(e)(3)(A) ("[EPA] may … provide a[n NBAR]"). And the government modified the allocation in significant ways that benefitted OxyChem.

OxyChem (Br.33) deems this reasoning "circular," analogizing it to an agency that claims that its violation of the APA's notice-and-comment rulemaking

requirements renders the agency's action "something other than a rulemaking." OxyChem.Br.33. But the district court did not, as OxyChem claims, hold that "an NBAR ceases to be an NBAR if EPA fails to follow the statutory requirements for preparing one." *Id.* The court instead looked to the text of § 122(e), and to the report that the third-party allocator prepared in this case, and concluded that the report is not what the statute describes—no different from a court examining an agency document and deciding it wasn't a "rule" as that term is defined in the APA. 5 U.S.C. §§ 551(4), 553.

Even on the erroneous assumption that the report here was an NBAR, OxyChem identifies no actual violation of § 122(e). OxyChem contends that the report was impermissibly used "as evidence in a[] proceeding" in violation of § 122(e)(3)(C). But that restriction, akin to Federal Rule of Evidence 408, ensures that when EPA prepares NBARs, particularly with its subpoena powers, the allocation itself cannot be used to show liability. That is not what happened here. The report provided an initial basis for assessing relative responsibility, which EPA then independently reviewed as it negotiated the actual settlement embodied in the consent decree. Nor was the report used as "*evidence.*" As controlling precedent requires, the district court reviewed the proposed consent decree to determine whether it was fair, reasonable, and consistent with CERCLA's goals.

39

The district court was not reviewing the initial allocation that OxyChem tries to claim was an NBAR.

If OxyChem were correct, the NBAR provision would make consent decrees impossible and make § 122 self-defeating. The government must use some sort of allocation process to settle claims with multiple parties. But under OxyChem's conception of § 122(e), once the parties relied on that allocation in crafting a settlement, the resulting decree would *necessarily* be invalid: According to OxyChem, that allocation would count as an NBAR, and that NBAR would be "evidence" supporting entry of the decree. Ironically, under this same theory, OxyChem's attack on the allocation would be *barred* by § 122(e)'s command (which OxyChem ignores) that "no court shall have jurisdiction to review the" NBAR.

### 2.    The covenant not to sue is consistent with § 122(f)(3).

OxyChem also attacks the consent decree's covenant not to sue under § 122(f)(3), which provides: "A covenant not to sue concerning future liability to the United States shall not take effect until the President certifies that remedial action has been completed in accordance with the requirements of this chapter at the facility that is the subject of such covenant." The decree's covenant does not violate this requirement, for three reasons.

40

*First*, as explained, § 122(f) only governs covenants not to sue in agreements where the private party is performing the remedy. *Supra* pp.27-29; *see* § 9622(f)(1)(C). It does not apply to cashout settlements like this one.

*Second*, the "*future* liability" at issue in § 122(f)(3) is future liability stemming from a cleanup. Section 122(f)(1) concerns covenants not to sue that cover "any liability …, including future liability," resulting from a release "addressed by a remedial action." § 9622(f)(1). Section 122(f)(3) refers to that same "future liability" described in § 122(f)(1)—future liability *for a remedial action*. EPA has explained that the term "[f]uture liability refers to a responsible party's obligation to perform any additional response activities at the site which are necessary to protect public health and the environment." EPA, *Superfund Program; Covenants Not to Sue*, 52 Fed. Reg. 28038, 28040 (July 27, 1987).

Future liability, for § 122(f) purposes, thus contemplates the *settling party* performing "response activities" (or "remedial action[s]"). The point is to ensure that the government has recourse—and the public is not left holding the bag—if it turns out that the response action is insufficient to remediate the site. Here, however, the settling parties are not performing any remedial actions that could give rise to future liability. While the government is agreeing not to sue the settling parties in the future (subject to the reopener discussed below), it is not giving up

41

any rights to sue for future liability stemming from any settling party's "remedial action[s]" under § 122(f)(1). There are no such actions in a cashout settlement.

EPA's regulations, moreover, make clear that "[i]n the context of [§] 122(f)(3), EPA interprets completion of the remedial action as that date at which remedial construction has been completed." 52 Fed. Reg. at 28041. Both the statute and EPA's implementation envision that EPA will be *reviewing* a settling party's remedial work and certifying when it believes that work is "completed." That is impossible if the settling party does no work. In short, § 122(f)(3) does not apply because this covenant does not deal with "future liability" within the meaning of § 122(f)(1) and (f)(3).[11]

*Third*, even accepting OxyChem's convoluted efforts to apply § 122(f) to this covenant, the covenant does not close the door on additional liability before "remedial action has been completed." 42 U.S.C. § 9622(f)(3). As the district court explained, the settling parties will not be "'off the hook' for future liability" to EPA until, at the earliest, "both the OU2 and OU4 remedies have been completed

---

[11] OxyChem confuses matters by focusing (Br.36-37) on whether the "final remedy" for OU4 has "been selected" and whether the "final remedy for OU2" is "complete." Under the consent decree, those questions do not alter the *settling parties' liability*, which is what matters under § 122(f). Indeed, the fact that selection for OU4 is not complete only confirms that applying § 122(f) makes no sense in this context: The consent decree does not contemplate that EPA will "certify" "complet[ion]" of a yet-to-be selected remedy, but rather provides that the settling parties will pay toward EPA's remediation based on costs it has already estimated.

and EPA has a complete accounting of response costs." JA34. That is because the decree contains a "reopener" reserving the government's rights to pursue additional liability if cleanup costs exceed expectations. *Id.* The decree also contains provisions conditioning the covenant not to sue on "satisfactory performance," and on the "veracity and completeness of the information provided," by the settling parties. *Id.*

OxyChem's suggestion (Br.35-37) that the district court found a violation of § 122(f) and excused it based on CERCLA's "intent" or "purposes" is thus incorrect. OxyChem cites (Br.35) the district court's statement that the covenant's "Effective Date" was "technically" before EPA's certification that remedial action is complete. But the district court made that passing statement on its way to finding that the decree does *not* violate § 122(f). The court pointed to the reopener and other provisions ensuring that, "despite the Covenant's Effective Date"—*i.e.*, the fact that the consent decree became effective upon entry—the covenant could not finally preclude liability to EPA until remedies are complete. JA34. That is all § 122(f)(3) requires—even if it did apply.

## II. The District Court Did Not Abuse Its Discretion by Approving the Consent Decree

Neither OxyChem nor Nokia provides any basis for disturbing the court's conclusion that the consent decree was fair and reasonable, especially given the highly deferential standard of review applicable here. The $150 million settlement is more than fair to OxyChem. And Nokia's arguments, which center on the government's decision not to settle with it *yet*, attack discretionary decisions, are largely unripe, and provide no basis for setting aside valid settlements with others.

### A. Appellate Review of Orders Entering Consent Decrees is Doubly Deferential

"Appellate review" of the entry of a consent decree "is 'encased in a double layer of swaddling.'" *Tutu Water Wells*, 326 F.3d at 207 (quoting *SEPTA*, 235 F.3d at 822). "First, there is deference to the administrative agencies' input during consent decree negotiations and the law's policy of encouraging settlement." *Id.* "Where the appropriate agency has reviewed the record and has made a reasonable determination of fault and damages, that determination is owed some deference." *Id.* (citing *Cannons,* 899 F.2d at 90). "Second, there is deference accorded the District Court under an abuse of discretion standard." *Id.* "Parties challenging a district court's discretion bear a 'heavy burden,'" and this Court "will not upset the [district] court's judgment unless those parties demonstrate the court committed a

44

material error of law or a 'meaningful error in judgment.'" *Id.* (quoting *Cannons*, 899 F.2d at 84).

Thus, the ultimate question on appeal is whether, applying a deferential standard, the district court abused its discretion in finding the consent decree "fair, reasonable, and consistent with CERCLA's goals." *Id.* That inquiry depends on "procedural and substantive considerations," namely, to ensure the negotiations "t[ook] place at arm's length," and to ensure that the settlement rested "on a rational determination of comparative fault," "whether or not [the court] would have employed the same method of apportionment." *Id.* (quoting *SEPTA*, 235 F.3d at 823).

## B. The Consent Decree is Fair, Reasonable, and Consistent with CERCLA's Goals

OxyChem and Nokia largely ignore these deferential standards. Under them, there is no basis for disturbing the district court's conclusion that the consent decree here was fair, reasonable, and consistent with CERCLA's goals. Across dozens of pages of its opinion, the court canvassed the settlement process, the consent decree, and OxyChem's and Nokia's procedural and substantive objections, which it found lacked merit. The court relied on a significant factual record developed over many years showing the site's contamination to be driven overwhelmingly by OxyChem's intentional discharges of highly toxic dioxin.

The court rejected OxyChem's arguments that the settling parties underpaid, explaining how "[d]ozens of PRPs—sophisticated, resourced, and represented by counsel—negotiated over the course of several years." JA23. The court highlighted that OxyChem "was invited to participate in the allocation and could have challenged many of [its] alleged insufficiencies in real time," and yet repeatedly forewent that opportunity. JA25. And it emphasized that, of the various contaminants of concern, "dioxin is, 'by an overwhelming margin,' the most toxic." JA4 (quoting JA630-31).

The court also explained why it was improper for OxyChem and Nokia to focus solely on the initial allocation, underscoring that the court's review accounted for "adjustments the Government made to the allocation's results for the purposes of settlement." JA36. The government had adequately explained "the strategic and highly complex choices AlterEcho made during the allocation and the Government's adjustments to it, including, for example, the Government's well-considered choice to extend the [decree] to OU4." JA37.

The district court considered and rejected Nokia's arguments that "bemoan[ed] the Government's failure to settle with them on different terms." JA19. As the court explained, although consent decrees "must be fair to non-settlors," "fairness does not require inclusion in the settlement." JA45 (citing *Cannons*, 899 F.2d at 93).

46

### C.    OxyChem's Objections Lack Merit

OxyChem's brief is long on overheated rhetoric and short on showing any abuse of discretion. Repeatedly calling the settlement "absurd" (Br.20, 42, 46, 47) or accusing the district court of an "abdicat[ion]" of the judicial role (Br.3) does not make it so. The court properly rejected OxyChem's arguments because they misstate the record and the law.

*Risk-based allocation.* As in the district court, OxyChem challenges the settlement almost exclusively based on the *report* prepared by AlterEcho to facilitate settlement negotiations. Not until fifty-five pages into its brief does OxyChem finally address EPA's substantial changes to that report's recommended allocation made during the settlement process—changes that played a major role in the district court's ultimate decision to approve the settlement. JA36-39; *supra* p.19.

Regardless, OxyChem's critiques of the report (not to mention the actual settlement) are misplaced. OxyChem primarily renews its contention that the report used a flawed methodology: namely, using health and environmental *risks* rather than cleanup costs to apportion liability. To start, dioxin's extraordinarily disproportionate risk to human health *also* contributes disproportionately to the *cost* of remedying those risks: EPA explained that "the main cost driver for" its "remedial design" is dioxin. JA380. In particular, EPA explained that *because* "the

47

consequences of dioxin breakthrough to human health and the environment are particularly serious," the remedy needed to be designed "with a high level of conservatism"—in that, for instance, "the cap will have to be thicker and contain more additives to bind to the [contaminants] to prevent them from breaking through the cap." *Id.* (citing JA466). OxyChem ignores this point entirely.

Regardless, "[t]here is no universally correct approach" to determining comparative fault in a settlement. *Cannons*, 899 F.2d at 87. Allocations depend on site-specific circumstances, with relevant factors including both the "amount of hazardous substance involved" and the "degree of toxicity of the hazardous substance involved." *Niagara Mohawk Power Corp. v. Chevron USA, Inc.*, 596 F.3d 112, 130 (2d Cir. 2010) (quoting S. Rep. 96-848, at 345-46 (1980)). And this Court has expressly recognized "toxicity of the hazardous waste involved" as a relevant factor for allocating liability. *Litgo*, 725 F.3d at 387.

Accordingly, risk-based allocations are common and accepted by scientists and courts alike. *See, e.g.*, *United States v. Acton Corp.*, 733 F. Supp. 869, 873 (D.N.J. 1990) ("It is beyond any real dispute that toxicity is an important factor that EPA may consider in entering into consent decrees."). That is particularly true when risk plays an outsize role in driving response activity at a site. *See Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 294 (5th Cir. 2010) (approving the expert allocator's "tailor[ing of the] algorithms to meet the specific

48

needs of this case" and noting that "the same effort is required of virtually all experts in environmental litigation").

OxyChem identifies no authority suggesting that allocations must be predicated on costs alone. It points (Br.46) only to this Court's decision in *Trinity Industries, Inc. v. Greenlease Holding Co.*, 903 F.3d 333 (3d Cir. 2018), which involved a contribution action rather than a settlement, and thus by statute required focusing on dividing "response costs among liable parties." *Id.* at 355 (quoting 42 U.S.C. § 9613(f)(1)). Settlements are governed by broader considerations: Fairness "requires that the terms of the consent decree are based on 'comparative *fault*,'" and reflect "rational estimates of the *harm* each party has caused." *Tutu Water Wells*, 326 F.3d at 207 (emphases added).

OxyChem ignores that the circumstances of this site are especially conducive to a risk-based approach. EPA explained over and over that, given dioxin's unique toxicity, the dioxin contamination is what defined the boundaries of the site, and the River may not have even been a Superfund site but for OxyChem's dioxin. *Supra* pp.12-13. Giving weight to these facts was not "punishment," as OxyChem says (Br.47), but a reasonable way to decide who should bear relative responsibility for cleanup measures necessitated by the risks OxyChem created.

49

***OxyChem's primary responsibility for dioxin.*** OxyChem also asserts (Br.50) that the report overestimated a portion of its contribution of dioxin. But OxyChem's *own expert* effectively reached the same conclusion about the allocation: that more than 99.8% of the dioxin in the River is attributable to OxyChem. *See* JA1839-40; JA730-35.

OxyChem misrepresents (Br.51) the allocation report as ignoring Givaudan Fragrances as a substantial source of dioxin to the River. But EPA carefully considered these same arguments—which OxyChem asserted numerous times throughout this process—and concluded that, "based on the supporting data in the allocation, [Givaudan] contributed min[u]scule amounts of dioxin compared to [OxyChem]'s predecessor." JA384-86; *see* JA436-39. Among other factors EPA identified, Givaudan used a different manufacturing process that produced less dioxin, and managed its wastewater on-site before connecting to the City of Clifton sewer by 1951—unlike OxyChem, which discharged dioxin and other dangerous chemicals directly into the River. JA385, 438. EPA's decision to distinguish Givaudan and OxyChem was well-supported.

***Less-toxic chemicals.*** Unable to minimize its responsibility for the highest-toxicity discharges, OxyChem plays up the *other* contaminants of concern polluting the River. To be clear: Dioxin is by far the most dangerous chemical here and OxyChem's dioxin discharges overwhelmingly drive the costs of this remedy.

But OxyChem did not *only* discharge dioxin. It released massive amounts of DDT and contributed measurable amounts of every single contaminant of concern. JA645; JA1159-72; *see Diamond Shamrock*, 609 A.2d at 447-48 (describing "mid-river 'mountain[s]'" of DDT that OxyChem employees "surreptitiously … chop[ped] up"). Pointing to other chemicals does not help OxyChem's case.

OxyChem also focuses extensively on AlterEcho's purported failure to "separate out and measure the risk of" a certain subcategory of PCB—"dioxin-like PCBs"—and instead to "lump[] all PCBs together for risk purposes." OxyChem.Br.49. But OxyChem's own pie chart (Br.49) confirms that *EPA* did not take this approach. EPA instead considered dioxin-like PCBs separately from "dioxins alone," and allocated responsibility with the unique risks of dioxin in mind. OxyChem.Br.50 (quoting JA1652-53). Those risks are severe: For OU2, "the human health cancer risk from dioxins alone (without dioxin-like PCBs), was identified as 70-82%." JA1652-53 (citing EPA, *Record of Decision: Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site* 29 (Mar. 2016), https://semspub.epa.gov/work/02/396055.pdf).

OxyChem's other theme is to reference "staggering" estimates of chemicals like lead, copper, hydrocarbons, and mercury. OxyChem.Br.1, 13; *see id.* at 27-28, 42, 47. OxyChem yet again ignores that dioxin, compared to other chemicals, is

"by an overwhelming margin" the most toxic to humans and to the River's broader ecology. JA630-31; JA627-28 ("most toxic by far").

As EPA explained, dioxin harms organisms in the River at concentrations of just 0.0000032 parts per billion. JA631. For copper and lead, those numbers are between *30* and *32* parts per billion—a concentration some 10 million times greater. *Id.* Comparing copper to dioxin is like comparing aspirin to cyanide. Even at its relatively low volumes, dioxin alone "drives the risks to human health and the environment that are addressed by the remedies selected for OU2 and OU4." JA627-28.

OxyChem is also factually wrong in contending (Br.42) that it is being "saddle[d] … with virtually the entire cost of cleaning up" these volumes of other chemicals. The remedy selected for OU2—removing sediment and capping the River bed—was designed to meet EPA's remediation goals *specifically* for dioxin. *Record of Decision*, *supra*, at 44-45. The costs OxyChem is supposedly "saddle[d]" with, in other words, do not depend on lead, mercury, or copper; EPA is constructing a thicker, more-expensive cap to cover the River because *dioxin* is so uniquely toxic. *Supra* pp.12-13. OxyChem also fails to mention that it is separately pursuing multiple other non-settling parties in litigation. *Supra* p.15.

OxyChem also asserts (Br.1, 10, 42) that the River's aquatic life was eliminated as of 1926. If OxyChem's suggestion is that there was no damage left

for it to cause, that is wildly inconsistent with the record. The discovery of dioxin in 1983—after decades of OxyChem's dumping dioxin, DDT, and other chemicals into the water—triggered advisories not to consume fish or crab in the River, confirming that there was aquatic life when OxyChem was polluting the River and that OxyChem's discharges were contaminating it. *See* N.J. Exec. Order No. 40 (June 2, 1983); N.J. Dep't Env't Prot. Admin. Orders EO-40-17 (Oct. 19, 1983), EO-40-1 (June 1, 1983).

***Other parties' discharges.*** OxyChem's theory that the settlement "dramatically underestimated the responsibility of numerous other settling parties" (Br.51) rests on a welter of mischaracterizations and outright falsehoods.

For example, OxyChem's assertion that the share originally allocated to PPG Industries failed to account for pre-sewer system discharges simply is false. Prior to construction and connection to that system, PPG's predecessor's operations were connected to the City of Newark sewer. EPA acknowledged that prior sewer connection, and further acknowledged evidence showing that PPG's liquid wastes were hauled offsite for disposal. JA445-46. Yet EPA gave OxyChem every benefit of the doubt, performed calculations anew, and re-confirmed the propriety of treating PPG on par with other settling parties. JA446. It was hardly "inexplicabl[e]" that EPA, upon its independent review and recalculation, allowed

PPG to remain in the settlement and declined to increase the settlement amount. OxyChem.Br.51.

OxyChem's whole "list" of "underestimat[ions]" (Br.51) suffers from similar inaccuracies and omissions. While OxyChem speculates that Benjamin Moore's share of responsibility for PCB discharges should have been higher because PCBs were used in paints, EPA considered and rejected this same assertion, explaining that AlterEcho's estimate reflected soil concentration measurements of PCBs from Benjamin Moore's facility. JA426.

So too for OxyChem's assertions (Br.50-54) regarding EnPro Holdings, Legacy Vulcan, Montrose Chemical, and STWB. EPA considered and rejected these very arguments. *See* JA397, 432-33, 439-40, 446; *see also* JA1853-62. Besides its blithe assertion that EPA "paper[ed] over" flaws in the allocation report (Br.27), OxyChem provides no explanation (or even argument) about how EPA's review and response to these arguments in determining fault was *unreasonable*, as would be required to jettison these determinations on appeal. *Tutu Water Wells*, 326 F.3d at 207. The (erroneous) ruling OxyChem cites regarding Cooper Industries was an interlocutory order in a case since settled and dismissed. *Pub. Serv. Elec. & Gas Co. v. Cooper Indus., LLC*, No. 2:21-cv-13644, ECF 88 (D.N.J. Oct. 9, 2024). And while OxyChem complains that the allocation assigned little responsibility to General Electric, Otis Elevator, and Stanley Black & Decker

despite their facilities operating for years, the allocation accounted for discharges throughout each company's full history. JA481. The problem for OxyChem is that the toxicity of any discharges by these parties pales in comparison to OxyChem's. JA1180 (nearly all Stanley Black & Decker contributions were copper and lead); JA1143 (no dioxin, DDT, or PCBs from General Electric); JA1175 (same for Otis Elevator).

***The settlement's coverage of OU4.*** OxyChem also argues (Br.54-56) that the inclusion of OU4 in the settlement was arbitrary because the allocation only concerned OU2. But OxyChem ignores that EPA had assembled a massive record concerning the entire Lower Passaic River built over decades of study. *See* JA464 (referring to the "volumes of scientific and technical information" EPA gathered at the Site); JA595-97. Based on that record, the government identified key attributes shared between OU2 and OU4 that justified extending the analysis of the former to the latter, notwithstanding OxyChem's claim (Br.56) of "significant differences in th[eir] geography and hydrology."

While the upper 9 miles of the River within OU4 and the lower 8.3 miles within OU2 had "some different physical characteristics," EPA concluded that "tidal action and other forces" had taken chemicals discharged in OU2 and "transported" them "to the upper 9 miles"—and vice versa. JA415-16. "As a result," contaminated sediments "are now comingled and deposited throughout the

"17-mile" River. JA416. And the allocation also "included facilities along the" entire 17-mile stretch, "not just the lower 8.3 miles that comprise OU2." JA414. For those reasons, EPA explained, it was "appropriate … to apply the results of the OU2 allocation to resolve liability for OU4." JA415. OxyChem does not even attempt to engage with this reasoning.

***The district court's supposed "abdication."*** Finally, OxyChem repeatedly asserts (Br.3, 27, 45) that the district court "abdicat[ed]" its judicial role by deferring to EPA's scientific expertise. But the standard of review is deferential—and must be deferential for settlements to be a viable path for resolving liability. *Tutu Water Wells*, 326 F.3d at 207. The district court nonetheless gave the consent decree, and OxyChem's arguments, significant scrutiny. Across some dozen pages of its opinion, the court carefully addressed OxyChem's and Nokia's substantive fairness arguments—including those OxyChem claims (Br.43-44) that the court disregarded.[12] Disagreeing with OxyChem is not judicial abdication.

---

[12] For example, OxyChem claims (Br.44) that the court "refused to engage with" its argument that the AlterEcho report "made egregious mathematical errors," namely, via an "attenuation factor" that OxyChem claims unfairly decreased other parties' liability, JA1295-96. But as OxyChem acknowledged below, the government had *not* "support[ed] Batson's 'attenuation' factor." JA1296. And the district court specifically dealt with this "attenuation" argument, explaining how OxyChem's attacks on this and other features of the report were unpersuasive given the "adjustments the Government made to the allocation's results." JA35-36.

OxyChem's attempt (Br.28) to analogize the district court's review to *Chevron* deference is off-base. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), dealt only with agencies' interpretation of "the *law*." *Id.* at 392 (emphasis added). The district court did not defer to EPA's interpretation of CERCLA; it ensured the settlement is reasonable and fair while respecting the government's substantial authority and discretion to achieve settlements with private parties.

The Supreme Court's recent decision in *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497, 1512-13 (2025), reaffirmed that courts continue to defer to agencies on "issues of fact" and other "exercise[s] of agency discretion" like those inherent in settling a case. *Seven County* distinguished *Loper Bright* and gave "substantial deference" to the agency's judgments in completing an environmental impact statement, confirming that when agencies make "predictive or scientific judgments," judicial review is "at its most deferential." *Id.* at 1512 (quotation marks omitted).

There is no precedent supporting the intense scrutiny of CERCLA settlements that OxyChem envisions. If courts reviewed them afresh, it would effectively require full CERCLA merits trials in service of approving settlements, undercutting parties' incentives to negotiate and disrupting a statutory scheme explicitly predicated on encouraging settlements.

### D. Nokia's Arguments Are Meritless and Forfeited

Nokia primarily attacks the report's "tiering" methodology, which purportedly led the government not to settle with Nokia. Nokia Br.1-5, 19-23, 38-39. But this argument starts from a fatally flawed premise: The district court's approval of the consent decree did not depend on the accuracy of the report's assignment of Nokia to Tier 2. Rather, those tiering assignments were relevant only to the government's decision *whether* to settle with a party during this round of settlements.

As the district court recognized, settlement decisions are highly discretionary. Nokia does not, and cannot, contend the district court would have had authority to order the government to settle with Nokia, or to undo the settlement based on its failure to do so. After all, while CERCLA settlements must be fair and reasonable, the law does "not require the agency to open all settlement offers to all PRPs." *Cannons*, 899 F.2d at 93. Drawing "fine lines" and "structur[ing] the order and pace of settlement negotiations to suit, is an agency prerogative." *Id.*

To the contrary, the government has significant "expertise and discretion" to decide, based on "considerations of resource allocation, agency priorities, and costs of alternatives," how best to enforce CERCLA and other environmental statutes.

58

*Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1032 (D.C. Cir. 2007) (citing

*Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985)).

Moreover, the court made clear that it was making no findings regarding

non-settling parties' shares—or whether the allocation would be a reasonable basis

on which to settle the United States' claims against Nokia. While the government

had not "included [Nokia] in this round of [its] multi-phased settlement process," it

had "included Nokia … in the allocation process," and "plans to negotiate with

them in the future." JA46 (quoting JA1610). Any objections regarding the

application of the allocation to Nokia are thus simply not ripe. Nokia notably cites

no authority to the contrary—not a single case holding that a CERCLA settlement

can be upended based on the government's decision not to include a particular

party in that settlement.

Nokia also raises a host of new arguments that it failed to raise below,

including that individual shares of aggregate settlements were not disclosed (Br.27

n.25), that certain individual document productions during the settlement process

were insufficient (Br.15), and that AlterEcho improperly treated "the absence of

data" as reflecting "zero discharge" from that facility (Br.16). These arguments are

forfeited, and there is no basis for reviewing them "for the first time on appeal."

*Brown v. Philip Morris Inc.*, 250 F.3d 789, 799 (3d Cir. 2001).

Most notably, Nokia raises for the first time (Br.53-56) a constitutional argument that the settlement—really, the *non*-settlement with Nokia—amounts to an equal protection violation. Even if that argument were not forfeited, it is plainly incorrect. Selective prosecution requires not only that the government used some impermissible factor as the basis for its decision, but that it did so with an unconstitutional *motive*. Nokia's case law acknowledges this: a party must show the government engaged in "*invidious[]*" discrimination. *Washington v. Davis*, 426 U.S. 229, 239 (1976) (emphasis added). Nokia does not seriously contend it could make that showing.

60

## CONCLUSION

The Court should affirm.

Date: March 11, 2026

Respectfully submitted,

*s/ Joseph A. Greenaway Jr.*

<table>
<tr>
<td>

Jeffrey D. Talbert
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 W 55th Street
New York, NY  10019
Tel: (212) 836-8000
Fax: (212) 836-8689

John P. Elwood
Elisabeth S. Theodore
Samuel F. Callahan
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001
Tel: (202) 942-5000
Fax: (202) 942-5999

</td>
<td>

Joseph A. Greenaway Jr.
ARNOLD & PORTER
  KAYE SCHOLER LLP
One Gateway Center, Suite 1025
Newark, NJ  07102
Tel: (973) 776-1900
Fax: (973) 776-1919
joseph.greenaway@arnoldporter.com

</td>
</tr>
</table>

## COMBINED CERTIFICATIONS

## CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies pursuant to L.A.R. 28.3(d) and 46.1, that the lead attorney whose name appears on the foregoing brief is a member in good standing of the Bar of this Court.

## CERTIFICATE OF COMPLIANCE

1.    The foregoing brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 12,935 words.

2.    The brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Times New Roman 14-point font.

3.    Pursuant to L.A.R. 31.1(c), the text of the electronically filed brief is identical to the text in the paper copies.

4.    Pursuant to L.A.R. 31.1(c), a virus detection program, Microsoft Defender (version 1.439.472.0), has been run on the electronic file and no virus was detected.

**CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2026, I electronically filed the foregoing brief with the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 11, 2026

*s/ Joseph A. Greenaway Jr.*
Joseph A. Greenaway Jr.